# **EXHIBIT 5**

2/16/2024 Officers' Opposition to Motion to Intervene (Civil Rights Dkt. 70)

- o Attorney Certification of J. Brooks DiDonato in Support of Opposition to Motion to Intervene on Behalf of Defendants (Civil Rights Dkt. 70-1)

  - o A- 9/30/2020 Koury letter to Candace Jorden Claims Resolution

  - o B- 4/18/2023 Koury email to Brooks DiDonato cc Kyle Mitchell

  - o C- 1/13/2023 Koury letters to Jose Abo, Claims Resolution

  - o D- 8/23- 8/24/2023 Emails Koury/DiDonato

  - o E- 1/9/2024 DiDonato email to Koury cc Marc Board

  - o F- 12/5/2023 DiDonato letter to Koury

# PARKER McCAY

**Parker McCay P.A.**
9000 Midlantic Drive, Suite 300
P.O. Box 5054
Mount Laurel, New Jersey 08054-1539

P: 856.596.8900
F: 856.596.9631
www.parkermccay.com

**J. Brooks DiDonato, Esquire**
P: 856-985-4047
F: 856-494-1715
bdidonato@parkermccay.com

February 16, 2024

File No. 15108-91/ JBD

**The Honorable Magistrate Douglas E. Arpert**
**UNITED STATES DISTRICT COURT**
**US Courthouse/Clarkson S. Fisher Building**
**402 East State Street**
**Trenton, NJ 08608**

      Re:    **TYSHON EDWARDS v CITY OF TRENTON, ET AL**
                **Civil Action: 3:20-cv-13552-ZNQ-DEA**

Dear Magistrate Judge Arpert,

      As you are aware, I represented defendants, Johnathon Cincilla, Nicholas Mahan, Eric Avalos, and Anthony Kubish (collectively, the "Officers") with respect to the above matter and was instrumental in negotiating the proposed settlement to be heard by Your Honor on February 20, 2024, with counsel for the plaintiff. While the Officers have been dismissed without prejudice, counsel for the City of Trenton (the "City") has asked me to correct several misstatements made in the Motion to Intervene filed on behalf of Certain Underwriters of Lloyd's of London ("Lloyds"), which is currently returnable on March 4, 2024.

      First, I would like to make it clear that Lloyd's, through its representatives David Koury, Esq. and Marc Board, were kept apprised of all material events occurring in this matter, related to settlement and otherwise, by both myself and the City of Trenton's Third Party adjuster Jose' Abo. Indeed, Mr. Koury and I discussed the matter countless times, exchanged volumes of email, and



he was ordered to be present for a Settlement Conference in Your Honor's Courtroom, which he attended. Despite my repeatedly imploring both Mr. Koury and Mr. Board to contribute towards the settlement of the case, neither ever offered a single cent towards settlement, by way of direct payment or reimbursement.

More specifically, current counsel for Lloyd's[1] is not accurate in his representations that: a) Lloyd's never denied coverage to Trenton or the Officers; b) I refused to discuss Lloyd's coverage questions with Mr. Koury; c) Lloyd's was not advised of the pending settlement until the motion to approve same was filed; d) the City inexplicably settled the case for $5,000,000.00 without Lloyd's knowledge or consent[2]; and, e) the settlement attempts to bypass Lloyd's rights. I will address each of these positions briefly below.

On September 30, 2020, Lloyd's forwarded a 16 page coverage letter to Candace Jordan, the claims representative handling the claim for the City's Third Party Administrator ("TPA"), laboriously setting forth the allegations in the Complaint and its position with respect to its coverage for same. Ultimately, it indicates in multiple spots that Lloyd's is at that time Reserving its Rights to deny coverage for plaintiff's claims[3]. *Atty. Cert., Exhibit "A"*. More recently, on April 18, 2023, Mr. Koury, then representing Lloyd's, sent me an email that stated: "[A]s set forth in Underwriter's January 13, 2023 coverage position letter, *Underwriters do not believe that*

---

[1] Notably not Mr. Koury, but another attorney from his firm.

[2] Implying that one or both was necessary.

[3] Interestingly, current counsel for Lloyd's repeatedly suggests that the $5,000,000 settlement is somehow outrageous, but in this same correspondence recognized at page three that "[I]n paragraph 8 of the Tort Claim, Mr. Edwards states that he is seeking in excess of $20,000,000 in damages, plus attorneys' fees, costs and interest."



*coverage exists for this matter.*" *Atty. Cert., Exhibits "B" and "C"[4].* Thus, Lloyd's has both Reserved its Rights and indicated that it does not believe there is coverage under the policy for plaintiff's claims on multiple occasions.

Lloyd's current counsel also represents to the court that in response to my notifying Mr. Koury and Mr. Board of my intention to resolve the case with counsel for the plaintiff he "outlined" to me that there were coverage issues that needed to be discussed, and infers I did not respond to that request; neither are true. First, Mr. Koury and I discussed the coverage issues in this case more times than I can remember, including during the Settlement Conference he was compelled by court order to attend; he knew well what my position on settlement was. In that regard, I sent an email with multiple attachments to him on September 22, 2023, refuting his position and that of Lloyd's that no coverage was owed under the policy because plaintiff was alleging intentional actions on the part of the Officers. Further, in an email dated July 20, 2023, I explained to Mr. Koury and Mr. Board: that the policy's SIR had been fully satisfied; that its continued refusal to assist with the negotiation of a settlement constituted "Bad Faith": that if Lloyd's did not immediately change its position with respect to same I would be forced to initiate a coverage action against it; that plaintiff's position was that the average verdict/settlement value of similar claims was $99,630.18 per day of incarceration, meaning the result for a 212 day wrongful incarceration could be $21,121,598.02; *and, that plaintiff had raised the issue of a Settlement and Assignment of its Rights against Lloyd's that I would be discussing with the client. Atty. Cert., Exhibit "D".* Finally, I responded to Mr. Koury's email of January 9, 2024, suggesting that there were still coverage issues to be discussed, by way of an email dated that same date that, indicating that:



"You and I have discussed what I believe to be the non-existent coverage issues. I have explained to you and Marc why it is a covered claim, and nevertheless you have never acknowledged that, nor have you (on behalf of the carrier) offered one dime to assist with the settlement of the case.

In fact, you have denied coverage, accepted it with an ROR, and then offered some convoluted formula that was a combination of both, but all resulted in the same thing: not one penny towards settling the case, **despite the fact that you have seen concrete evidence, in terms of verdict and settlement research, indicating that the case could potentially result in an 8-figure award, thereby exposing your client's insured (COT) to a very large excess verdict.**

In short, I am not sure what there is to speak about.
However, if you think there is, feel free to call." *Atty. Cert, Exhibit "E"*.

Mr. Koury never responded.

Lloyd's was not advised of the settlement *number* prior to the Motion to Settle, but it was advised that a settlement was being discussed, including one that included an assignment of the defendants' rights under the policy to the plaintiff. As noted above, this was raised in my email to him on July 3, 2023. I then sent then counsel for Lloyd's a letter dated December 5, 2023, advising him that while Lloyd's prior denial of coverage and Reservation of Rights meant I was not obligated to inform it of the status of settlement, I was, nevertheless, advising him that the City intended to settle the litigation with plaintiff, and that the result of that settlement would exhaust the City's SIR and involve liability for Lloyd's *under the policy and for its Bad Faith. Atty. Cert., Exhibit "F"*. That letter concluded by encouraging him to immediately reach out to plaintiff's counsel if Lloyd's wished to participate in the settlement discussion.

It has never been the intent of the defendants to exclude Lloyd's from the settlement discussions in the case; to the contrary, I repeatedly implored both Mr. Koury and Mr. Board to

# PARKER McCAY

get involved and to contribute to a potential settlement, both of which they flatly refused to do. I further advised both counsel and Mr. Board that I believed they were acting in Bad Faith towards the City relative to that refusal, and that a failure to rectify their behavior would result in a coverage action by the defendants regarding same *or* a settlement involving an assignment of those rights to the plaintiff. Moreover, while I did initially estimate the value of the file at less than $1,000,000, I also advised them that plaintiff's attorneys had done verdict/settlement research credibly indicating that the value of the claim could exceed $20,000,000, as indicated by plaintiff's counsel as far back as 2020.

Lastly, we note that Lloyd's Reservation of Rights is not without consequence. In *Evanston Ins. Co. v. Treister*, 794 F. Supp 560, 572 (Dist. Ct. V.I. 1992), the court held that while an insurance company has a right to operate under a Reservation of Rights with respect to a claim against its insured, it cannot later complain when the insured settles the claim without its consent, especially where by doing so it does not compromise the carrier's reserved right to contest coverage. (citing, *Cay Divers, Inc. v. Raven*, 812, F.2d 866, 871 (3d Cir. 1987). Here, as in those cases, faced with an insurance company that flatly refused to participate in any settlement negotiations and Reserved its Right to deny coverage for plaintiff's claim, and the potential of a verdict in the $15,000,000-$20,000,000+ range, the City chose to settle the case for a sum substantially less than that potential. By doing so it protected its interests, and even Lloyd's as plaintiff's counsel initial demand was $9,500,000.00 before the City managed to negotiate that sum down to $5,000,000, and in no way compromised Lloyd's ability to contest coverage.



I hope this has clarified some of the issues for the court.

Respectfully submitted,

*s/ J. Brooks DiDonato*

J. BROOKS DIDONATO

/de
Attachment
Cc:    John S. Stapleton, Esq.
       Jeffrey L. Nash, Esq.
       Wesley Bridges, Esq.
       Rashaan S. Williams, Esq.
       Charles R.G. Simmons, Esq.
       David Koury, Esq.
       Marc Board
       Brian H. Leinhauser, Esq.

4887-0001-4757, v. 1

File No. 15108-91-JBD

**PARKER McCAY P.A.**
**By: J. Brooks DiDonato, Esquire**
**bdidonato@parkermccay.com**
**9000 Midlantic Drive, Suite 300, P.O. Box 5054**
**Mount Laurel, New Jersey 08054**
**(856) 596-8900**
*Attorneys for Defendants, Johnathon Cincilla, Nicholas Mahan, Eric Avalos, Anthony Kubish*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| TYSHON EDWARDS, <br><br> Plaintiff, <br><br> v. <br><br><br> CITY OF TRENTON, MICHAEL TILTON, JOHNATHON CINCILLA, NICHOLAS MAHAN, ERIC AVALOS, ANTHONY KUBISH, and JOHN DOES 1-8, <br><br> Defendants. | Docket No.: 3:20-13552-BRM-DEA <br><br><br> **ATTORNEY CERTIFICATION IN SUPPORT OF OPPOSITION TO MOTION TO INTERVENE ON BEHALF OF DEFENDANTS** |

LAW OFFICE
Parker McCay P.A.

J. Brooks DiDonato, Esquire, of full age, do hereby Certify as follows:

1. I am an attorney at law in the State of New Jersey and a member of the law firm of Parker McCay, P.A., attorneys for *Defendants, Johnathon Cincilla, Nicholas Mahan, Eric*

*Avalos and Anthony Kubish.*  As such, I have personal knowledge of the facts contained herein and am authorized to make this Certification on their behalf.

2.  Attached hereto as *Exhibit "A"* is a true and correct copy of a letter from David Koury, Esq. dated September 30, 2020.

3.  Attached hereto as *Exhibit "B"* is a true and correct copy of a letter from David Koury, Esq., dated April 18, 2023.

4.  Attached hereto as *Exhibit "C"* is a true and correct copy of a letter from David Koury, Esq., dated January 13, 2023.

5.  Attached hereto as *Exhibit "D"* is a true and correct copy of a letter from me to David Koury, Esq. and Marc Board dated July 20, 2023.

6.  Attached hereto as *Exhibit "E"* is a true and correct copy of a letter from me to David Koury, Esq., dated January 9, 2024.

7.  Attached hereto as *Exhibit "F"* is a true and correct copy of a letter from me to David Koury, Esq., dated December 5, 2023.

I hereby certify that the above statements made by me are true and correct.  I am aware that if any of the above statements made by me are willfully false, I am subject to punishment.

PARKER McCAY, P.A.

Attorneys for *Defendants, **Johnathon Cincilla,
Nicholas Mahan, Eric Avalos,  Anthony Kubish***

*s/ J. Brooks DiDonato*
J. BROOKS DIDONATO

Dated:  February 16, 2024

4859-2266-5125, v. 1

2

# Exhibit "A"



David L. Koury
312.762.3226 Direct
dkoury@batescarey.com

September 30, 2020

**VIA E-MAIL**

Candace Jorden
Claims Resolution Corporation, Inc.
323 S. Pitney Road, Suite 200
Galloway, NJ 08205
E-Mail: CJorden@crctpa.com

|  | | |
|---|---|---|
| Re: | Assured: | **City of Trenton, NJ** |
|  | Policy No.: | **PK1021618** |
|  | Policy Period: | **March 1, 2018 to July 1, 2019** |
|  | Matter: | **Tort Claim for Damages Against the City of Trenton by Tyshon Edwards** |
|  | Brit Claim No.: | **1015692** |
|  | Our File No.: | **16614** |

Dear Ms. Jorden:

We represent Certain Underwriters at Lloyd's of London ("Underwriters") that subscribe to the above-referenced Public Entity Package Policy, Policy No. PK1021618 (the "Policy"), issued to the City of Trenton, NJ (the "City"), in connection with the above-referenced matter. This letter supplements, and does not replace, all other correspondence Underwriters, or anyone on Underwriters' behalf, have issued to the City.

Please note that we are providing this letter to you in your capacity as the representative designated to receive such correspondence on behalf of all **ASSUREDS**[1] under the Policy. If that is incorrect, please so advise, and provide us with the correct contact information, and we will provide a copy of this letter to the proper representative(s).

We have reviewed the allegations made in connection with the above-referenced Tort Claim and the Policy, and additional materials received in connection with the matter. As discussed below, there is no duty to defend the City or any other **ASSURED** in connection with the matter under the Policy. Moreover, any duty of Underwriters to indemnify the City for **ULTIMATE NET LOSS**, if at all, only arises upon resolution of the matter. We also remind you of various duties and obligations that are owed to Underwriters in connection with the matter pursuant to the Policy.

---

[1]    Terms in bold and all capital letters are defined in the Policy.



## I.     FACTUAL BACKGROUND

For purposes of this letter, we understand the significant facts alleged in connection with the matter are as summarized below.  By referencing these facts, Underwriters neither endorse the allegations made against the City or any other **ASSURED** in connection with the matter nor presume any facts as true.  To the extent you are aware of additional facts that you believe would impact Underwriters' preliminary coverage analysis, please advise us as soon as possible.

On or about January 20, 2020, counsel for Tyshon Edwards sent a letter to the City, the Mercer County Prosecutor's Office, and Mercer County.  In the letter, counsel states that they have been engaged to represent Mr. Edwards in civil litigation against the City, the City's Police Department, Mercer County, the Mercer County Prosecutor's Office, certain officers and personnel, and other individuals and organizations to be determined.

Mr. Edwards alleges that, on January 21, 2019, City police officers unlawfully targeted, seized, and arrested him for drug possession.  He further asserts that, as evidenced by video, the police officers lied on the police report, the Complaint-Warrant, and the Affidavit of Probable Cause.  These documents were then used as the basis to violate Mr. Edwards' parole and deprive him of his freedom for approximately seven months from March 13, 2019 to October 9, 2019 (in addition to holding him from January 21-22, 2019), among other injuries.

Mr. Edwards alleges that multiple street cameras captured the whole incident and prove the it "was an intentional framing by the government of an innocent man."  After reviewing the recordings, the State Parole Board reversed Mr. Edwards' revocation of parole and released him.  On January 13, 2020, the Mercer County Prosecutor's Office also dropped the criminal charges against Mr. Edwards.  Mr. Edwards states that he intends to pursue all claims available to him under federal and state law.  In the letter, Mr. Edwards requests a meeting to discuss potential resolution of this matter prior to the commencement of litigation.  The letter further requests the preservation of all related information and materials.

On January 24, 2020, Mr. Edwards filed a Tort Claim for Damages against the City (the "Tort Claim").  In the Tort Claim, Mr. Edwards identifies Detectives Tilton, Cincilla, Mahan, Sergeant Moffa, and six other City police officers as City employees he claims "were at fault." In the Tort Claim, Mr. Edwards also claims the following "negligent or wrongful acts" caused his damage:  (1) false arrest, (2) false imprisonment, (3) false police report, complaint, and affidavit of probable cause, (4) defamation and slander, (5) unreasonable search and seizure, (6) trespass, (7) assault and battery, (8) wrongful prosecution, (9) abuse of process, (10) intentional infliction of emotional distress, (11) negligent infliction of emotional distress, (12) fraud, (13) conversion, (13) violation of due process, (14) conspiracy, (15) violation of constitutional and civil rights, (16) failure to supervise, train, discipline, investigate and report, (17) ratification of conduct, (18) unlawful policies and practices, and (19) other related torts.


**BATESCAREY** LLP

Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 3 of 16

     In paragraph 8 of the Tort Claim, Mr. Edwards states that he is seeking in excess of $20,000,000 in damages, plus attorneys' fees, costs, and interest.

## II.    UNDERWRITERS' POLICY

     Underwriters issued the Policy to the City for the **PERIOD OF INSURANCE** of March 1, 2018 to July 1, 2019 (pursuant to Endorsement No. 10). The Policy provides Law Enforcement Liability coverage on an **OCCURRENCE** basis. The Policy's limit of liability for the Law Enforcement Liability Coverage Section (Section VIII) is $3,000,000 each **OCCURRENCE** and $6,000,000 Annual Aggregate of Liability, subject to a $500,000 **SELF INSURED RETENTION**, and a $500,000 Corridor Retention pursuant to Endorsement No. 6 to the Policy. The Policy does not impose a duty to defend on Underwriters, only a duty to indemnify.[2]

     The pertinent language from the Policy is set forth below. Please refer to the Policy for all of its complete terms and conditions.

### A.    General Policy Definitions, Exclusions, and Conditions

     The Policy's General Policy Definitions section contains the following relevant Definitions:

    **2.**    **ASSURED** means not only the **NAMED ASSURED** as stated on the **Declarations**, but also includes any past, present or future officials; members of boards or commissions; and trustees, directors, officers, volunteers, or employees of the **NAMED ASSURED** while acting within the scope of their duties as such. **ASSURED** shall also mean any person, organization, trustee or estate to whom the **NAMED ASSURED** is obligated by virtue of a written contract or written mutual aid agreement or other written agreement to provide insurance such as is offered by this policy; but only in respect to acts or operations by or on behalf of the **NAMED ASSURED**, and subject to the limitations on coverage contained in any such written contract or written mutual aid agreement or other written agreement.

                                      \*         \*         \*

---

[2] In addition to the Law Enforcement Liability Coverage Section, the Policy also provides certain other coverages that do not appear to be implicated by the Tort Claim. However, if the City disagrees and would like Underwriters to evaluate coverage under any of the other Coverage Sections, please so advise, and Underwriters will do so promptly. Underwriters reserve all of their rights under the other Coverage Sections, and waive none.



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 4 of 16

4.    **BODILY INJURY** means physical injury (including death) to any person, and any mental anguish or shock, sickness, disease, disability or death associated with or arising from such physical injury.

\*        \*        \*

11.    **LAW ENFORCEMENT ACTIVITIES** means the activities of any **ASSURED** while acting as a law enforcement official, officer, auxiliary officer, employee, or volunteer of a law enforcement agency or department of the **NAMED ASSURED**. **LAW ENFORCEMENT ACTIVITIES** does not include **EMPLOYMENT PRACTICE VIOLATIONS**.

\*        \*        \*

18.    **PERIOD OF INSURANCE** means the length of time that the policy is in force as stated in Item 3 of the **Declarations** as the Effective Date and Expiration Date.

19.    **PERSONAL INJURY** means any Injury (other than **BODILY INJURY** or **PROPERTY DAMAGE**) arising out of one or more of the following:

Wrongful Entry; Wrongful Eviction; Malicious Prosecution; Humiliation; Piracy; Infringement or Misappropriation of any Intellectual Property Rights (including: Copyrights; Patents; Trademarks; Servicemarks; and Advertising, Broadcasting, and Publishing Ideas); Invasion of Rights of Privacy; Libel; Slander; Defamation of Character; Disparagement of Property; Erroneous Service of Civil Papers; False Arrest; False Imprisonment; and Detention.

Injury includes: Mental Anguish, Shock, Sickness, Disease, Disability or Death, which do not arise from **BODILY INJURY** or **PROPERTY DAMAGE**.

In addition, as respects to **LAW ENFORCEMENT LIABILITY** only, **PERSONAL INJURY** also includes any Injury (other than **BODILY INJURY** or **PROPERTY DAMAGE**) arising out of Discrimination or Violation of Civil Rights.

\*        \*        \*

24.    **SELF INSURED RETENTION** means that United States Dollar amount specified in the **SCHEDULE OF SELF INSURED RETENTIONS** which the **ASSURED** is obligated to pay because of **ULTIMATE NEW LOSS**, after the application of any applicable



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 5 of 16

> **MAINTENANCE DEDUCTIBLE**, and before the **Specific Excess Limit of Insurance** of this Policy responds to the same loss.

*      *      *

23. **ULTIMATE NET LOSS** means the total sum which the **ASSURED** is obligated to pay because of loss or damage covered under any Section of this policy, either through adjudication or compromise, after first making proper deductions for all subrogation, **RECOVERY(IES)** and salvages.

**ULTIMATE NET LOSS** also includes:

(a) Premium on attachment, appeal or similar bonds (but without any obligation on the part of the Underwriters to apply for or furnish such bonds); or

(b) Expenses of lawyers, private investigators and other persons for litigation, settlement, adjustment and investigation of claims and SUITS which are paid as a consequence of any loss or damage covered hereunder.

However, the **ULTIMATE NET LOSS** does not include:

(c) Any costs, fees and other expenses incurred by the **ASSURED** for litigation, settlement, adjustment and investigation of claims or **SUITS** for any loss or damage not covered under any Section of this policy;

(d) Payment for any judgments or acts deemed uninsurable by law;

(e) Contractual fees paid to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** by the **ASSURED** for services rendered in administering, investigating or settlement of any claim for loss or damage;

(f) Payments, including salaries and expenses, to any employee or official of the **ASSURED** for services rendered in administering any claim for loss or damage; or

(g) Expenses incurred by the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** in the hiring of experts or other specialists to establish the existence or value of a covered claim or **OCCURRENCE** unless specifically provided for in the policy or agreed to in advance by Underwriters.

Underwriters are liable only for the **ULTIMATE NET LOSS** in excess of the applicable **MAINTENANCE DEDUCTIBLE** and **SELF**



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 6 of 16

> **INSURED RETENTION**, and not more than the **Specific Excess Limit of Insurance**. Underwriters duty to indemnify ends when the applicable **Specific Excess Limit of Insurance** is exhausted by the payment of the **ULTIMATE NET LOSS**.

> \*  \*  \*

> 32.  **WRONGFUL ACT** means any actual or alleged error or mis-statement, omission, act or neglect or breach of duty due to misfeasance, malfeasance, and non-feasance, Discrimination, and Violation of Civil Rights by the **ASSURED**.

> All claims based on or arising out of the same **WRONGFUL ACT** or a series of related **WRONGFUL ACTS** by one or more **ASSUREDS** shall be deemed one **WRONGFUL ACT**. Only one Policy issued by Underwriters, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **WRONGFUL ACT**.

The Policy's General Policy Exclusions provide, in relevant part, that the Policy does not insure against:

> A.  Loss or damage caused by, or resulting from fraudulent or dishonest acts committed by the **ASSURED**, whether working alone or with others, except as covered in **Coverage Section VII Crime**;

The Policy's General Policy Conditions section provides, in relevant part, as follows:

> 11.  **DUTIES:** Underwriters have no duty to investigate, handle, adjust, settle or defend any **CLAIM**, **OCCURRENCE**, proceeding or **SUIT** against the **NAMED ASSURED**, any **ASSURED**, or against any other person or organization for whom the **NAMED ASSURED** is, or may be found to be, legally liable; or whom asserts or claims a right of coverage under the policy. These duties shall be the responsibility of the **NAMED ASSURED**.

> Underwriters' duty under the policy shall be to indemnify the **NAMED ASSURED** for **ULTIMATE NET LOSS** in excess of the applicable **SELF INSURED RETENTION, MAINTENANCE DEDUCTIBLE**, or any other applicable deductible or deduction; and not more than the **Specific Excess Limit of Insurance**.

> Underwriters' duty to indemnify ends when the applicable **Specific Excess Limit of Insurance** is exhausted by the payment of the **ULTIMATE NET LOSS**.



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 7 of 16

Underwriters may, at their sole discretion, tender periodic advance payments of amounts in excess of the **SELF INSURED RETENTION**, before **ULTIMATE NET LOSS** as defined in the Policy is reached; provided that:

(a) Only amounts where coverage is not in dispute will be used to compute the partial **ULTIMATE NET LOSS**; and

(b) Only payments made by the **NAMED ASSURED** and not disputed by Underwriters will be used to compute the partial **ULTIMATE NET LOSS**; and

(c) Any potential **RECOVERY** source has been identified; has been put on notice if appropriate; and **RECOVERY** is being aggressively pursued; and

(d) Delaying payment until the final **ULTIMATE NET LOSS** is determined will result in financial hardship to the Assured; and

(e) All payments are without prejudice.

\*     \*     \*

15. **OTHER INSURANCE:** If the **ASSURED** has other insurance against loss or damage covered under this policy, the Underwriters are liable, under the terms of this policy, only as excess of coverage provided by such other insurance. No monies payable or collectible from such other insurance shall accrue to the Loss Fund. However, this clause does not apply to the purchase of excess insurance above the **Specific Excess Limit of Insurance** stated in the **Schedule of Specific Excess Limits of Insurance** of this Policy.

Endorsement No. 7 to the Policy amends the General Policy Conditions section to provide, in relevant part, that:

7. **CLAIMS, OCCURENCES or SUITS:** Underwriters reserves the right to deny coverage under this Policy if there has not been full compliance with the following duties:

The **ASSURED** shall as soon as practicable notify Underwriters though the **THIRD PARTY CLAIMS ADMINSTRATOR** of any **CLAIM, OCCURRENCE,** or **SUIT** meeting the following criteria:

(a) The cost of which is likely to result in payment by Underwriters under this Policy;

 **BATESCAREY**LLP

Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 8 of 16

(b)     All claims reserve at 50% or more of the **SELF INSURED RETENTION;**

(c)     All claims where there has been a settlement demand above the **SELF INSURED RETENTION** and there is a trial, binding arbitration or binding mediation date within ninety (90) days;

(d)     Catastrophic losses (including Paraplegia, Quadriplegia, Severe Burns, Fatalities, Significant Brain Injury, Amputation of Major Extremity);

(e)     **SEXUAL ABUSE** claims;

(f)     Discrimination or Violation of Civil Rights where the claim is reserved at 50% or more of the **SELF INSURED RETENTION** or within ninety (90) days of a trial date, whichever is sooner;

(g)     Third-party claims involving **LAW ENFORCEMENT ACTIVITIES;**

(h)     Act or series of **ACTS OF TERRORISM;**

(i)     Any claims where there is a question as to whether there will be coverage under this Policy.

Underwriters shall have the right, but not the obligation, to be associated with the **ASSURED** in, an/or assume charge of, the investigation, handling, defense or settlement of any claims, **SUIT** or proceedings relative to an **OCCURRENCE** or **CLAIM** where in the opinion of the Underwriters, their liability under this Policy is likely to be involved or when the **SELF INSURED RETENTION** has been exhausted; in which case the **ASSURED** and Underwriters shall co-operate to the mutual advantage of both.  In all other circumstances, Underwriters have the right, but not the obligation, to assume charge of the defense of any claim or suit relative to an **OCCURRENCE** or **CLAIM** at its own expense.

The **ASSURED** shall make no commitment to pay or settle any **CLAIMS, OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is involved without the prior written agreement of Underwriters.  Underwriters shall not withhold agreement without just cause.  Neither shall the **ASSURED** refuse any reasonable opportunity to pay or settle a claim when such refusal will result in Underwriters having liability under this Policy without the prior agreement of Underwriters.  Underwriters shall not withhold agreement without just cause.  If the **ASSURED** refuses to consent to settlement of any **CLAIMS,**



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 9 of 16

> **OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is potentially involved, and settlement or compromise is recommended by Underwriters and acceptable to the claimant, then calculation of, and Underwriters obligation under **ULTIMATE NET LOSS** with respect to the **CLAIMS, OCCURRENCES** or **SUITS** shall be limited to the amount of damages or payments for which the **CLAIMS, OCCURRENCES** or **SUITS** could have been settled for, plus any expenses payable under **ULTIMATE NET LOSS** incurred until the date of the **ASSURED'S** refusal to settle or compromise the **CLAIMS, OCCURRENCES** or **SUITS** as recommended by Underwriters.

> \*       \*       \*

21. **THIRD PARTY CLAIMS ADMINISTRATOR:** It is a condition precedent that this Policy is issued by Underwriters on the express condition that:

> (a) The **NAMED ASSURED** must contract with, and utilize the services of, a duly qualified and competent **THIR PARTY CLAIMS ADMINISTRATOR**, as agreed upon by Underwriters prior to the **PERIOD OF INSURANCE**, and

> (b) All **CLAIMS, SUITS** or **OCCURRENCES** for which coverage is sought under this Policy must be adjusted and handled by the contracted **THIRD PARTY CLAIMS ADMINISTRATOR;** and

> (c) The duties involved in adjusting and handling **CLAIMS, SUITS** or **OCCURENCES** by the **THIRD PARTY CLAIMS ADMINISTRATOR** include but are not limited to, timely investigations, setting ground-up case reserves, documenting case reserve rationale, pursuing settlement and recording financials; and

> (d) All **CLAIMS, SUITS** or **OCCURENCES** for which coverage is sought under this Policy are adjusted and handled by the **THIRD PARTY CLAIMS ADMINISTRATOR** in accordance with all **statutory** and regulatory standards, all accepted industry standards am practices and the Brit Global Specialty USA Third Party Claims Administrator Claims Handling Guidelines.

Underwriters or their representatives shall have the right but not the duty to conduct audits and inspections of the **CLAIMS, SUITS** or **OCCURRENCES** reported to the **THIRD PARTY CLAIMS ADMINISTRATIOR** to better inform Underwriters of the potential

 **BATESCAREY** LLP

Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 10 of 16

> liability under this Policy. The **THIRD PARTY CLAIMS ADMINISTRATOR** will cooperate should the audit or inspection be requested.

**B.    Law Enforcement Liability Coverage Section (Section VIII) Insuring Agreement, Exclusions, and Definitions**

The Policy's Law Enforcement Liability Coverage Section (Section VIII) provides occurrence-based Law Enforcement Liability coverage. The occurrence-based Law Enforcement Liability Insuring Agreement provides:

> **A.    Law Enforcement Liability:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is legally obligated to pay by reason of the liability imposed upon the **ASSURED** by law for damage, direct or consequential, and expenses, all as more fully defined by the term **ULTIMATE NET LOSS**, on account of **PERSONAL INJURY** or **BODILY INJURY** or **PROPERTY DAMAGE** or the loss of use thereof suffered or alleged to have been suffered by any person(s) or organization(s) resulting from **LAW ENFORCEMENT ACTIVITIES**, including **INCIDENTAL MEDICAL MALPRACTICE** and **MOONLIGHTING** arising out of an **OCCURRENCE** during the **PERIOD OF INSURANCE**.

The Law Enforcement Liability Coverage Section (Section VIII) contains the following relevant Exclusions:

> **B.    Any CLAIM or SUIT for BODILY INJURY, PROPERTY DAMAGE, or PERSONAL INJURY,** including any award of attorney's fees and costs, resulting from:
>
> (a)    Any knowing and intentional violation of any subsection of Title 42 of the U.S. Code, including but not limited to 42 U.S.C § 1981 thru 42 U.S.C. §1989 and 42 U.S.C. §1997; or
>
> (b)    Any knowing and intentional deprivation of any rights protected under the United States Constitution or the Constitution of any State, Territory, or Protectorate of the United States; or
>
> (c)    Any act which is not reasonably related to the execution and/or enforcement of the law; or
>
> (d)    Any act committed with the knowledge and intent to cause **BODILY INJURY, PROPERTY DAMAGE, or PERSONAL INJURY,** or which could reasonably be expected to cause **BODILY INJURY, PROPERTY DAMAGE, or PERSONAL**



BATESCAREYLLP

Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 11 of 16

       **INJURY** unless the act of the **ASSURED** was reasonably necessary to lawfully prevent injury to persons or damage to property.

     However, Exclusion B. shall not apply to:

    i.  Any liability on the part of the **NAMED ASSURED**, including liabilities from negligent hiring, training or supervision, arising out of an act by any other **ASSURED** resulting from **LAW ENFORCEMENT ACTIVITIES** and excluded herein, but this provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify an **ASSURED**.

        \*   \*   \*

   H.  Any **CLAIM** arising from **WRONGFUL ACTS** except as provided under this Section for Discrimination or Violation of Civil Rights arising out of **LAW ENFORCEMENT ACTIVITIES**;

  The Law Enforcement Liability Coverage Section (Section VIII) contains the following relevant Definitions:

    1.  **CLAIM** means all notices or **SUITS** demanding payment of money based on, or arising out of the same **OCCURRENCES** by one or more **ASSUREDS**.

    2.  **DEFENSE COSTS** mean the expenses incurred for the investigation and defense of a **CLAIM** or **SUIT** alleging **BODILY INJURY**, **PERSONAL INJURY**, **PROPERTY DAMAGE**, **SEXUAL HARRASMENT** or **SEXUAL ABUSE** resulting only from **LAW ENFORCEMENT ACTIVITIES**. However, the salaries, expense and administrative cost of the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** are not included within the meaning of **DEFENSE COSTS**.

  Please understand that there may be other provisions of the Policy not addressed in this letter that apply to this matter, and Underwriters do not waive and expressly reserve their right to state additional issues and provisions that may affect coverage.



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 12 of 16

## III.     UNDERWRITERS' COVERAGE POSITION

As an initial matter, we note that Paragraph 11 of the General Policy Conditions provides that Underwriters have no duty to defend under the Policy, only a duty to indemnify. As such, Underwriters will not provide a defense to any **ASSURED** in connection with the Tort Claim.

We also note that the term **ASSURED** includes not only the **NAMED ASSURED**, but also "any past, present or future officials; members of boards or commissions; and trustees, directors, officers, volunteers, or employees of the **NAMED ASSURED** while acting within the scope of their duties as such." The City and its employees implicated in the Tort Claim may be **ASSUREDS** under the Policy. However, Underwriters reserve the right to deny coverage to the extent than any purported **ASSURED** was not acting within the scope of their duties.

With regards to coverage for the Tort Claim under the Policy's Law Enforcement Liability Coverage Section (Section VIII), we note Underwriters are obligated to indemnify the **ASSURED** for all sums which the **ASSURED** "is legally obligated to pay by reason of the liability imposed upon the **ASSURED** by law for damage, direct or consequential, and expenses, all as more fully defined by the term **ULTIMATE NET LOSS**, on account of **PERSONAL INJURY** or **BODILY INJURY** or **PROPERTY DAMAGE** or the loss of use thereof suffered or alleged to have been suffered by any person(s) or organization(s) resulting from **LAW ENFORCEMENT ACTIVITIES**, including **INCIDENTAL MEDICAL MALPRACTICE** and **MOONLIGHTING** arising out of an **OCCURRENCE** during the **PERIOD OF INSURANCE**."

In the Tort Claim, the City and certain of its employees are alleged to have engaged in conduct that appears to fall within the Policy's definition of **LAW ENFORCEMENT ACTIVITIES**. Further, Mr. Edwards' alleged injuries appear to arise out of an alleged violation of his civil rights, which appear to meet the definition of **PERSONAL INJURY**, and were allegedly the result of **LAW ENFORCEMENT ACTIVITIES**. Accordingly, the Tort Claim appears to constitute an **OCCURRENCE** that would potentially be covered in this instance under the Policy's Law Enforcement Liability Coverage Section (Section VIII).

Notwithstanding the above, we note certain terms, provisions, conditions, and exclusions of the Policy may limit or preclude coverage for this matter.

First, Exclusion B. of the Law Enforcement Liability Coverage Section precludes coverage, in relevant part, for:

> B.     Any **CLAIM** or **SUIT** for **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL INJURY,** including any award of attorney's fees and costs, resulting from:



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 13 of 16

  (a)  Any knowing and intentional violation of any subsection of Title 42 of the U.S. Code, including but not limited to 42 U.S.C § 1981 thru 42 U.S.C. §1989 and 42 U.S.C. §1997; or

  (b)  Any knowing and intentional deprivation of any rights protected under the United States Constitution or the Constitution of any State, Territory, or Protectorate of the United States; or

  (c)  Any act which is not reasonably related to the execution and/or enforcement of the law; or

  (d)  Any act committed with the knowledge and intent to cause **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL INJURY,** or which could reasonably be expected to cause **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL INJURY** unless the act of the **ASSURED** was reasonably necessary to lawfully prevent injury to persons or damage to property.

  Based on the allegations set forth in the Tort Claim, Underwriters reserve the right to deny coverage under Exclusion B. of the Law Enforcement Liability Coverage Section to the extent the City or any other **ASSURED** is found to have knowingly or intentionally violated 42 U.S.C. § 1983, or knowingly and intentionally deprived Mr. Edwards of any rights protected under the United States Constitution or the Constitution of any State, Territory, or Protectorate of the United States.

  Second, Exclusion H. of the Law Enforcement Liability Coverage Section precludes coverage for "[a]ny CLAIM arising from **WRONGFUL ACTS** except as provided under this Section for Discrimination or Violation of Civil Rights arising out of **LAW ENFORCEMENT ACTIVITES.**"  To the extent the Tort Claim arises from **WRONGFUL ACTS** that do not constitute Discrimination or Violation of Civil Rights arising out of **LAW ENFORCEMENT ACTIVITES,** Underwriters reserve their rights to deny coverage under Exclusion H.

  Third, General Policy Exclusion A. precludes coverage for any "[l]oss or damage caused by, or resulting from fraudulent or dishonest acts committed by the **ASSURED** whether working alone or with others, except as covered in **Coverage Section VII Crime.**"  The Tort Claim contains certain allegations, including that the City and certain of its employees engaged in "intentional framing" of Mr. Edwards, which may rise to the level of a fraudulent or dishonest act.  As such, Underwriters reserve the right to deny coverage under General Policy Exclusion A.

  Fourth, Underwriters reserve their rights under the definition of **ULTIMATE NET LOSS** to the extent that any payment for any judgment or acts is deemed uninsurable by law, including punitive damages.



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 14 of 16

Fifth, the Policy contains an "Other Insurance" provision at Paragraph 15 of the General Policy Conditions. To the extent, the City or any other **ASSURED** has any other insurance which may apply, Underwriters reserve their rights pursuant to Condition 15. We also ask that the City forward any correspondence exchanged with any other insurers and any and all materials and information provided to other insurers, if any.

Sixth, pursuant to Endorsement No. 7 to the Policy, the City's **THIRD PARTY CLAIMS ADMINISTRATOR's** – which we understand is Claims Resolution Corporation ("CRC") – duties include but are not limited to, timely investigations, setting ground-up case reserves, documenting case reserve rationale, pursuing settlement and recording financials. Pursuant to Endorsement No. 7, Underwriters further reserve the right to deny coverage under this Policy if there has not been full compliance with the following duties:

The **ASSURED** shall as soon as practicable notify Underwriters through the **THIRD PARTY CLAIMS ADMINSTRATOR** of any **CLAIM, OCCURRENCE,** or **SUIT** meeting the following criteria:

(a) The cost of which is likely to result in payment by Underwriters under this Policy;

(b) All claims reserved at 50% or more of the **SELF INSURED RETENTION;**

(c) All claims where there has been a settlement demand above the **SELF INSURED RETENTION** and there is a trial, binding arbitration or binding mediation date within ninety (90) days;

\*       \*       \*

(f) Discrimination or Violation of Civil Rights where the claim is reserved at 50% or more of the **SELF INSURED RETENTION** or within ninety (90) days of a trial date, whichever is sooner;

(g) Third-party claims involving **LAW ENFORCEMENT ACTIVITIES;**

\*       \*       \*

(i) Any claims where there is a question as to whether there will be coverage under this Policy.

We ask that CRC report on the status of the Tort Claim, any settlement demands received above the **SELF INSURED RETENTION**, the reserves set in relation to the Tort Claim, paid to date, any erosion of the Corridor and provide any missing claim documentation within fourteen (14)



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 15 of 16

days of the City's receipt of this letter. Underwriters reserve all of their rights with respect to Endorsement No. 7.

Lastly, to the extent that the Tort Claim involves both covered and uncovered matters, or covered and uncovered parties, Underwriters reserve their right to an appropriate allocation under the terms of the Policy and New Jersey law.

Please understand that there may be other Policy provisions that apply to this matter, and Underwriters do not waive and expressly reserve, their right to state additional issues/defenses that may affect coverage.

## IV.   RESERVATION OF RIGHTS / REQUESTS FOR INFORMATION

For the reasons set forth above, Underwriters have no duty to defend the City or any other **ASSURED** in connection with the Tort Claim. Also, there is no obligation to indemnify any **ASSURED** until the $500,000 **SELF INSURED RETENTION**, and $500,000 Corridor Retention, have been satisfied.

In furtherance of Underwriters' ongoing investigation into this matter, please also provide us with the following items and materials at your earliest convenience:

1.   All substantive pleadings and briefs filed or communications exchanged in connection with the Tort Claim, including any amended claim(s) filed by Mr. Edwards or response made to the Tort Claim;

2.   All communications exchanged between Mr. Edwards (or his counsel) and any **ASSUREDS** (or their counsel), including all communications related to settlement;

3.   All defense invoices received by the City or any other **ASSURED** to date in connection with the Tort Claim;

4.   Any communications, case assessments, evaluations, expert opinions, and/or information related to the liability and/or exposure of the City or any other **ASSURED** in connection with the Tort Claim; and

5.   All notices, communications, correspondence, policies, and/or agreements entered into or exchanged with any other insurers or entities concerning any coverage or indemnification that may be available to the **ASSUREDS** in relation to the Tort Claim.

_**Given the lack of information we have received on this matter to date, we insist that you provide us with this requested information within fourteen (14) days of this letter, or by October 14, 2020**_.   Please consider the foregoing requests to be standing requests and provide



Candace Jorden
Claims Resolution Corporation, Inc.
September 30, 2020
Page 16 of 16

any additional information as it becomes available. If you have any questions regarding any of the requests, please let us know so that we can arrange a call as soon as possible this week to discuss.

Underwriters do not waive any of their rights under the Policy, and by virtue of the matters discussed herein, Underwriters do not intend to waive any of their other coverage defenses, nor shall Underwriters be estopped from asserting any applicable defense. This reservation includes, but is not limited to, the right to seek a judicial declaration of Underwriters' rights and defenses as expressed herein. Underwriters continue to expressly reserve their rights to state additional reasons why coverage does not exist for this matter under the Policy and/or amend this letter to address additional coverage issues under the Policy.

If you have any questions or concerns regarding Underwriters' coverage position set forth above, please let us know. Further, while we encourage you to contact us with any questions or concerns you may have, you may be entitled to have the matter reviewed by the Office of Insurance Claims Ombudsman, Department of Banking and Insurance. Their contact information is as follows:

> P.O. Box 472
> Trenton, NJ 08625-0472
> Phone: (800) 446-7467
> Fax: (609) 292-2431
> E-mail: ombudsman@dobi.state.nj.us

Please do not hesitate to contact us with any question you may have.

Very truly yours,

David L. Koury

cc:    Allison Burns, BGSU (via e-mail only)

Kim Emberson, BGSU (via e-mail only)

2551511

# Exhibit "B"

## J. Brooks DiDonato

| | |
|---|---|
| **From:** | Koury, David L. <dkoury@BatesCarey.com> |
| **Sent:** | Tuesday, April 18, 2023 4:21 PM |
| **To:** | Brooks DiDonato |
| **Cc:** | Mitchell, Kyle B. |
| **Subject:** | Tyshon Edwards v COT |
| **Attachments:** | 3095681_1.pdf; 3116175_1.pdf; RE: Tyshon Edwards |

**\*\*\* External Email – This email has come from outside of Parker McCay. Think before you click on links, open attachments, or reply! \*\*\***

_**Confidential Settlement Communication**_

Hi Brooks -

As set forth in Underwriters' January 13, 2023 coverage position letter, Underwriters do not believe coverage exists for this matter. This letter is attached for your convenience. However, as an accommodation, Underwriters did set forth a framework by which they would be willing to contribute towards a settlement. That framework is set forth in our "Confidential Settlement Communication" letter, also dated January 13, 2023. That letter is also attached.

With respect to your March 29, 2023 inquiry/comments, we thought it best to respond to the comments you made in your March 29th e-mail, which I'm also attaching for your convenience. Here are our comments/responses:

- You are correct that the Policy is subject to a $500k SIR.

- You are correct that the $500k SIR gets reduced by defense counsel fees and costs incurred by all counsel who have defended the "Trenton Defendants" but only if they are in the defense of covered claims. As outlined in our January 13, 2023 letter, Underwriters do not believe there are any covered claims. Nevertheless, Underwriters are willing count any defense fees incurred in the defense of the Trenton Defendants towards the erosion of the $500k SIR.

- In light of the above, you are correct that if the defense fees incurred total $100k, the $500k SIR would be reduced to $400k under the framework proposed by Underwriters.

- Further, under Underwriters' proposal, you are correct that the remaining $400k SIR would then be reduced by up to 25% of a settlement amount up to $1 million. For example, if the matter is settled for $1 million, then the remaining $400k SIR would be reduced by $250k.

- Your statement that "[o]nce the SIR is exhausted, the remainder of any settlement would be paid by the carrier, subject to the reservation of its rights and its agreement with the number" would not be applicable in the scenarios listed in the prior bullet point above as based on your settlement evaluation, coupled with the SIR erosion framework discussed above, we do not see how the SIR could be fully exhausted.

To reiterate, using your hypothetical example regarding a settlement at $850k, it would not fully erode the SIR. Instead, we would start with a $400k SIR remaining. If the case settled for $850k, the remaining $400k SIR would be reduced by $212,500 (or 25% of the $850k) leaving the SIR at $187,500.

Please let us know if you have any further questions or wish to set up a call to discuss, which we are happy to do.

Regards,
Dave

1

# Exhibit "C"



**BATESCAREY** LLP

David L. Koury
312.762.3226 Direct
dkoury@batescarey.com

January 13, 2023

**VIA E-MAIL**

Jose Abo
Claims Resolution Corporation, Inc.
323 S. Pitney Road, Suite 200
Galloway, NJ 08205
E-Mail: JAbo@crctpa.com

| | | |
|---|---|---|
| Re: | Assured: | **City of Trenton, NJ** |
| | Policy No.: | **PK1021618** |
| | Policy Period: | **March 1, 2018 to July 1, 2019** |
| | Matter: | ***Tyshon Edwards v. City of Trenton, et al.*, Case No. 3:20-cv-13552 (U.S. District Court for the District of New Jersey)** |
| | CRC File No.: | **16136** |
| | Claim No.: | **1015692** |
| | Our File No.: | **19143** |

Dear Mr. Abo:

As you know, we represent Certain Underwriters at Lloyd's of London ("Underwriters") that subscribe to the above-referenced Public Entity Package Policy, Policy No. PK1021618 (the "Policy"), issued to the City of Trenton, NJ (the "City"), in connection with the above-referenced matter. This letter supplements, and does not replace, all other correspondence Underwriters, or anyone on Underwriters' behalf, have issued to the City, including our letter to you dated September 30, 2020.

Please note that we are providing this letter to you in your capacity as the representative designated to receive such correspondence on behalf of all **ASSUREDS**[1] under the Policy. If that is incorrect, please so advise, and provide us with the correct contact information, and we will provide a copy of this letter to the proper representative(s).

As you know, on September 29, 2020, Plaintiff, Tyshon Edwards, filed a Complaint, styled *Tyshon Edwards v. City of Trenton, et al.*, Case No. 3:20-cv-13552, in the United States District Court for the District of New Jersey (the "Lawsuit"). As discussed below, there is no duty to defend the City or any **ASSURED** in connection with the Lawsuit under the Policy. Moreover, any duty of Underwriters to indemnify the City for the **ULTIMATE NET LOSS**, if at all, may arise only upon resolution of the litigation. After you review this letter, we are happy to discuss the matter with you at your convenience.

---

[1]     Terms in bold and all capital letters are defined in the Policy.



Jose Abo
Claims Resolution Corporation, Inc.
January 13, 2023
Page 2 of 6

## I.    FACTUAL BACKGROUND

Based on the information provided to Underwriters to date, we understand the facts associated with this matter are as set forth in our September 30, 2020 letter and below.  Our September 30 letter outlined Mr. Edwards' January 20, 2020 letter and the claims set forth in Mr. Edwards' "Tort Claim for Damages."  Those facts and allegations are incorporated herein by reference.  The facts set forth below are alleged in the September 29, 2020 Complaint Mr. Edwards filed.  Nothing in this letter is intended to suggest that any of the allegations either set forth below or in our September 30, 2020 letter have any legal or factual merit.

On September 29, 2020, Mr. Edwards (hereafter, "Plaintiff") filed his Complaint against the City, Michael Tilton, Johnathon Cincilla, Nicholas Mahan, Eric Avalos, and Anthony Kubish.  In the Complaint, Plaintiff alleges that on January 21, 2019, Defendant police officers swarmed and seized Plaintiff despite him being legally parked on a public road.  After removing Plaintiff from the vehicle, Plaintiff alleges that the Detective Tilton advised him that he was under arrest due to drugs being found in the car.  However, Plaintiff also alleges that none of the Defendant police officers showed Plaintiff any evidence of drugs.  Plaintiff was cited for various drug charges regarding possession of heroin.

Plaintiff alleges that the police officers then falsified the police report to justify their false arrest of Plaintiff and falsified affidavits to the court to support a criminal complaint.  Due to Plaintiff being on parole, the new drug charges resulted in him being jailed for 212 days.  Plaintiff alleges that, months later, a subpoena brought to light video footage of the arrest which demonstrated that the police had lied about the traffic violation that led to Plaintiff's arrest.  The video was delivered to the prosecution, who subsequently dropped all charges.  Plaintiff alleges that, to the extent that Defendants claim a defense of relying on information from an anonymous tip or confidential information, such information provides no justification for their conduct.

Plaintiff alleges that all Defendants, including the City and its policymakers, acted willfully, recklessly, and with deliberate disregard for Plaintiff's rights.  Plaintiff also alleges that Defendants' actions and omissions shock the conscience, and are fraudulent, dishonest, unlawful, malicious, conducted in bad faith, and intended to injure in a manner unjustified by any government interest.  Plaintiff asserts that the City has a custom, policy, practice, and pattern of allowing its agents, including Defendants, to engage in the wrongful conduct alleged.  Plaintiff further asserts that the City and its policymakers acted deliberately indifferent to an unreasonable risk that the rights of persons with whom the City's police officers come into contact with would be deprived.

In his Complaint, Plaintiff asserts the following six causes of action against Defendants: (1) 42 U.S.C. § 1983 (Violation of Fourth and Sixth Amendments); (2) 42 U.S.C. § 1983 (Violation of Substantive Due Process Rights); (3) 42 U.S.C. § 1983 (*Monell* Liability); (4) Violation of New Jersey Civil Rights Act (N.J.S.A. 10:6-2(c); (5) Violation of New Jersey Civil Rights Act (N.J.S.A. 10:6-2(c); and (6) Malicious Prosecution (Common Law).



Jose Abo
Claims Resolution Corporation, Inc.
January 13, 2023
Page 3 of 6

By way of relief, Plaintiff demands a judgment requesting that the court declare Defendants violated Plaintiff's civil and substantive due process rights, that the City is liable for the violation of Plaintiff's rights, that Defendants violated Plaintiff's rights, privileges, and immunities protected by the United States and New Jersey Constitutions, an award of all damages, including but not limited to compensatory, nominal, and punitive damages, penalties permitted by N.J.S.A. 10:6-2(e), attorneys' fees, costs, and such other relief as the court deems just and proper.

## II.     UNDERWRITERS' POLICY

The Policy subscribed to by Underwriters was issued to the City for the **PERIOD OF INSURANCE** of March 1, 2018 to July 1, 2019 (pursuant to Endorsement No. 10). The Policy provides Law Enforcement Liability coverage on an **OCCURRENCE** basis.[2] The Policy's limit of liability for the Law Enforcement Liability Coverage Section (Section VIII) is $3,000,000 each **OCCURRENCE** and $6,000,000 Annual Aggregate of Liability, subject to a $500,000 **SELF INSURED RETENTION**, and a $500,000 Corridor Retention pursuant to Endorsement No. 6 to the Policy. The Policy does not impose a duty to defend on Underwriters, only a duty to indemnify.

Please note that the pertinent provisions of the Policy are set forth in our September 30, 2020 letter to you. Those provisions are incorporated herein by reference. Coverage under the Policy is also subject to additional certain terms and conditions beyond those set forth in this letter and in our September 30, 2020 letter.

Below, we provide you with Underwriters' supplemental coverage position based on the information currently available to Underwriters.

## III.     UNDERWRITERS' SUPPLEMENTAL COVERAGE POSITION

As an initial matter, we note that Paragraph 11 of the General Policy Conditions provides that Underwriters have no duty to defend under the Policy, only a duty to indemnify. As such, Underwriters will not provide a defense to any **ASSURED** in connection with the Lawsuit.

Second, pursuant to the Policy's Law Enforcement Liability Coverage Section (Section VIII), we note that Underwriters are obligated to indemnify the **ASSURED** for all sums which the **ASSURED** "is legally obligated to pay by reason of the liability imposed upon the **ASSURED** by law for damage, direct or consequential, and expenses, all as more fully defined by the term **ULTIMATE NET LOSS**, on account of **PERSONAL INJURY** or **BODILY INJURY** or **PROPERTY DAMAGE** or the loss of use thereof suffered or alleged to have been suffered by any person(s) or organization(s) resulting from **LAW ENFORCEMENT ACTIVITIES** . . . arising out

---

[2]     The Policy provides various coverage sections. This letter focuses on coverage issues pertaining to the Law Enforcement Liability Coverage Section only, as this appears to be the only potentially applicable coverage section. If you believe that other sections potentially apply, please let us know immediately.


**BATESCAREY** LLP

Jose Abo
Claims Resolution Corporation, Inc.
January 13, 2023
Page 4 of 6

of an **OCCURRENCE** during the **PERIOD OF INSURANCE**."[3]  Moreover, we note that the Law Enforcement Liability Coverage Section contains Exclusion B., which provides, in relevant part, that there is no coverage for:

> B.    Any **CLAIM** or **SUIT** for **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL INJURY,** including any award of attorney's fees and costs, resulting from:
>
> (a)    Any knowing and intentional violation of any subsection of Title 42 of the U.S. Code, including but not limited to 42 U.S.C § 1981 thru 42 U.S.C. §1989 and 42 U.S.C. §1997; or
>
> (b)    Any knowing and intentional deprivation of any rights protected under the United States Constitution or the Constitution of any State, Territory, or Protectorate of the United States; or
>
> (c)    Any act which is not reasonably related to the execution and/or enforcement of the law; or
>
> (d)    Any act committed with the knowledge and intent to cause **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL INJURY,** or which could reasonably be expected to cause **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL INJURY** unless the act of the **ASSURED** was reasonably necessary to lawfully prevent injury to persons or damage to property.

Here, we note that Counts I through III of the Complaint each involve Section 1983 claims that allege that Defendants' actions and omissions "shock the conscience, and are fraudulent, dishonest, unlawful, malicious, conducted in bad faith, and intended to injure in a manner unjustified by any government interest, and/or were conducted with reckless disregard."  With respect to Count III, Plaintiff alleges that Defendants "acted deliberately indifferent to an unreasonable risk that the rights of persons with whom Trenton police come into contact would be deprived."  Similarly, Counts IV and V of the Complaint allege that the **ASSUREDS** violated Plaintiff's rights under the United States and New Jersey Constitutions, and the New Jersey Civil Rights Act.  Additionally, Count VI of the Complaint asserts that the legal proceedings brought against Plaintiff by Defendants "were instituted with malice, without probable cause, caused harm to Mr. Edwards, and were terminated in Mr. Edwards' favor."  Therefore, Underwriters must

---

[3]    The term **OCCURRENCE** means "an accident or happening or event or a continuous or repeated exposure to conditions with results in **BODILY INJURY, PROPERTY DAMAGE,** [or] **PERSONAL INJURY** . . . during the **PERIOD OF INSURANCE**."  As noted in our September 30, 2020 letter, it appears that this matter involves an **OCCURRENCE**.  That said, Underwriters must reserve their rights to deny coverage with respect to whether an **OCCURRENCE** is involved here, and whether the Policy's Law Enforcement Liability Coverage Section is triggered.



Jose Abo
Claims Resolution Corporation, Inc.
January 13, 2023
Page 5 of 6

reserve their rights, including the right to deny coverage for the Lawsuit, pursuant to Exclusion B. of the Law Enforcement Liability Coverage Section.

Third, Exclusion H. of the Law Enforcement Liability Coverage Section precludes coverage for "[a]ny **CLAIM** arising from **WRONGFUL ACTS** except as provided under this Section for Discrimination or Violation of Civil Rights arising out of **LAW ENFORCEMENT ACTIVITES.**" To the extent the Lawsuit arises from **WRONGFUL ACTS** that do not constitute Discrimination or Violation of Civil Rights arising out of **LAW ENFORCEMENT ACTIVITES,** Underwriters reserve their rights to deny coverage under Exclusion H.

Fourth, we note that the term **ASSURED** includes not only the **NAMED ASSURED,** but also "any past, present or future officials; members of boards or commissions; and trustees, directors, officers, volunteers, or employees of the **NAMED ASSURED** while acting within the scope of their duties as such." Underwriters reserve the right to deny coverage to the extent than any purported **ASSUREDS** were not acting within the scope of their duties.

Fifth, General Policy Exclusion A. precludes coverage for any "[l]oss or damage caused by, or resulting from fraudulent or dishonest acts committed by the **ASSURED** whether working alone or with others, except as covered in **Coverage Section VII Crime.**" Again, in his Complaint, Plaintiff alleges that Defendants' actions and omissions shock the conscience, and are fraudulent, dishonest, unlawful, malicious, conducted in bad faith, and were intended to injure Plaintiff in an unjustified manner. As such, Underwriters reserve the right to deny coverage under General Policy Exclusion A.

Sixth, Underwriters reserve their rights to deny coverage under the definition of **ULTIMATE NET LOSS** to the extent that any payment for any judgment or acts is deemed uninsurable by law, including punitive damages.

Seventh, to the extent it is later determined that there is any coverage under the Policy, Underwriters reserve rights on the basis that the Tort Claim and the Lawsuit involve both covered and uncovered matters, or covered and uncovered parties. Specifically, we understand that Plaintiff may have a separate theory of liability against the City that is not alleged in the Complaint. Accordingly, Underwriters must reserve their rights to an appropriate allocation under the terms of the Policy and New Jersey law.

Eighth, the Policy contains an "Other Insurance" provision at Condition 15 of the General Policy Conditions. To the extent, the City or any other **ASSURED** has any other insurance which may apply, Underwriters reserve their rights pursuant to Condition 15.

Please understand that there may be other Policy provisions that apply to this matter, and Underwriters do not waive and expressly reserve, their right to state additional issues/defenses that may affect coverage.

 **BATESCAREY** LLP

Jose Abo
Claims Resolution Corporation, Inc.
January 13, 2023
Page 6 of 6

## IV.    RESERVATION OF RIGHTS / REQUESTS FOR INFORMATION

For the reasons set forth above, Underwriters have no duty to defend the City or any other **ASSURED** in connection with the Lawsuit.  Also, there is no obligation to indemnify any **ASSURED** until the $500,000 **SELF INSURED RETENTION** and the $500,000 Corridor Retention has been satisfied.

We ask that the City keep us apprised of all developments in the Lawsuit.  To the extent you have not provided them, we reiterate the requests for information contained within our September 30, 2020 letter to you.  We also ask that you provide us with any additional transcripts of depositions of any of the parties to the Lawsuit.  (We note we have already received from you the transcripts of the depositions of Plaintiff and Detective Mahan.)  Please consider the foregoing requests to be standing requests and provide any additional information as it becomes available.  If you have any questions regarding any of the requests, please let us know so that we can arrange a call as soon as possible.

Underwriters do not waive any of their rights under the Policy, and by virtue of the matters discussed herein, Underwriters do not intend to waive any of their other coverage defenses, nor shall Underwriters be estopped from asserting any applicable defense.  This reservation includes, but is not limited to, the right to seek a judicial declaration of Underwriters' rights and defenses as expressed herein.  Underwriters continue to expressly reserve their rights to state additional reasons why coverage does not exist for this matter under the Policy and/or amend this letter to address additional coverage issues under the Policy.

If you have any questions or concerns regarding Underwriters' coverage position set forth above, please let us know.

Very truly yours,

*[signature]*

David L. Koury

cc:    J. Brooks DiDonato, Esq. (via e-mail only)

Marc Board, Riverstone (via e-mail only)

3095681


**BATESCAREY**LLP

David L. Koury
312.762.3226 Direct
dkoury@batescarey.com

January 13, 2023

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**WITHOUT PREJUDICE**

**VIA E-MAIL**

Jose Abo
Claims Resolution Corporation, Inc.
323 S. Pitney Road, Suite 200
Galloway, NJ 08205
E-Mail: JAbo@crctpa.com

| | Re: | | |
|---|---|---|---|
| | Assured: | **City of Trenton, NJ** |
| | Policy No.: | **PK1021618** |
| | Policy Period: | **March 1, 2018 to July 1, 2019** |
| | Matter: | ***Tyshon Edwards v. City of Trenton, et al.*, Case No. 3:20-cv-13552 (U.S. District Court for the District of New Jersey)** |
| | CRC File No.: | **16136** |
| | Claim No.: | **1015692** |
| | Our File No.: | **19143** |

Dear Mr. Abo:

This letter is written to convey Underwriters' proposed resolution of any dispute over coverage. We note that Brooks DiDonato's November 15, 2022 e-mail outlines the alleged facts of the matter and notes what we understand to be the current settlement numbers. In his e-mail, Mr. DiDonato advises that Plaintiff's most recent demand was $1.2 million and that the City of Trenton offered a "walk away number of $500,000 to settle subject to approval by Council." We also understand that Magistrate Judge Alpert has opined that the settlement value is approximately $1.5 million. Mr. DiDonato believes it will take between $900,000 and $1,000,000 to settle.[1] As of the November 15, 2022 e-mail, we understand that the Policy's $500,000 SIR has been reduced to approximately $438,869.12 in light of defense costs.

Underwriters have sent, under separate cover, a supplemental coverage position letter dated January 13, 2023, which discusses what we believe are significant coverage issues.[2] Also,

---

[1]    We note that a detailed damages analysis or calculation for Mr. DiDonato's settlement evaluation has not been provided. We ask that you please provide such an analysis.

[2]    As outlined in Underwriters' January 13, 2023 supplemental coverage position letter, Plaintiff's allegations against the City of Trenton in the referenced lawsuit all sound in intentional conduct. Moreover, despite any



**BATESCAREY LLP**

Jose Abo
Claims Resolution Corporation, Inc.
January 13, 2023
Page 2 of 3

we note that it is ultimately the City of Trenton's burden to establish coverage under the above referenced Policy. We also remind you that the Policy is a reimbursement-only policy, under which Underwriters have no current indemnity obligation.

Despite the coverage issues noted in our coverage letters, and as a courtesy, Underwriters propose the following settlement structure in connection with any dispute regarding Underwriters' position. Underwriters are willing to consider any defense costs incurred to date will count against the Policy's $500,000 SIR. Additionally, given the coverage issues, in conjunction with Mr. DiDonato's settlement evaluation (*i.e.*, between $900,000 and $1,000,000) Underwriters are willing to reduce the Policy's $500,000 SIR by up to twenty-five percent (25%) of a settlement amount up to $1,000,000, on a "without prejudice" basis and without withdrawal of any of the coverage positions set forth in our September 30, 2020 or January 13, 2023 correspondence. In other words, if the referenced lawsuit were to be settled for $1,000,000, Underwriters would reduce the Policy's $500,000 SIR by $250,000.

As discussed in our coverage position letters, Underwriters have no duty to defend or indemnify the City of Trenton or any **ASSURED**[3] in connection with the referenced lawsuit. Any duty of Underwriters to indemnify for **ULTIMATE NET LOSS**, if at all, may arise only upon resolution of the referenced lawsuit.

Underwriters do not waive any of their rights under the Policy, and by virtue of the matters discussed herein, Underwriters do not intend to waive any of their other coverage defenses, nor shall Underwriters be estopped from asserting any applicable defense. This reservation includes, but is not limited to, the right to seek a judicial declaration of Underwriters' rights and defenses as expressed herein. Underwriters continue to expressly reserve their right to supplement and/or amend this letter to state additional coverage issues as they may arise, based upon the Policy, as well as any additional facts that may come to Underwriters' attention. Nothing stated in this letter or in any other communication, and no action taken (or not taken), by Underwriters or on their behalf should be construed as a waiver or limitation of any of their rights, remedies or defenses under the Policy, at law or in equity. Rather, while providing this or any other communication or engaging in any discussion, Underwriters continue to reserve all rights, remedies and defenses.

---

possibility of there eventually being any claims sounding more negligent in nature, Plaintiff and his counsel echo this view that the claims are intentional in Plaintiff's August 31, 2019 deposition. For example, Plaintiff's counsel noted that "my client is the victim of not only gross civil [r]ights violations by the defendants as alleged in this case, but frankly of criminal conduct." Plaintiff also testified that he was not sure whether the police were involved in framing him for possession of heroin.

[3]       Terms in bold and all capital letters are defined in the Policy.



Jose Abo
Claims Resolution Corporation, Inc.
January 13, 2023
Page 3 of 3

      After you have reviewed this letter, we are happy to discuss the matter with you further at your convenience. Please do not hesitate to contact us with any questions you may have.

Very truly yours,

David L. Koury

cc:    J. Brooks DiDonato, Esq. (via e-mail only)

       Rashaan S. Williams, Esq. (via e-mail only)

       Charles Simmons, Esq. (via e-mail only)

       Marc Board, Riverstone (via e-mail only)

3116175

# Exhibit "D"

**To:** Koury, David L. <dkoury@BatesCarey.com>
**Subject:** RE: Tyshon Edwards v COT, et al.

My apologies David, I just saw this.
I will be in tomorrow (Friday-8/25) from about 10 am on all day.

I look forward to hearing from you.

**J. Brooks DiDonato, Esquire**
*Shareholder*
**Defense Litigation**

**PARKER McCAY P.A.**
O: 856-985-4047
C: 856-296-1143
bdidonato@parkermccay.com

**From:** Koury, David L. <dkoury@BatesCarey.com>
**Sent:** Wednesday, August 23, 2023 8:37 AM
**To:** J. Brooks DiDonato <bdidonato@parkermccay.com>
**Subject:** RE: Tyshon Edwards v COT, et al.

**\*\*\* External Email – This email has come from outside of Parker McCay. Think before you click on links, open attachments, or reply! \*\*\***

Hi Brooks – Are you available this afternoon or in the morning for a quick call regarding this matter?

**David L. Koury** | Partner
BatesCarey LLP | 191 N. Wacker, Suite 2400, Chicago, IL 60606
Direct 312.762.3226 | dkoury@batescarey.com | batescarey.com



**From:** J. Brooks DiDonato <bdidonato@parkermccay.com>
**Sent:** Thursday, July 20, 2023 11:21 AM
**To:** Koury, David L. <dkoury@BatesCarey.com>; Marc Board <Marc.Board@rsml.co.uk>
**Cc:** Jose Abo <JAbo@crctpa.com>; Rashaan S. Williams <rswilliams@trentonnj.org>; Charles Simmons <csimmons@simmonslaw-llc.com>
**Subject:** Tyshon Edwards v COT, et al.

Mr. Koury,

It would appear that on 8/03/22 at 4:31 p.m. Susan DeCaro, then with CRC, advised Brit that the corridor SIR for the policy period in question had been satisfied, albeit in the context of the Art All Night Shooting cases. Specifically, that email stated:

**Marc, Jose forwarded the below message to me. It is my understanding the $500K SIR for this loss has or will be met under the coverage for Artworks Llyod's policy where the City is an additional insured. The corridor appears to run across all lines for the City under policy PK1021618 effective 03/01/18 to 03/01/19. It does appear that with**

3

the erosion of the SIR for this claim and payments for claims under all lines of coverage for this policy period the Corridor Retention has been eroded. Claim payments for WC are over $2M for this policy period to date along with payments under all other lines of approximately $440,000 for the policy period.

Given that the arrest in question in this case occurred on January 19, 2019, it would clearly fall within the same policy period.

This is yet further proof that the corridor SIR is satisfied, and, therefore, not applicable in this case.
Thus, the Corridor is out and we need only deal with the underlying SIR, of which roughly $100,000.00 has been eroded for counsel fees and costs.
That leaves Trenton with roughly $400,000.00 in SIR, and Brit responsible for the payment of any settlement funds necessary to resolve this matter beyond that.

Thus, as I have previously pointed out, if we use a figure of $850,000.00 for settlement, Brit must reimburse COT the sum of $450,000.00 upon its payment of a settlement in that amount.
Obviously, this number changes with any change in the proposed settlement amount and as the SIR becomes further eroded by additional counsel fees and costs.

Your continued denial of any responsibility to reimburse Trenton for any settlement funds above the approximate $400,000.00 mark, in light of the above and my recent email setting forth other reasons, would appear to be evidence of Brit's Bad Faith in the handling of this claim.
As previously indicated, if Brit does not promptly change its position with respect to settlement we will be forced to initiate a coverage action that will include discovery of Brit's claims handling policies, previous claims against it putting it on notice of its Bad Faith, and will seek all sums necessary to reimburse Trenton for monies paid by it to settle this claim or pay a judgment in the event that the case goes to verdict. That claim will also seek attorney's fees and costs incurred by Trenton relative to the coverage action as required by statute here in New Jersey, and punitive damages for Brit's Bad Faith. Finally, in the event that the case goes to judgement and that judgment exceeds the coverage under the policy we will seek payment of any excess verdict from Brit. See, New Jersey Insurance Fair Conduct Act and *Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474 (1974).*

In regards to the last of these issues, plaintiff's research has revealed that the verdict/settlement averages per wrongful day of incarceration are $99,630.18, meaning that the average result for 212 days (what plaintiff spent here) is $21,121,598.02.
Given that I believe our case can be settled for between $850,000 and $900,000, Brit's refusal to contribute (reimburse) in settlement negotiations in a meaningful fashion is all the more shocking.

As you are also aware, plaintiff has raised the issue of Trenton settling directly with him for a single cash payment to be determined and assigning its rights against Brit to the plaintiff.
I will be discussing this proposal with Director Bridges next week when he returns from vacation.

Thank you,



**J. Brooks DiDonato, Esquire (He/Him/His)**
*Shareholder*
**Defense Litigation**

 PARKER McCAY

O: 856-985-4047
C: 856-296-1143
bdidonato@parkermccay.com

Exhibit "E"

## J. Brooks DiDonato

| | |
|---|---|
| **From:** | J. Brooks DiDonato |
| **Sent:** | Tuesday, January 9, 2024 6:45 PM |
| **To:** | Koury, David L. |
| **Cc:** | Marc Board |
| **Subject:** | RE: Tyshon Edwards/CRC#16136/Riverstone#1015692 |

David,

You and I have discussed what I believe to be the non-existent coverage issues.
I have explained to you and Marc why it is a covered claim, and nevertheless you have never acknowledged that, nor have you (on behalf of the carrier) offered one dime to assist with the settlement of the case.
In fact, you have denied coverage, accepted it with an ROR, and then offered some convoluted formula that was a combination of both, but all resulted in the same thing: not one penny towards settling the case, despite the fact that you have seen concrete evidence, in terms of verdict and settlement research, indicating that the case could potentially result in an 8 figure award, thereby exposing the your client's insured (COT) to a very large excess verdict.

In short, I am not sure what there is to speak about.
However, if you think there is feel free to call.

**J. Brooks DiDonato, Esquire**
*Shareholder*
**Defense Litigation**

**PARKER McCAY P.A.**
O: 856-985-4047
C: 856-296-1143
bdidonato@parkermccay.com

**From:** Koury, David L. <dkoury@BatesCarey.com>
**Sent:** Tuesday, January 9, 2024 3:27 PM
**To:** J. Brooks DiDonato <bdidonato@parkermccay.com>
**Cc:** Marc Board <Marc.Board@rsml.co.uk>
**Subject:** RE: Tyshon Edwards/CRC#16136/Riverstone#1015692

**\*\*\* External Email – This email has come from outside of Parker McCay. Think before you click on links, open attachments, or reply! \*\*\***

Brooks,

As you know, there are coverage issues to be discussed and sorted out in connection with this claim and the indemnity-only nature of the policy. I believe that you and I speaking first offers the best chance of working something out.

Dave

# Exhibit "F"



Parker McCay P.A.<br>
9000 Midlantic Drive, Suite 300<br>
P.O. Box 5054<br>
Mount Laurel, New Jersey 08054-5054<br><br>
P: 856.596.8900<br>
F: 856.596.9631<br>
www.parkermccay.com<br><br>
<strong>J. Brooks DiDonato, Esquire</strong><br>
P: 856-985-4047<br>
F: 856-494-1715<br>
bdidonato@parkermccay.com

December 5, 2023

File No. 15108-91/JBD

***<u>Via Certified and Regular Mail</u>***
**David Koury**
**BATES CAREY, LLP**
**191 N. Wacker, Suite 2400**
**Chicago, IL 60606**

Re:   <u>TYSHON EDWARDS v CITY OF TRENTON, ET AL</u>
Civil Action:  3:20-cv-13552-ZNQ-DEA

Dear Mr. Koury:

Certain Underwriters at Lloyd's of London ("Underwriters") that subscribe to Policy No. PK1021618 (the "Policy"), issued to the City of Trenton, NJ (the "City"), has denied coverage to the City regarding the above-referenced litigation, including refusing to defend or indemnify the City. At other times, Underwriters has purported to reserve all rights and defenses under said policy. At not to time has it ever offered to provide the coverage owed under that Policy.

In light of same, the City has no obligation to inform Underwriters regarding the status of the matter. Nevertheless, this letter is to inform you that the City intends to settle the litigation with Plaintiff and that the Ultimate Net Loss resulting from the settlement will exhaust the Self Insured Retention and will involve liability to Underwriters under the Policy and for Underwriters' bad faith denial of coverage.

If Underwriters wishes to finally participate in the settlement at this time, I encourage you to immediately contact Plaintiff's counsel, Mr. John Stapleton, directly at jstapleton@levanstapleton.com and (856) 272-3603.

Thank you for your attention in this matter.

Very truly yours,

*s/ J. Brooks DiDonato*

J. BROOKS DIDONATO

/de
Cc:   John S. Stapleton, Esq.
Marc Ford/Lloyds

COUNSEL WHEN IT MATTERS.<sup>SM</sup>

Mount Laurel, New Jersey | Hamilton, New Jersey | Atlantic City, New Jersey | Camden, New Jersey