# **EXHIBIT 9**

2/26/2024 Lloyd's Response to Plaintiff's Motion for Approval of Settlement and Entry of Consent Judgment (Civil Rights Dkt. 76)

- o A- Policy (Dkt. 76-1)

  *(Exhibits B-C, Civil Rights Dkt. 76-2 – 76-3 omitted as duplicative of other documents in record)*

- o D- Koury Declaration (Civil Rights Dkt. 76-4)

  - o 1- 2/16/2023 DiDonato email to Koury cc W. Bridges, J. Abo, R. Williams, C. Simmons, M. Board, E. Frink, L. Shaw

  - o 2- 7/17/2023 DiDonato email to Koury cc Wesley Bridges

    *(Exhibit D-3 of Civil Rights Dkt. 76-4 omitted as duplicative of other documents in record)*

- o E- 4/7/2020 news article: *Hamilton Township settles wrongful arrest lawsuit for almost $1 million* (Civil Rights Dkt. 76-5)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TYSHON EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:20-CV-13552 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF TRENTON, MICHAEL | ) | **INTERVENOR, CERTAIN** |
| TILTON, JOHNATHON CINCILLA, | ) | **UNDERWRITERS OF LLOYD'S** |
| NICHOLAS MAHAN, ERIC AVALOS, | ) | **LONDON'S RESPONSE TO** |
| ANTHONY KUBISH, and JOHN DOES 1- | ) | **PLAINTIFF'S MOTION FOR** |
| 8, | ) | **APPROVAL OF SETTLEMENT AND** |
| | ) | **ENTRY OF CONSENT JUDGMENT** |
| Defendants. | ) | |

Intervenor, Certain Underwriters of Lloyd's London ("Underwriters"), by and through their attorneys, MacMain Leinhauser PC and BatesCarey, LLP, respectfully submit this Brief in Response to Plaintiff's Motion for Approval of Settlement Agreement and Entry of Consent Judgment (Doc. 62).

## I.     INTRODUCTION

Given that this Court will conduct a hearing with respect to both Plaintiff's Motion for Approval of Settlement Agreement and Entry of Consent Judgment (the "Motion to Approve") and Underwriters' Motion to Intervene on February 28, 2024, Underwriters have filed its objections in relation to the proposed Consent Judgement in advance of the Court's consideration of the issues.

Underwriters subscribe to a Public Entity Package Policy, Policy No. PK1021618 (the "Policy"), issued to the City of Trenton, NJ (the "City") for the period of March 1, 2018 to July 1, 2019 (pursuant to Endorsement No. 10).  A true and correct copy of the Policy is attached hereto

as **<u>Exhibit A</u>**.[1]  The Policy does not impose a duty to defend on Underwriters, only a duty to indemnify.

After the City and Plaintiff reached an apparent agreement to resolve this matter for $5 million, Plaintiff's filed the Motion to Approve, which requested in part that this Court enter proposed findings that the Consent Judgment was "reasonable" and entered into by the parties in "good faith" under *Griggs v. Bertram*, 443 A.2d 163 (N.J. 1982).  Plaintiff's request for a *Griggs* finding is an effort to circumvent and overtly leap-frog the significant procedural prerequisites that a potential future enforcement action against Underwriters would entail with respect to actually enforcing the Consent Judgment.  This is especially troublesome where Underwriters is not a party to the case before this Court, and Plaintiff has specifically objected to Underwriters' request to intervene, yet Plaintiff has filed a 9-page Motion supported by 2 stipulations that discuss in detail what the parties describe as Underwriters' allegedly improper conduct during the settlement discussions to justify a *Griggs* finding.

## II.     ARGUMENT

### A.     The Consent Judgment requested is improper in light of the Policy's terms

Any settlement reached by the parties does not actually require that this Court: (1) analyze Underwriters' conduct during the settlement negotiations; (2) agree to Plaintiff's and the City's self-serving summarization and characterization of the facts at issue; or (3) resolve the issues of reasonableness and good faith under *Griggs*.  In other words, the Court is being asked to do much more than simply enter a Consent Judgment for a specific monetary amount as a matter of record

---

[1] The Policy's limit of liability for the Law Enforcement Liability Coverage Section (Section VIII) is $3,000,000 each **OCCURRENCE** and $6,000,000 Annual Aggregate of Liability, subject to a $500,000 **SELF INSURED RETENTION**, and a $500,000 Corridor Retention pursuant to Endorsement No. 6 to the Policy.  Terms in bold are defined in the Policy.

and dismiss the case, and instead *is* being asked to essentially make coverage determination as to what Underwriters' duties were here.

### 1.    The City breached the Policy's Consent to Settle Provision

Initially, while Plaintiff and the City contend that they should be free to settle this Lawsuit pursuant to *Griggs* given what they characterize as Underwriters' denial of coverage, Underwriters again note that it never denied coverage.  Underwriters instead issued coverage position letters on September 30, 2020 and on January 13, 2023 (attached hereto as **Exhibit B** and **Exhibit C**, respectively), which outlined that: "there is no duty to defend the City or any **ASSURED** in connection with the Lawsuit under the Policy.  Moreover, any duty of Underwriters to indemnify the City for the **ULTIMATE NET LOSS**, if at all, may arise only upon resolution of the litigation."

In light of the allegations, Underwriters did reserve rights to deny coverage for the Lawsuit pursuant to Exclusion B. of the Law Enforcement Liability Coverage Section, which generally precludes coverage under the Policy for any "knowing and intentional violation" of §1983.  But, again, Underwriters made clear in its January 13, 2023 that the actual duty to indemnify the City could not be determined until the resolution of the Lawsuit, and that no obligation to indemnify any **ASSURED** existed until the $500,000 **SELF INSURED RETENTION** and the $500,000 Corridor Retention had been satisfied.  Underwriters additionally asked the City to keep Underwriters' apprised of all developments in the Lawsuit, which is entirely inconsistent with simply denying coverage and walking away, as the City and Plaintiff contend.  Underwriters also specifically reserved rights in its January 13, 2023 letter to an appropriate allocation to the extent it *was* later determined that the Lawsuit involved both covered and uncovered matters, or covered and uncovered parties.

Paragraph 7 of the General Policy Conditions, as amended by Endorsement No. 7, makes clear that:

> Underwriters shall have the right, but not the obligation, to be associated with the **ASSURED** in, an/or assume charge of, the investigation, handling, defense or settlement of any claims, **SUIT** or proceedings relative to an **OCCURRENCE** or **CLAIM** where in the opinion of the Underwriters, their liability under this Policy is likely to be involved or when the **SELF INSURED RETENTION** has been exhausted; in which case the **ASSURED** and Underwriters shall co-operate to the mutual advantage of both. In all other circumstances, Underwriters have the right, but not the obligation, to assume charge of the defense of any claim or suit relative to an **OCCURRENCE** or **CLAIM** at its own expense.
>
> The **ASSURED** shall make no commitment to pay or settle any **CLAIMS, OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is involved without the prior written agreement of Underwriters. Underwriters shall not withhold agreement without just cause. ****.

Despite the clear language of Paragraph 7 requiring that the City "make no commitment to pay or settle *** where Underwriters liability under this Policy is involved ***without the prior written agreement of Underwriters*," the City attempted to do exactly that, and entered into a settlement agreement dated January 26, 2024 *without* ever seeking Underwriters' consent to do so.

Likewise, Paragraph 11 of the General Policy Conditions further makes clear that:

> **DUTIES:** Underwriters have no duty to investigate, handle, adjust, settle or defend any **CLAIM**, **OCCURRENCE**, proceeding or **SUIT** against the **NAMED ASSURED**, any **ASSURED**, or against any other person or organization for whom the **NAMED ASSURED** is, or may be found to be, legally liable; or whom asserts or claims a right of coverage under the policy. These duties shall be the responsibility of the **NAMED ASSURED**.
>
> Underwriters' duty under the policy shall be to indemnify the **NAMED ASSURED** for **ULTIMATE NET LOSS** in excess of the applicable **SELF INSURED RETENTION**, **MAINTENANCE DEDUCTIBLE**, or any other applicable deductible or deduction; and not more than the **Specific Excess Limit of Insurance**.

J. Brooks DiDonato, as counsel for "the Officers" named in the Lawsuit, specifically admits in his February 16, 2024 letter (Doc. 70) to the Court---which again raises several factual

4

contentions as to Underwriters' alleged conduct---that he took the position that Underwriters would need to "immediately reach out to plaintiff's counsel if Lloyd's wished to participate in the settlement discussions."  As noted above, Paragraph 11 requires that the City handle, adjust, settle and defend the Lawsuit---not Underwriters---and Mr. DiDonato's approach to settlement was entirely unreasonable.  The City, and by extension Mr. DiDonato---who appears to have been handling settlement discussions on the City's behalf---had the duty to engage in settlement discussions with the Plaintiff, while Underwriters had the right to associate in those discussions and approve any settlement proposed by the City and Plaintiff.  In fact, Mr. DiDonato goes as far in his letter as asserting in his letter to this Court that "I was not obligated to inform [Underwriters] of the status of settlement," despite the fact that Paragraph 11 makes clear the City (and Mr. DiDonato in acting as the apparent representative of the City and as counsel for City employees) had *exactly* that duty.[2]

Though the City and Plaintiff have only provided select communications between Underwriters and the City in order to attempt to paint a narrative to support a *Griggs* finding of "good faith," several other emails exchanged between Underwriters and Mr. DiDonato tell a different story.  After Underwriters issued its January 13, 2023 coverage position letter, Mr. DiDonato sent Underwriters' coverage counsel an email dated February 16, 2023 wherein Mr. DiDonato stated that: "I understand that all discussions of settlement are subject to a reservation of rights.  I also understand that there is a 500K SIR and a 500K corridor SIR, meaning there is

---

[2] Paragraph 21 of the General Policy Conditions, as amended by Endorsement No. 8, also requires the City to contract with, and utilize the services of, a duly qualified and competent **THIRD PARTY ADMINISTRATOR**.  Paragraph 21 further evidences that it is *not* Underwriters' duty to handle, adjust, settle and/or defend the Lawsuit, it is the City's duty to do so working in conjunction with its qualified and competent **THIRD PARTY ADMINISTRATOR.**

essentially a $1,000,000 SIR for this case." See Exhibit 1 to Declaration of David Koury, attached hereto as **Exhibit D**.  It wasn't until July 17, 2023, on the eve of the settlement conference, that Mr. DiDonato first asserted (incorrectly) that the Corridor Retention did not apply, and that Underwriters had "denied coverage" in "bad faith" (it had not).  See Exhibit 2 to Declaration of David Koury.

Moreover, Mr. DiDonato also admits in his February 16, 2024 letter to the Court that "Lloyd's was not advised of the settlement *number* prior to the Motion to Settle, but it was advised that a settlement was being discussed, including one that included an assignment of the defendants' rights under the policy to the plaintiff."  (Emphasis in original.)  Underwriters was never asked to consent to this proposed settlement, and Mr. DiDonato's "effort" outlined above fails to satisfy Paragraph 7.  See Declaration of David Koury.  The City had a duty to disclose the proposed settlement to Underwriters and ask for its consent **before** it was agreed to.  *See Benecard Services, Inc. v. Allied World Specialty Ins. Co.*, 2021 WL 4077047 (3rd Cir. Sep. 8, 2021) (finding insured breached consent to settle provision where no notice of settlement was given to insurer).  Underwriters were in turn required under that same paragraph to not withhold agreement to any settlement proposed "without just cause" once a settlement was proposed.  The City, by Mr. DiDonato's own admission, simply chose not to do so.  That conclusion does not align with the

Policy language at issue or New Jersey law, especially where a duty to defend policy is not at issue.[3]

### 2. Plaintiff and the City are attempting to end-run the Policy's Anti-Assignment and Arbitration Provisions

Plaintiff's efforts to secure a "good faith" finding under *Griggs* is an attempt to "pre-litigate" certain coverage issues by asking this Court to make stipulated factual findings on various topics which will prove integral to the Plaintiff's hopes of a prevailing in any future enforcement action. The request are squarely aimed at being used against Underwriters in a potential future coverage action, and appear to be little more than an inappropriate attempt to avoid the Policy's Anti-Assignment and Arbitration Provisions.

The Assignment Provision, which is found in Paragraph 3 of the General Policy Conditions, provides that "[a]ssignment of interest under this Policy does not bind Underwriters' [sic] unless Underwriters consent is endorsed herein." While Plaintiff and the City will

---

[3] Mr. DiDonato also states in his February 16, 2024 letter to this Court that: "Despite my repeatedly imploring both Mr. Koury and Mr. Board to contribute towards the settlement of the case, neither ever offered a single cent towards settlement, by way of direct payment or reimbursement." Mr. DiDonato's exhibits attached to his own certification (Doc. 70-1) establish this statement is false.

Exhibit B is an email from David Koury to Mr. DiDonato wherein Mr. Koury references and discusses a "framework by which they would be willing to contribute towards a settlement" of the matter up to $1 million, evidencing that Underwriters ***did*** attempt to work with Mr. DiDonato and the City to resolve this matter. Exhibit C to the certification is the January 13, 2023 settlement communication letter referenced in Exhibit B, which makes clear that in relation to a proposed settlement of $1 million, Underwriters outlined its proposed resolution of any dispute over coverage. Exhibit B also makes clear that Plaintiff had demanded $1.2 million, this Court had opined that the settlement value of this case was approximately $1.5 million, and Mr. DiDonato had indicated he believed it would take between $900,000 and $1,000,000 to settle the Lawsuit. As this Court is aware, Mr. Koury also attended the July 18, 2023, settlement conference in the Lawsuit on behalf of Underwriters, and participated in those discussions in good faith in an attempt to resolve the Lawsuit. See Declaration of David Koury. Exhibit B further highlights the collusive nature of the settlement agreement where a Consent Judgment is now being proposed for $5 million, despite also including factual stipulations that even further undercut the City's liability to Plaintiff from the case Plaintiff had presented in its Complaint.

undoubtably suggest Underwriters cannot enforce the Anti-Assignment provision where it has denied coverage, as explained above Underwriters never denied coverage, and instead simply reserved rights. The City nevertheless failed to seek Underwriters' consent to settle the Lawsuit before it entered into the collusive and unreasonable settlement agreement at issue here, and likewise violated the Policy's Anti-Assignment Provision by assigning all of its rights under the Policy to Plaintiff without Underwriters' consent.

Similarly, the Motion to Approve is a clear effort by the City and Plaintiff to avoid the impact of the Policy's Arbitration Provision, which is found in Paragraph 2 of the General Policy Conditions. Plaintiff attempts to use this Court's approval of a Consent Judgment to determine the issue of "good faith" is especially troublesome given the actual analysis of when a good faith finding is appropriate in the *Griggs* decision itself. There, the New Jersey Supreme Court specifically recognized that:

> We therefore hold that a settlement may be enforced against an insurer in this situation only if it is reasonable in amount and entered into in good faith. The initial burden of going forward with proofs of these elements rests upon the insured and the ultimate burden of persuasion as to these elements is the responsibility of the insurer. This rule reasonably accommodates and compromises the competing interests of the parties and considerations of public policy. It will discourage collusive or overreaching impositions upon insurance carriers and, at the same time, will be conducive toward encouraging settlement and protecting an insured in its efforts amicably to resolve a claim against it after having been abandoned by its carrier. *Id.* at 367-68.

Again, Underwriters are not asking this Court to actually resolve any of the complex coverage issues that are present here. But, Underwriters do assert that Plaintiff asking this Court to enter a finding that the Consent Judgment is "reasonable" and entered into by the City and Plaintiff in "good faith" under *Griggs* (based almost entirely on the incorrect factual assertions Plaintiff raises in the Motion to Approve as to Underwriters' actions during the settlement discussions) is itself a blatant attempt by Plaintiff and the City to have this Court resolve portions

8

of the coverage dispute. Such an attempt is especially troublesome where Plaintiff objected to any attempt by Underwriters to even intervene in this matter, arguing Underwriters' interest is "too contingent and remote to support intervention" (Doc. 71, pg. 3), despite almost the entire Motion to Approve being framed as an indictment of Underwriters' handling of the Lawsuit. *Griggs* recognizes the need to "discourage collusive or overreaching impositions upon insurance carriers," and Plaintiff's and the City's attempt to have this Court enter a good faith finding based upon the sort of questionable factual assertions contained in the Motion to Approve is entirely improper.

> ### 3. The factual stipulations in the Consent Judgment are legally incongruent with a §1983 *Monell* liability claim

The collusive nature of the Consent Judgment is apparent from the very way it is structured. Exclusion B Law in the Enforcement Liability Coverage Section provides in relevant part that there is no coverage for:

<blockquote>

(a) Any knowing and intentional violation of any subsection of Title 42 of the U.S. Code, including but not limited to 42 U.S.C § 1981 thru 42 U.S.C. §1989 and 42 U.S.C. §1997; or

(b) Any knowing and intentional deprivation of any rights protected under the United States Constitution or the Constitution of any State, Territory, or Protectorate of the United States; or

(c) Any act which is not reasonably related to the execution and/or enforcement of the law; or

(d) Any act committed with the knowledge and intent to cause **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL INJURY,** or which could reasonably be expected to cause **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL INJURY** unless the act of the **ASSURED** was reasonably necessary to lawfully prevent injury to persons or damage to property.

</blockquote>

In what is more than just a coincidence, Plaintiff and the City make specific factual stipulations in the Consent Judgment that:

<blockquote>

Plaintiff and Defendant City of Trenton stipulate that $0.00 of this judgment is attributable to punitive damages, statutory penalties, or fines, and that Defendant City of Trenton and its agents did not knowingly or intentionally violate or deprive Plaintiff of any rights protected by any federal, state, or local laws, or commit any acts not reasonably related to the execution and/or enforcement of the law, or

</blockquote>

commit any acts with knowledge and intent to cause injury or damage or which could reasonably be expected to cause injury or damage.  (Doc. 62-1, Ex. A).

The above "stipulations" are clearly designed to address any argument that Exclusion B precludes coverage.  Such findings amount to a collusive attempt to justify an award of $5 million based off of the City's alleged *Monell* liability while entering factual stipulations that undercut any actual *Monell* liability.

The U.S. Supreme Court, the 3rd Circuit, and New Jersey federal courts have all clearly recognized that in order to prevail on a *Monell* claim, a plaintiff must show that the municipality, through one of its policymakers, affirmatively proclaimed the policy, or acquiesced in the widespread custom, that caused the violation.  *See, e.g., Watson v. Abington Twp.*, 478 F.3d 144, 155–156 (3d Cir.2007).  Once a § 1983 plaintiff identifies a municipal policy or custom, a plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).  If the policy or custom does not facially violate federal law, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.  A showing of simple or even heightened negligence will not suffice."  *Id*. at 407; *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir.2000).  For a § 1983 claim of failure to train or supervise municipal employees, as Plaintiff alleged here, the plaintiff must show that the failure to provide training or supervision amounted to " 'deliberate indifference' to the rights of persons with whom the employee will come into contact."  *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir.2014).   Deliberate indifference may be demonstrated by showing a pattern of violations which puts the municipal employee on notice that a new program is necessary; or a single incident violation where the need for training was patently obvious.  *Id*. at 223.  "Deliberate indifference" at a minimum encompasses

10

"knowledge of a risk, recognition of the harm posed by the risk, and a conscious decision to take no action or manifestly inadequate action to avoid the risk." *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1089 (3d Cir.1991). *See also S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 266 n.26 (3d Cir. 2013) (recognizing in the Title IX context that "[d]eliberate indifference requires actual knowledge; allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference.")

Plaintiff and the City seek to settle Plaintiff's *Monell* claim, yet do so in a way that contradicts the sort of "deliberate indifference" that must be shown to actually prevail on a *Monell* claim. Underwriters question why the City would consent to a $5 million judgment where Plaintiff is apparently willing to stipulate that the City's and the individual Officers' actions were not knowing or intentional. Again, the above stipulations are nothing more than an attempt to preclude Underwriters from evaluating whether any *Monell* liability would actually be covered under the Policy in light of Exclusion B, and in turn illustrate the settlement is collusive.

> **B.    The amount of the Consent Judgment at issue compared to the facts known through discovery to date also suggests the settlement reached between the City and Plaintiff is collusive**

Plaintiff and the City have purported to provide a basis for asserting that the settlement in this matter is reasonable. The main case they point to is a settlement in a matter involving Hamilton Township Police Department. The case cited has a factual recitation that does not square with this matter. Michael Lionelli was arrested by the Hamilton Police Department and accused of robbing a local CVS. The summary of the case from CommunityNews.org (an online news organization for New Jersey news) is as follows[4]:

---

[4] A copy of the News Article is attached hereto as **Exhibit E**.

11

- Lionelli was arrested by the Hamilton Police and charged with robbing a CVS;
- The eye witness could not identify Lionelli as the perpetrator.  The police received and did not share evidence that exonerated Lionelli;
- Charges were unresolved for more than 25 months after spending 11 days in jail.  His college career was delayed by 2 years while the charges were pending; and
- The Hamilton Police publicized the arrest of Lionelli, and damaged his reputation.

The City's and Plaintiff's allegation that this case is an exemplar of the case before this Court is absurd.  The City and Plaintiff apparently ignore the fact that the Hamilton Police Department withheld evidence, arrested an individual that was actually innocent of the crime, and continue to drag out a prosecution for over two (2) years, depriving an innocent young man of his opportunity to go to college in a timely manner or complete his senior year of high school.

As indicated above, this case is not on all fours with the factual foundation of the present matter and the comparison presented is inapposite.  Assuming the factual foundation of Plaintiff's case is true, and the City of Trenton police officers fabricated their police reports, Plaintiff in this case was in possession of 1,000 bags of heroin partitioned for distribution.  While the Officers' conduct may have been found in an adjudication to be improper in causing the stop, effectuating the arrest, and inaccurately reporting on the matter, there can be no claim of reputational harm to an individual caught in possession of the very drugs he was intending to distribute.  The claim that these cases are similar, or that the value of the Hamilton litigation somehow informs the value of this litigation does not comport with the facts.  While both Plaintiff here and in Hamilton allege that the police fabricated evidence or engage in misconduct, the similarities end there.  The measure of the loss of reputation by any individual has to be compared to their status at the outset of the interaction with the defendants.

It is believed that Plaintiff will point to other flawed comparator cases of actually innocent individuals detained by the police or wrongfully charged with criminal conduct.  These cases, of

course, do not actually compare to the settlement here and, to the extent the City relied upon these representations as a means of resolving the case, the $5 million settlement cannot be determined to be fair or reasonable, especially where Mr. DiDonato analyzed the City's exposure as under the $1 million mark up to the point where Plaintiff presented the theory that he could collect up to $18 million in damages under a tortured analysis of what an applicable "per diem rate" would be based on Plaintiff's 212 days in jail given the Hamilton Township settlement for $950,000 based on 11 days in jail. Despite Plaintiff's contention in the Motion to Approve, the Hamilton Township settlement is far from an "apples-to-apples comparison for value," and as explained above no deeper analysis of why this Lawsuit would result in an $18 million potential verdict is provided outside of the fact that both this Lawsuit and the Hamilton Township matter involve an alleged "pre-conviction, wrongful detentions without any major physical injuries."

## III.    CONCLUSION

Underwriters are not seeking to litigate the issue of whether coverage exists under the Policy. Instead, Underwriters respectfully requests that this Court **_not_** analyze or issue findings relative to whether the proposed Consent Judgment was reasonable and entered into good faith under _Griggs_, and **_not_** enter the Consent Judgment, as the requested findings in the Consent Judgment are merely a precursor to Plaintiff later using this Court's rulings in potential future coverage litigation between Plaintiff (as an assignee of the City, which again stands in direct contradiction of the Policy's Anti-Assignment Provision where Underwriters never consented to an assignment) and Underwriters.

Respectfully submitted,

**MacMAIN LEINHAUSER PC**

Dated: <u>February 26, 2024</u>          By:   <u>*/s/ Brian H. Leinhauser*</u>
                                              Brian H. Leinhauser
                                              Brian C. Conley
                                              Attorney I.D. Nos. 59320 / 311372
                                              433 W. Market Street, Suite 200
                                              West Chester, PA 19382

                                              Adrian T. Rohrer (admitted *Pro Hac Vice*)
                                              BatesCarey LLP
                                              191 N Wacker Suite 2400
                                              Chicago, IL 60606

# EXHIBIT A



# Lloyd's Certificate

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Assured** is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:

**Brit Global Specialty USA**
**161 North Clark Street, Suite 3200**
**Chicago, IL 60601**
**USA**

SLC-3 (USA) NMA2868 (4/22/13)

LCAO0416

**Certificate Provisions**

1. **Signature Required.** This Certificate shall not be valid unless signed by the Correspondent on the attached Declarations.

2. **Correspondent Not Insurer.** The Correspondent is not an Insurer hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Insurers hereunder are those Underwriters at Lloyd's, London whose syndicate numbers can be ascertained as set forth in this Certificate. As used in this Certificate "Underwriters" shall be deemed to include incorporated as well as unincorporated persons or entities that are Underwriters at Lloyd's, London.

3. **Cancellation.** If this Certificate provides for cancellation and this Certificate is cancelled after the inception date, earned premium must be paid for the time the insurance has been in force.

4. **Service of Suit.** It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters, at the request of the Assured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon the firm or person named in item 1 of the attached Declarations, and that in any suit instituted against any one of them upon this Certificate, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

   The Correspondent is authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon request of the Assured to give a written undertaking to the Assured that they will enter a general appearance on behalf of Underwriters in the event such a suit shall be instituted.

   Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this Certificate, and hereby designate the above-mentioned as the person to whom the said officer is authorized to mail such process or a true copy thereof.
   LMA5020
   14/09/2005

5. **Assignment.** This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

6. **Attached Conditions Incorporated.** This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached or endorsed, all of which are to be considered as incorporated herein.

7. **Short Rate Cancellation.** If the attached provisions provide for cancellation, the table below will be used to calculate the short rate proportion of the premium when applicable under the terms of cancellation.

**LCAO0416**

**Short Rate Cancellation Table For Term of One Year.**

| Days Insurance in Force | Per Cent of one year Premium | Days Insurance in Force | Per Cent of one year Premium | Days Insurance in Force | Per Cent of one year Premium | Days Insurance in Force | Per Cent of one year Premium |
|---|---|---|---|---|---|---|---|
| 1 | 5% | 66 - 69 | 29% | 154 - 156 | 53% | 256 - 260 | 77% |
| 2 | 6 | 70 - 73 | 30 | 157 - 160 | 54 | 261 - 264 | 78 |
| 3 - 4 | 7 | 74 - 76 | 31 | 161 - 164 | 55 | 265 - 269 | 79 |
| 5 - 6 | 8 | 77 - 80 | 32 | 165 - 167 | 56 | 270 - 273 ( 9 mos ) | 80 |
| 7 - 8 | 9 | 81 - 83 | 33 | 168 - 171 | 57 | 274 - 278 | 81 |
| 9 - 10 | 10 | 84 - 87 | 34 | 172 - 175 | 58 | 279 - 282 | 82 |
| 11 - 12 | 11 | 88 - 91 ( 3 mos ) | 35 | 176 - 178 | 59 | 283 - 287 | 83 |
| 13 - 14 | 12 | 92 - 94 | 36 | 179 - 182 ( 6 mos ) | 60 | 288 - 291 | 84 |
| 15 - 16 | 13 | 95 - 98 | 37 | 183 - 187 | 61 | 292 - 296 | 85 |
| 17 - 18 | 14 | 99 - 102 | 38 | 188 - 191 | 62 | 297 - 301 | 86 |
| 19 - 20 | 15 | 103 - 105 | 39 | 192 - 196 | 63 | 302 - 305 ( 10 mos ) | 87 |
| 21 - 22 | 16 | 106 - 109 | 40 | 197 - 200 | 64 | 306 - 310 | 88 |
| 23 - 25 | 17 | 110 - 113 | 41 | 201 - 205 | 65 | 311 - 314 | 89 |
| 26 - 29 | 18 | 114 - 116 | 42 | 206 - 209 | 66 | 315 - 319 | 90 |
| 30 - 32 ( 1 mos ) | 19 | 117 - 120 | 43 | 210 - 214 ( 7 mos ) | 67 | 320 - 323 | 91 |
| 33 - 36 | 20 | 121 - 124 ( 4 mos ) | 44 | 215 - 218 | 68 | 324 - 328 | 92 |
| 37 - 40 | 21 | 125 - 127 | 45 | 219 - 223 | 69 | 329 - 332 | 93 |
| 41 - 43 | 22 | 128 - 131 | 46 | 224 - 228 | 70 | 333 - 337 ( 11 mos ) | 94 |
| 44 - 47 | 23 | 132 - 135 | 47 | 229 - 232 | 71 | 338 - 342 | 95 |
| 48 - 51 | 24 | 136 - 138 | 48 | 233 - 237 | 72 | 343 - 346 | 96 |
| 52 - 54 | 25 | 139 - 142 | 49 | 238 - 241 | 73 | 347 - 351 | 97 |
| 55 - 58 | 26 | 143 - 146 | 50 | 242 - 246 ( 8 mos ) | 74 | 352 - 355 | 98 |
| 59 - 62 ( 2 mos ) | 27 | 147 - 149 | 51 | 247 - 250 | 75 | 356 - 360 | 99 |
| 63 - 65 | 28 | 150 - 153 ( 5 mos ) | 52 | 251 - 255 | 76 | 361 - 365 ( 12 mos ) | 100 |

Rules applicable to insurance with terms less than or more than one year:

A.   If insurance has been in force for one year or less, apply the short rate table for annual insurance to the full annual premium determined as for insurance written for a term of one year.

B.   If insurance has been in force for more than one year:

1.   Determine full annual premium as for insurance written for a term of one year.

2.   Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the Policy was originally written.

3.   Add premium produced in accordance with items (1) and (2) to obtain earned premium during full period insurance has been in force.

LCAO0416

<u>Declarations</u>

This Policy (and any documents referred to in it) contains the whole agreement between Underwriters and the NAMED ASSURED relating to the insurance provided by this Policy; and supersedes all previous understandings and agreements between Underwriters and the NAMED ASSURED relating to the terms and conditions of this Policy.

Please note that words or terms that appear in bold and capitalized are defined within the Policy.

Previous Policy No:     PK1021617

Authority Ref. No:     B0356JA281N18

Policy No:     PK1021618

1.     **NAMED ASSURED:**

City of Trenton NJ

2.     **NAMED ASSURED Address:**

319 East State
Trenton, NJ 08608

3.     **Effective date:**     March 1, 2018
**Expiration date:**     March 1, 2019
           both days at 12:01 a.m. local standard time.

4.     **Insurance is effective with certain Underwriters at Lloyd's, London (Brit Syndicate 2987).**

Percentage: 100.00%

5.     **Coverage:**

<u>**GENERAL LIABILITY, AUTOMOBILE LIABILITY, PUBLIC OFFICIALS MISCELLANEOUS LIABILITY, EXCESS WORKERS' COMPENSATION AND EMPLOYERS LIABILITY, EMPLOYEE BENEFITS LIABILITY, LAW ENFORCEMENT LIABILITY,**</u>  and as more fully defined in the attached wording which is understood to be incorporated in and form part of this Certificate.

6.     **Forms attached hereto and special conditions:**

The Public Entity Package Wording and agreed Endorsements as per **Schedule of Endorsements** attached.

**Wherever the attached wordings refer to this 'Policy' it is deemed to mean this 'Certificate'.**

Territorial Limits: Worldwide as more fully defined in the attached wording.

Choice of Law: New Jersey

Jurisdiction: United States of America

**PKGDEC2016**

Limits of Liability: Underwriters' Limits of Liability shall not exceed the limits as indicated for each coverage section on the attached wording or Declarations and apply only to those coverages for which a limit is shown. Underwriters Limits of Liability are excess over a **SELF INSURED RETENTION** and a **LOSS FUND** (if applicable) as specified in the attached wording.

7. **Service of Suit may be made upon:**

Walker Wilcox Matousek LLP, One North Franklin Street, Suite 3200, Chicago, IL 60606.

8. **In the event of a reportable claim as per General Policy Condition 7, the THIRD PARTY CLAIMS ADMINISTRATOR must notify the following:**

By email (*Preferred method*):
    USA.Claims@britinsurance.com

By mail:
    Brit Global Specialty USA, 161 North Clark Street, Suite 3200
    Chicago, IL 60601 USA

By telephone:
    +1 (312) 577-9450

9. **Currency Clause:**

All premiums, limits, deductibles, claims and other amounts under this Policy are expressed and payable in United States Dollars.

The dollar symbol ($) used within this Policy represents United States Dollars.

10. **Policy Premium:**

Gross Premium    $615,949

11. **Minimum Earned Premium:**

$307,974.50

The minimum earned premium is 50% of the annual Policy Premium. If the Policy is cancelled at the **NAMED ASSURED'S** request, or by Underwriters for non-payment of premium, the minimum earned premium will be the greater of either the Minimum Earned Premium above or the premium as calculated by the Short Rate Cancellation Table in this Policy.

Authorized Correspondent signatory:          Brit Global Specialty USA.

Dated:    10-MAY-2018

**Pkg.Ver.Aug.2016**

**Several Liability Notice**

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

08/94
LSW1001 (Insurance)

**Pkg.Ver.Aug.2016**

**Complaints Procedure**

*We* strive to provide an excellent service to all *Our* customers but occasionally things can go wrong. *We* take all concerns seriously and endeavour to resolve all customers' problems promptly. If *You* have a question or concern about *Your* policy *You* should, in the first instance follow the guidance notes or instructions in the insurance documentation *You* have been sent. *Your* broker will also be able to advise *You* and provide assistance in this regard.

Alternatively, if *You* wish to contact *Us* directly *You* should either write or telephone:

> **The Complaints Department**
> **Brit Syndicates Limited**
> 122 Leadenhall Street
> London
> EC3V 4AB
> Telephone: 020 3857 0000
> Email: BGS.Complaints@britinsurance.com

In the unlikely event that *You* remain dissatisfied and wish to make a complaint *You* can do so at any time by referring the matter to *Us* at the above stated address or the Complaints Team at Lloyd's at the following address:

> **Complaints Team**
> **Lloyd's**
> Fidentia House
> Walter Burke Way
> Chatham Maritime
> Chatham, Kent ME4 4RN
> Telephone: 020 7327 5693
> Facsimile: 020 7327 5225
> E-mail: complaints@lloyds.com

Details of Lloyd's complaints procedure are set out in a leaflet "Your Complaint - How We Can Help" available at www.lloyd's.com/complaints and are also available from the above address.

Should *You* remain dissatisfied after Lloyd's has considered your complaint and *You* are NOT a policyholder in the UK, *You* should, in the first instance, seek advice from *Your* broker as to whom *You* should direct your complaint.

**SCHEDULE OF ENDORSEMENTS**

The following Endorsements attach to and form part of the terms and conditions of this Policy:

| Endorsement No. | Title |
|---|---|
| 1 | Loss Fund Exclusion |
| 2 | Failure to Supply Exclusion (Except Water & Sewer) |
| 3 | TRIA Rejected |
| 4 | Non Waiver of Governmental Immunity |
| 5 | Nursing Home Exclusion |
| 6 | Coverage Section II, III, IV, V, VI and VIII – Corridor Deductible |
| 7 | General Policy Conditions Notification of Claims, Occurrences or Suits |
| 8 | Procedures for Third Party Claims Administrators |

SOE 02/15

## Schedule of SELF INSURED RETENTIONS

This Policy has the following underlying **SELF INSURED RETENTIONS**, which apply to a covered loss for each **OCCURRENCE** or **CLAIM**.

**MAINTENANCE DEDUCTIBLES** are payable by the **ASSURED** and only apply when an amount is filled in. **MAINTENANCE DEDUCTIBLES** do not apply to the erosion of the **LOSS FUND**.

| | Coverage Section | SELF INSURED RETENTION | MAINTENANCE DEDUCTIBLE |
|---|---|---|---|
| I | **Property** unless listed below: | NOT COVERED | NOT APPLICABLE |
| | **AUTOMOBILE** Physical Damage: | NOT COVERED | NOT APPLICABLE |
| | **FLOOD AND SURFACE WATER:** | NOT COVERED | NOT APPLICABLE |
| | **EARTHQUAKE:** | NOT COVERED | NOT APPLICABLE |
| | **NAMED WINDSTORM:** | NOT COVERED | NOT APPLICABLE |
| II | **General Liability:** | $500,000 | |
| | **SEXUAL HARASSMENT** Liability: | $500,000 | |
| | **SEXUAL ABUSE** Liability: | $500,000 | |
| III | **AUTOMOBILE Liability:** | $500,000 | |
| IV | **Public Officials Miscellaneous Liability:** | $500,000 | |
| | unless listed below: | | |
| | Errors & Omissions: | $500,000 | |
| | Employment Practice Liability: | $500,000 | |
| | **SEXUAL HARASSMENT** Liability: | $500,000 | |
| | **SEXUAL ABUSE** Liability: | $500,000 | |
| V | **Excess Workers' Compensation and Employers' Liability for a qualified self-insurer:** | | |
| | Coverage A Excess Workers' Compensation: | $750,000 | |
| | Coverage B Excess Employers' Liability: | $750,000 | |
| VI | **Employee Benefits Liability:** | $500,000 | |
| VII | **Crime:** | | |
| | **MONEY** and **SECURITIES:** | NOT COVERED | NOT APPLICABLE |
| | Forgery or Alteration: | NOT COVERED | NOT APPLICABLE |
| | **EMPLOYEE** Dishonesty: | NOT COVERED | NOT APPLICABLE |
| VIII | **Law Enforcement Liability:** | $500,000 | |
| | **SEXUAL HARASSMENT** Liability: | $500,000 | |
| | **SEXUAL ABUSE** Liability: | $500,000 | |

PKG.Ver.Aug.2016

**IX Terrorism:**          NOT COVERED
    Property Terrorism:        NOT COVERED
    Liability Terrorism:        NOT COVERED
    Employers Liability Terrorism:        NOT COVERED

**LOSS FUND:**          NOT COVERED

### Specific Excess Insurance

**1.** This Policy contains various **SELF INSURED RETENTIONS** as listed in the **Schedule of SELF INSURED RETENTIONS** of this Policy. The **ASSURED** is responsible for payment of each applicable **SELF INSURED RETENTION** except as otherwise stated in **Clash Coverage** and **Excess LOSS FUND Protection**.

**2.** This Policy contains various **Specific Excess Limits of Insurance** above the **SELF INSURED RETENTIONS** as listed in the **Schedule of Specific Excess Limits of Insurance**.

**3.** This Policy contains various Annual Aggregate **Excess Limits of Insurance** as listed in **the Schedule of Specific Excess Limits of Insurance**. Underwriters' duty to indemnify under this Policy ends when the applicable Annual Aggregate **Excess Limit of Insurance** has been exhausted by payments to the **ASSURED**.

4. This Policy provides coverage in accordance with all of the terms of each Coverage Section attached to and forming part of this Policy. For **Coverage Section IV Public Officials Miscellaneous Liability**, and **Coverage Section VI Employee Benefits Liability**, coverage is provided on a Claims Made basis. Claims Made coverage applies only to claims made against the **ASSURED** during the **PERIOD OF INSURANCE** or Extended Reporting Periods, if applicable.

5. It is understood and agreed that if more than one Insuring Agreement under any Coverage Section hereunder is involved in one **CLAIM** or **OCCURRENCE**, then the highest **SELF INSURED RETENTION** and **Specific Excess Limit of Insurance** for each **CLAIM** or **OCCURRENCE,** in respect to that Coverage Section, shall apply.

### Schedule of Specific Excess Limits of Insurance

**Coverage Section I Property**:
**Specific Excess Limit of Insurance** for each **OCCURRENCE**:
    All coverages under Section I combined:      NOT COVERED
    Subject to the following **SUBLIMITS**/Annual aggregates:
    **AUTOMOBILE** Physical Damage Only:      NOT COVERED
    **FLOOD AND SURFACE WATER:**      NOT COVERED      N/A Annual Aggregate
    **EARTHQUAKE:**      NOT COVERED      N/A Annual Aggregate
    **NAMED WINDSTORM:**      NOT COVERED
    **DATA PROCESSING EXTRA EXPENSE:**      NOT COVERED
    **DATA PROCESSING SYSTEMS EQUIPMENT:**      NOT COVERED
    **DATA PROCESSING MEDIA:**      NOT COVERED
    **VALUABLE PAPERS:**      NOT COVERED
    **FINE ARTS:**      NOT COVERED
    **ACCOUNTS RECEIVABLE:**      NOT COVERED
    **EXTRA EXPENSE:**      NOT COVERED
    **MOBILE EQUIPMENT:**      NOT COVERED
    Transit**:**      NOT COVERED
    **BUSINESS INCOME** including **RENTAL VALUE:**      NOT COVERED
    **BUSINESS INCOME** other than **RENTAL VALUE:**      NOT COVERED
    **RENTAL VALUE:**      NOT COVERED
    Tuition And Fees**:**      NOT COVERED

PKG.Ver.Aug.2016

Newly Acquired Property Reporting Limit as provided in
Coverage Section I Conditions, Automatic Acquisition
Clause:                                                          NOT APPLICABLE

**Coverage Section II General Liability**:
 **Specific Excess Limit of Insurance** for each **OCCURRENCE:**
 All coverages under Coverage Section II combined: $3,000,000 $6,000,000 Annual Aggregate

Subject to the following **SUBLIMITS**/Annual Aggregates which are part of, and not in addition to, the **Coverage Section II General Liability Specific Excess Limit of Insurance** and Annual Aggregate Limit above:

 **SEXUAL HARASSMENT** Liability: $3,000,000 $6,000,000 Annual Aggregate
 **SEXUAL ABUSE** Liability: $3,000,000 $3,000,000  Annual Aggregate
 Damage to the Premises Rented to the **ASSURED** NOT COVERED
 Premises Medical Payments: NOT COVERED

**Coverage Section III AUTOMOBILE Liability**:
 **Specific Excess Limit of Insurance** for each **OCCURRENCE:**
 All Coverages under Coverage Section III combined: $3,000,000 N/A Annual Aggregate

Subject to the following **SUBLIMITS**/Annual Aggregates which are part of, and not in addition to, the **Coverage Section III AUTOMOBILE Liability Specific Excess Limit of Insurance** and Annual Aggregate Limit above:

 **AUTOMOBILE MEDICAL PAYMENTS:** NOT COVERED Ground Up Any One Person
  $15,000 Ground Up Any One **OCCURRENCE**
 Uninsured Motorists/Underinsured Motorists: $30,000 Ground Up Any One **OCCURRENCE**
 No Fault Insurance: $35,000 Ground Up Any One **OCCURRENCE**
 Garagekeeper's Legal Liability: NOT COVERED

**Coverage Section IV Public Officials Miscellaneous Liability:**
 **Specific Excess Limit of Insurance** for each **CLAIM:**
 All Coverages under Coverage Section IV combined: $3,000,000 $6,000,000 Annual Aggregate

Subject to the following **SUBLIMITS**/Annual Aggregates which are part of, and not in addition to, the **Coverage Section IV Public Officials Miscellaneous Liability – Specific Excess Limit of Insurance** and Annual Aggregate Limit above:

 Errors & Omissions: $3,000,000 $6,000,000 Annual Aggregate
 Retroactive Date: **January 01, 2014**

 Employment Practice Liability: $3,000,000 $6,000,000 Annual Aggregate
 Retroactive Date: **January 01, 2014**

 **SEXUAL HARASSMENT** Liability: $3,000,000 $6,000,000 Annual Aggregate
 Retroactive Date: **January 01, 2014**

 **SEXUAL ABUSE** Liability: $3,000,000 $3,000,000 Annual Aggregate
 Retroactive Date: **January 01, 2014**

**Coverage Section V Excess Workers' Compensation and Employers' Liability for a Qualified Self-Insurer**:
 **Specific Excess Limit of Insurance** for each **OCCURRENCE:**

 Coverage A Excess Workers' Compensation: $250,000
 Coverage B Excess Employers' Liability: $250,000

PKG.Ver.Aug.2016

**Coverage Section VI Employee Benefits Liability**:
    **Specific Excess Limit of Insurance** for each **CLAIM:**

    All Coverages under Coverage Section VI Combined:   $3,000,000        $6,000,000 Annual Aggregate
    Retroactive Date: **January 01, 2014**


**Coverage Section VII Crime**:
    **Specific Excess Limit of Insurance** for each **OCCURRENCE:**

    **MONEY & SECURITIES:**              NOT COVERED
    Forgery or Alteration:               NOT COVERED
    **EMPLOYEE** Dishonesty:         NOT COVERED

**Coverage Section VIII Law Enforcement Liability**:
    **Specific Excess Limit of Insurance** for each **OCCURRENCE:**
    All coverages under Coverage Section VIII combined:  $3,000,000       $6,000,000 Annual Aggregate

Subject to the following **SUBLIMITS**/Annual Aggregates which are part of, and not in addition to, the **Coverage Section VIII Specific Excess Limit of Insurance** and Aggregate Limit above:

    **SEXUAL HARASSMENT** Liability:       $3,000,000       $6,000,000 Annual Aggregate
    **SEXUAL ABUSE** Liability:           $3,000,000       $3,000,000 Annual Aggregate


**Coverage Section IX Terrorism:**
**Specific Excess Limit of Insurance** for each **OCCURRENCE:**

    Property Terrorism:              NOT COVERED      N/A Annual Aggregate
    Liability Terrorism:              NOT COVERED      N/A Annual Aggregate
    Employers' Liability Terrorism:     NOT COVERED      N/A Annual Aggregate


**<u>Clash Coverage</u>**

1.    In the event of a covered loss involving more than one Coverage Section, the **ASSURED** will only be liable for one **SELF INSURED RETENTION**. This will be the **SELF INSURED RETENTION** for the Coverage Section that results in the largest **ULTIMATE NET LOSS**.

2.    Underwriters will indemnify the **ASSURED** for **ULTIMATE NET LOSS** arising within each **SELF INSURED RETENTION** applicable to the Coverage Section involved in the loss, less the **SELF INSURED RETENTION** determined in Paragraph 1. above.

**3.**    Indemnity paid under Clash Coverage is in addition to amounts payable under the **Schedule of Specific Excess Limits of Insurance**.

Clash Coverage does not apply to **Coverage Section IX – Terrorism**.

### Excess LOSS FUND Protection

**Excess Loss Fund Protection Annual Aggregate Limit:   NOT COVERED**

1. This Policy contains various **SELF INSURED RETENTIONS** as listed in the **Schedule of SELF INSURED RETENTIONS** of this Policy.  The **ASSURED** is responsible for the payment of applicable **SELF INSURED RETENTIONS** in accordance with the terms and conditions of this Policy.

2. The **ASSURED'S LOSS FUND** is the aggregate amount stated in the **Schedule of SELF INSURED RETENTIONS** to be paid by the **ASSURED** for covered loss amounts incurred during the **PERIOD OF INSURANCE** within the **ASSURED'S SELF INSURED RETENTION**. This coverage applies only if an **Excess Loss Fund Protection Limit** is stated above and a corresponding **LOSS FUND** amount stated in the **SCHEDULE OF SELF INSURED RETENTIONS**.

3. If there is an applicable **MAINTENANCE DEDUCTIBLE** underlying the **SELF INSURED RETENTION**, this **MAINTENANCE DEDUCTIBLE** is not considered part of the **SELF INSURED RETENTION**, and does not accrue to the exhaustion of the **LOSS FUND**.

4. Each payment made by the **ASSURED** for covered loss amounts within the applicable **SELF INSURED RETENTION** shall reduce the outstanding **LOSS FUND** by the amount of such payment until the **LOSS FUND** is exhausted.  Upon exhaustion of the **LOSS FUND** stated in the **Schedule of SELF INSURED RETENTIONS**, Underwriters obligation to indemnify the **ASSURED** begins for covered loss amounts within the **SELF INSURED RETENTION**.

5. The amount of **Excess LOSS FUND Protection** payment(s) made by Underwriters to the **ASSURED**:

(a) Shall not be for more than the applicable **SELF INSURED RETENTION**; and

(b) Shall not be greater than the **Excess LOSS FUND Protection Annual Aggregate Limit**, as stated under **Excess LOSS FUND Protection**.

6. Each **Excess LOSS FUND Protection** payment made reduces Underwriters' **Excess LOSS FUND Protection Annual Aggregate Limit** by the amount of such payment.

7. Underwriters' duty to indemnify under **Excess LOSS FUND Protection** ends when the **Excess LOSS FUND Protection Annual Aggregate Limit** has been exhausted by payments to the **ASSURED**.

PKG.Ver.Aug.2016

**General Policy Conditions**

Underwriters assume no other obligation or liability to the **ASSURED** to indemnify sums or perform acts or services unless explicitly provided under this Policy.

These conditions shall survive the termination of this Policy without regard to whether said termination is due to cancellation or natural expiration of this Policy.

1.   **Abandonment:** There shall be no abandonment to Underwriters of any property.

2.   **Arbitration:** In the event the **ASSURED** and Underwriters are unable to agree as to the amount recoverable by the **ASSURED** from Underwriters under the terms and conditions of this Policy, each party shall name a competent and disinterested arbitrator, and the two so chosen shall, before proceeding further, appoint a competent and disinterested umpire. The arbitrators together shall calculate the indemnity due, and failing to agree, shall submit their differences to the umpire.

   The award in writing, duly verified by any two, shall determine the points in question. Both parties shall pay the cost of their arbitrators and equally pro rate the cost of the umpire. The **ASSURED'S** portion of such fee does not accrue to the **ULTIMATE NET LOSS**.

   The decision by the arbitrators shall be binding on Underwriters and the **ASSURED,** and that judgment may be entered in any court of competent jurisdiction.

3.   **Assignment:** Assignment of interest under this Policy does not bind Underwriters' unless Underwriters consent is endorsed hereon.

4.   **Bankruptcy and Insolvency:** In the event of the bankruptcy or insolvency of the **ASSURED** or any entity comprising the **ASSURED,** Underwriters shall not be relieved of the payment of any covered loss amounts hereunder because of such bankruptcy or insolvency, but Underwriters shall be liable only to the same extent had there been no bankruptcy or insolvency.

5.   **Cancellation and Non-Renewal:** In the event of non-payment of premium by the **NAMED ASSURED,** Underwriters will give ten (10) days' notice of cancellation in writing to the **NAMED ASSURED** and all coverage will terminate ten (10) days after the mailing of such notice. If Underwriters cancel, the earned premium is calculated pro rata, and the **NAMED ASSURED** is responsible for the full annual amount of the **LOSS FUND** as stipulated in **Excess Loss Fund Protection**.

   The **NAMED ASSURED** shown on the Declarations may cancel this Policy by giving thirty (30) days' notice of cancellation in writing. If the **NAMED ASSURED** cancels, the earned premium is calculated in accordance with the short rate table and procedure subject to the minimum earned premium. The **NAMED ASSURED** is responsible for the full annual amount of the **LOSS FUND** as stipulated in **Excess Loss Fund Protection**.

   If the period of limitation relating to the giving of notice is prohibited or made void by any law, such period is amended to provide the minimum period of limitation permitted by such law.

   **Non-Renewal:** Either the **NAMED ASSURED** or Underwriters may elect to non-renew this Policy at its expiration date for any reason.

6.   **Changes:** By acceptance of this Policy the **ASSURED** agrees that it embodies all agreements existing between the **ASSURED** and Underwriters or any of their agents relating to this Policy. None of the provisions, conditions or other terms of this Policy shall be waived or altered except by endorsement; nor shall notice to any agent or knowledge possessed by any agent or by any other person be held in effect a waiver or change to any part of this Policy.

**Pkg2016.1**

7. **CLAIMS**, **OCCURRENCES** or **SUITS**: The **ASSURED** shall as soon as practical notify Underwriters through the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** of any **CLAIM**, **OCCURRENCE** or **SUIT** meeting the following criteria:

(a)  The cost of which is likely to result in payment by Underwriters under this Policy;

(b)  All claims reserved at 75% or more of **SELF INSURED RETENTION**;

(c)  Catastrophic losses (including Paraplegia, Quadriplegia, Severe Burns, Fatalities, Significant Brain Injury, Amputation of Major Extremity);

(d)  **SEXUAL ABUSE** claims;

(e)  Discrimination or Violation of Civil Rights where the claim is reserved at 50% or more of the **SELF INSURED RETENTION** or within ninety (90) days of a trial date, whichever is sooner;

(f)  Third-party claims involving **LAW ENFORCEMENT ACTIVITIES**;

(g)  Act or series of **ACTS OF TERRORISM**;

(h)  Any claims where there is a question as to whether there will be coverage under this Policy.

Underwriters shall have the right but not the duty to be associated with the **ASSURED** in the investigation, handling, defense or settlement of any claims, **SUIT** or proceedings relative to an **OCCURRENCE** or **CLAIM** where in the opinion of the Underwriters, their liability under this Policy is likely to be involved; in which case the **ASSURED** and Underwriters shall co-operate to the mutual advantage of both.

The **ASSURED** shall make no commitment to pay or settle any **CLAIMS**, **OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is involved without the prior agreement of Underwriters. Underwriters shall not withhold agreement without just cause. Neither shall the **ASSURED** refuse any reasonable opportunity to pay or settle a claim that will result in Underwriters having liability under this Policy without the prior agreement of Underwriters. Underwriters shall not withhold agreement without just cause. If the **ASSURED** refuses to consent to settlement of any **CLAIMS**, **OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is potentially involved, and settlement or compromise is recommended by Underwriters and acceptable to the claimant, then calculation of, and Underwriters obligation under **ULTIMATE NET LOSS** with respect to the **CLAIMS**, **OCCURRENCES** or **SUITS** shall be limited to the amount of damages or payments for which the **CLAIMS**, **OCCURRENCES** or **SUITS** could have been settled for, plus any expenses payable under **ULTIMATE NET LOSS** incurred until the date of the **ASSURED'S** refusal to settle or compromise the **CLAIMS**, **OCCURRENCES** or **SUITS** as recommended by Underwriters.

**Pkg2016.1**

8. **Conflicting Statutes:** If any terms of this Policy conflict with the statutes of the state in which this Policy is issued, those terms are amended to conform to such statutes.

9. **Currency:** The premium and losses under this Policy are payable in United States currency. Payment of premium shall be made to Underwriters or via the **NAMED ASSURED**'s intermediary.

10. **Due Diligence:** The **ASSURED** shall use due diligence and concur in doing all things reasonably practical to avoid or diminish any loss of or damage to the property insured.

11. **Duties:** Underwriters have no duty to investigate, handle, adjust, settle or defend any **CLAIM**, **OCCURRENCE**, proceeding or **SUIT** against the **NAMED ASSURED**, any **ASSURED**, or against any other person or organization for whom the **NAMED ASSURED** is, or may be found to be, legally liable, or whom asserts or claims a right of coverage under the Policy. These duties shall be the responsibility of the **NAMED ASSURED.**

Underwriters' duty under the Policy shall be to indemnify the **NAMED ASSURED** for **ULTIMATE NET LOSS** in excess of the applicable **SELF INSURED RETENTION**, **MAINTENANCE DEDUCTIBLE**, or any other applicable deductible or deduction; and not more than the **Specific Excess Limit of Insurance.**

Underwriters' duty to indemnify ends when the applicable **Specific Excess Limit of Insurance** is exhausted by the payment of the **ULTIMATE NET LOSS.**

Underwriters may, at their sole discretion, tender periodic advance payments of amounts in excess of the **SELF INSURED RETENTION**, before **ULTIMATE NET LOSS** as defined in the Policy is reached; provided that:

(a) Only amounts where coverage is not in dispute will be used to compute the partial **ULTIMATE NET LOSS**; and

(b) Only payments made by the **NAMED ASSURED** and not disputed by Underwriters will be used to compute the partial **ULTIMATE NET LOSS**; and

(c) Any potential **RECOVERY** source has been identified; has been put on notice if appropriate; and **RECOVERY** is being aggressively pursued; and

(d) Delaying payment until the final **ULTIMATE NET LOSS** is determined will result in financial hardship to the Assured; and

(e) All payments are without prejudice.

Further, and in regard to advance payments under **SECTION I – PROPERTY**; advance payments will be based upon **ACTUAL CASH VALUE** for property that is not being actively repaired or replaced.

This condition shall survive the termination of this Policy without regard to whether said termination is due to cancellation or natural expiration of this Policy.

12. **False or Fraudulent Claims:** If the **ASSURED** shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claims hereunder shall be forfeited.

13. **Inspections / Audits / Verification of Values:** Underwriters or their duly authorized representatives may inspect the premises used by the **ASSURED** and audit the **ASSURED'S** books or records at any time during the **PERIOD OF INSURANCE** or within three (3) years after its

**Pkg2016.1**

expiration or termination. Underwriters assume no liability and will not be made liable for their right to make inspections or audit or not make inspections or not audit, or for their results, findings or reports, nor shall any inspection warranty the safety of a premises or an audit confirm the accuracy of books or records.

14. **Mortgage:** Underwriters will pay for covered losses of or damage to property to each mortgage holder, lienholder or creditor to the extent of their interest as of the date of loss or damage subject to the limits of insurance as states in the **Declarations** and subject to all terms and conditions of this Policy.

15. **Other Insurance:** If the **ASSURED** has other insurance against loss or damage covered under this Policy, Underwriters are liable, under the terms of this Policy, only as excess of coverage provided by such other insurance. No monies payable or collectible from such other insurance shall accrue to the **LOSS FUND**. However, this clause does not apply to the purchase of excess insurance above the **Specific Excess Limits of Insurance** stated in the **Schedule of Specific Excess Limits of Insurance** of this Policy.

16. **Representations:** By accepting this Policy and as a condition precedent to coverage, the **ASSURED** agrees that:

    (a) The information contained within the **Declarations** is complete and accurate and is based upon representations made by the **ASSURED** to Underwriters in the submission and/or application(s) for this Policy;

    (b) Underwriters have issued this Policy in reliance upon the **ASSURED'S** representations in the submission and/or application(s);

    (c) Except as otherwise provided in this Policy or by law, this Policy is void in any case of fraud; or, if the **ASSURED** conceals or misrepresents any material facts in the **ASSURED'S** submission and/or application(s) for this Policy. If the Policy is wholly voidable due to fraud, misrepresentation or concealment by the **ASSURED** as aforementioned, Underwriters, at their sole discretion, may elect to void coverage only for the particular loss or claim which is affected by such concealment and/or misrepresentation and/or fraud.

17. **Risk Control Services:** Underwriters assume no liability for, nor will it be made liable by any person or organization for risk control or consulting services, including the results or failure of results, findings or failure of findings, performance or failure of performance of said services.

18. **Separation of ASSUREDs:** With the exception of the **Specific Excess Limits of Insurance**, **SELF INSURED RETENTIONS** and any rights or duties specifically assigned in this Policy to the **NAMED ASSURED**, this insurance applies:

    (a) As if each **ASSURED** were the only **ASSURED**; and

    (b) Separately to each **ASSURED** against whom a claim is made or a **SUIT** is brought.

19. **Subrogation, Salvage and RECOVERY:** As a condition precedent to the issuance of this Policy, it is agreed that Underwriters shall be subrogated, at their sole discretion, to all rights which any **ASSURED** may have against any person or other entity in respect to any claim or payment made under this Policy; including any person or organization hired to investigate, handle, settle or defend any **OCCURRENCE**, **CLAIM**, proceeding or **SUIT** resulting in the aforementioned payment. The **ASSURED** shall execute all papers required by Underwriters and must cooperate with Underwriters to secure and prosecute Underwriters rights; to include the filing and prosecution of any **CLAIM** or **SUIT** for any right or cause of action which the **ASSURED** cannot legally or contractually assign to Underwriters. If any reimbursement is obtained, or salvage or **RECOVERY** made by the **ASSURED** or Underwriters on account of any loss covered by this Policy, the net amount of such

reimbursement, salvage or **RECOVERY**, after deducting the actual cost of obtaining or making the same, shall be applied in the following order:

1. Amount of loss which exceeds the applicable **Specific Excess Limits of Insurance**;

2. To reduce Underwriters loss until Underwriters are fully reimbursed;

3. To reduce the **ASSURED'S** loss because of the application of the **SELF INSURED RETENTION**, and then any applicable **MAINTENANCE DEDUCTIBLE**.

In the event Underwriters decline to be subrogated to the rights which the **ASSURED** may have against any person or other entity in respect to any claim or payment made under this Policy, the **ASSURED** shall regain its rights and may pursue **RECOVERY** against said parties at its discretion. If any reimbursement is obtained, or salvage or **RECOVERY** made by the **ASSURED** on account of any loss covered by this Policy, the net amount of such reimbursement, salvage or **RECOVERY**, after deducting the actual cost of obtaining or making the same, shall be applied in the following order:

1. Amount of loss which exceeds the applicable **Specific Excess Limit of Insurance**;

2. To reduce the **ASSURED'S** loss because of the application of the **SELF INSURED RETENTION**, but not any applicable **MAINTENANCE DEDUCTIBLE**;

3. To reduce the Underwriters loss until Underwriters are fully reimbursed;

4. To reduce the **ASSURED'S** loss because of the application of any **MAINTENANCE DEDUCTIBLE**.

20. **Territory:** This Policy applies worldwide; however, indemnity by Underwriters shall be made only if the original **SUIT** and any related legal actions is brought in the United States of America, its territories or possessions, or transferred to the United States of America, its territories or possessions from a foreign jurisdiction.

21. **THIRD PARTY CLAIM ADMINISTRATOR:** It is a condition precedent that this Policy of insurance is issued by Underwriters on the express condition that:

(a) The **NAMED ASSURED** must contract with, and utilize the services of, a duly qualified and competent **THIRD PARTY CLAIM ADMINISTRATOR**, as agreed upon by Underwriters prior to the **PERIOD OF INSURANCE**; and

(b) All **CLAIMS**, **SUITS** or **OCCURRENCES** for which coverage is sought under this Policy must be adjusted and handled by the contracted **THIRD PARTY CLAIM ADMINISTRATOR**; and

(c) The duties involved in adjusting and handling **CLAIMS**, **SUITS** or **OCCURRENCES** by the **THIRD PARTY CLAIM ADMINISTRATOR** include but are not limited to, timely investigations, setting ground-up case reserves, documenting case reserve rationale, pursuing settlement and recording financials; and

(d) All **CLAIMS**, **SUITS** or **OCCURRENCES** for which coverage is sought under this Policy are adjusted and handled by the **THIRD PARTY CLAIM ADMINISTRATOR** in accordance with all statutory and regulatory standards; and in accordance with all accepted industry standards and practices.

Underwriters or their representative shall have the right but not the duty to conduct audits and inspections of **the CLAIMS, SUITS or OCCURRENCES** reported to the **NAMED ASSURED'S THIRD PARTY CLAIMS ADMINISTRATOR** to better inform Underwriters of the potential liability

**Pkg2016.1**

under this Policy. The **THIRD PARTY CLAIMS ADMINISTRATOR** will cooperate should the audit or inspection be requested.

The **NAMED ASSURED**, through its **THIRD PARTY CLAIM ADMINISTRATOR**, may utilize the services of an attorney or lawyer or other specialized party to assist the **THIRD PARTY CLAIM ADMINISTRATOR** in the disposition of its duties, and defend an **ASSURED**; but only provided that:

(a) the **THIRD PARTY CLAIM ADMINISTRATOR** retains control of the adjusting process, reserving, settlement activity and documentation of the claims financials including erosion of the **NAMED ASSUREDS SELF INSURED RETENTION** and;

(b) The **THIRD PARTY CLAIMS ADMINISTRATOR** continues to monitor and direct the actions of these other parties; and

(c) Any control of the adjusting process designated to parties other than the **NAMED ASSUREDS THIRD PARTY CLAIM ADMINISTRATOR** or an attorney or lawyer hired or employed by the **NAMED ASSURED** must be approved by Underwriters in writing; and

(d) Any control of the adjusting process retained by the **NAMED ASSURED** (i.e. "self-administering **CLAIMS**") must be approved by Underwriters in writing; and

(e) Payment to these other parties shall be subject to all other terms and conditions of the Policy; specifically, but not limited to, **General Policy Condition 11. Duties** and **General Policy Definition 30. ULTIMATE NET LOSS**.

(f) Further, this Policy of insurance is issued by Underwriters on the express condition that all **CLAIMS**, **SUITS** or **OCCURRENCES**, for which coverage is sought under this Policy and which are being defended by the **THIRD PARTY CLAIMS ADMINISTRATOR** or an attorney or lawyer hired or employed by the **NAMED ASSURED,** are defended by the attorney or lawyer in accordance with all statutory and regulatory standards; and in accordance with all accepted professional standards and practices

In the event of cancellation, expiration or revision of the agreement between the **NAMED ASSURED** and the designated **THIRD PARTY CLAIM ADMINISTRATOR**, the **NAMED ASSURED** must notify Underwriters ninety (90) days prior to the effective date of such cancellation, expiration or material revision, and the **NAMED ASSURED** and Underwriters must agree upon the specifications for the new **THIRD PARTY CLAIM ADMINISTRATOR** or the material revision of the incumbent **THIRD PARTY ADMINISTRATOR'S** agreement with the **NAMED ASSURED**.

22. **Waiver of Subrogation:** This Policy shall not be invalidated if the **ASSURED**, by written agreement, has waived or shall waive its right of **RECOVERY** from any party for loss or damage covered hereunder; provided that any such waiver is made prior to the **OCCURRENCE** of said loss or damage.

## General Policy Exclusions

**This Policy does not insure against:**

A. Loss or damage caused by, or resulting from fraudulent or dishonest acts committed by the **ASSURED**, whether working alone or with others, except as covered in **Coverage Section VII Crime**;

**B.**     Expenses from any cost, civil fine, penalty or expense against any **ASSURED** for any compliance or enforcement action from any Federal, State or local governmental regulatory or administrative agency; except as provided in **Coverage Section I Property – Conditions 7. Ordinance Deficiency Clause** and **Coverage Section VI Employee Benefits Liability – Exclusions D**;

**C.**     Any liability arising out of the operation of the principles of eminent domain, condemnation proceedings, adverse possession or inverse condemnation proceedings by whatever name called, whether such liability accrues directly against the **ASSURED** or by virtue of any agreement entered into by or on behalf of the **ASSURED**;

**D.**     **BODILY INJURY, PERSONAL INJURY, PROPERTY DAMAGE** or loss or damage to the **PROPERTY OF THE ASSURED**, either directly or indirectly occasioned by, happening through, or in consequence of: war (including undeclared or civil war), warlike action by a military force (including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents), insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these; or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority, except as provided in **Coverage Section I Property – Conditions 6. Civil Authority Clause.** This Exclusion does not apply to loss or damage to the **PROPERTY OF THE ASSURED** caused secretly by a foreign enemy or agent of any government or sovereign power, when not in connection with the operations of armed forces in or against the country where the described location is situated;

**E.**     The investigation, defense, loss or damage, including loss of use, **BODILY INJURY**, **PERSONAL INJURY** or **PROPERTY DAMAGE** caused by the release, discharge, dispersal, seepage or migration of **POLLUTANTS** anywhere, anytime, in any way, whether accidental or intentional, sudden or intermittent or continuous:

(a)     At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any **ASSURED**;

(b)     At or from any premises, site or location which is or was at any time used by or for any **ASSURED** or others for the handling, storage, disposal, processing or treatment of waste;

(c)     Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any **ASSURED** or any person or organization for whom any **ASSURED** may be legally responsible; or

(d)     At or from any premises, site or location on which any **ASSURED** or any contractor or subcontractor working directly or indirectly on any **ASSURED'S** behalf are performing operations:

(i)     If the **POLLUTANTS** are brought on or to the premises, site or location in connection with such operations by such **ASSURED**, contractor or subcontractor; or

(ii)     If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **POLLUTANTS**.

(e)     That are, or that are contained in any property that is:

(i)     Being transported or towed by, handled, or handled for movement into, onto or from, an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability**; or

(ii)     Otherwise in the course of transit by or on behalf of the **ASSURED**; or

**Pkg2016.1**

(iii) Being stored, disposed of, treated or processed in or upon an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability**; or

(f) Before the **POLLUTANTS** or any property in which the **POLLUTANTS** are contained are moved from the place where they are accepted by the **ASSURED** for movement into or onto an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability**; or

(g) After the **POLLUTANTS** or any property in which the **POLLUTANTS** are contained are moved from an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability** to the place where they are finally delivered, disposed of or abandoned by the **ASSURED**.

(1) The investigation, defense, loss or damage, including loss of use, caused by the release, discharge or dispersal of **POLLUTANTS** anywhere, anytime, in any way, whether accidental or intentional, sudden or intermittent or continuous for any loss, cost or expense arising out of any:

(a) Request, demand, or other order that any **ASSURED** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **POLLUTANTS**; or

(b) Claim or **SUIT** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **POLLUTANTS**;

**Except**:

1. This exclusion does not apply to the reverse of flow of sewage into any building from a sewage facility, fixed conduit or sanitary sewer that the **ASSURED** owns, operates or maintains; and

As respects **Coverage Section II General Liability** only:

2. Subparagraph E.(a) **only** of this exclusion does not apply to **BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE** arising out of heat, smoke or fumes from a "hostile fire" as defined below;

   As used in this Extension, the definition of **PROPERTY DAMAGE** excludes loss of use.

   As used in this Extension, a "hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

3. This exclusion does not apply to **BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE** arising out of the use, handling, storage, discharge, dispersal, release or escape of chemicals when introduced by an **ASSURED** into such **ASSURED'S** drinking water system solely for the purpose of purifying or treating such drinking water; provided that the chemicals' generally accepted use is for the purification or treatment of drinking water.

4. This exclusion does not apply to **BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE** arising out of the use, handling, storage, discharge, dispersal, release or escape of chemicals when used in the day-to-day operation and/or maintenance of swimming pools owned or operated by an **ASSURED;** provided that the chemicals' generally accepted use is for the operation/maintenance of swimming pools.

5. This exclusion does not apply to **BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE** arising out of the application of pesticides, or herbicides provided such application is performed by employees of the **NAMED ASSURED** who are properly licensed or certified by a federal or state agency to apply those chemicals, pesticides or herbicides; and where the

**Pkg2016.1**

application or use is in strict compliance with all federal, state, and local laws, statutes, regulations, ordinances, or the like; and where the application or use is in compliance with industry standards for application or use.

As respects **Coverage Section III AUTOMOBILE Liability** only:

6. Subparagraph (e) of this exclusion does not apply to fuels, lubricants, fluids, exhaust gases or other similar **POLLUTANTS** that are needed for, or result from the normal electrical, hydraulic or mechanical functioning of an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability** or its parts, if:

  (a) The **POLLUTANTS** escape, seep, migrate, or are discharged, dispersed or released directly from an **AUTOMOBILE** part designed by its manufacturer to hold, store, receive or dispose of such **POLLUTANTS**; and

  (b) The **BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE** does not arise out of the operation of any equipment defined as **MOBILE EQUIPMENT**.

7. Paragraphs 7(c) and 7(d) of this exclusion do not apply to accidents that occur away from premises owned by or rented to an **ASSURED** with respect to **POLLUTANTS** not in or upon an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability** if:

  (c) The **POLLUTANTS** or any property in which the **POLLUTANTS** are contained are upset, overturned or damaged as a result of the maintenance or use of an **AUTOMOBILE** covered under **Coverage Section III AUTOMOBILE Liability**; and

  (d) The discharge, dispersal, seepage, migration, release or escape of the **POLLUTANTS** is caused directly by such upset, overturn or damage.

As respects **Coverage Section VIII Law Enforcement Liability** only:

8. This exclusion does not apply to **BODILY INJURY**, **PERSONAL INJURY**, or **PROPERTY DAMAGE** resulting from **LAW ENFORCEMENT ACTIVITIES** and due to the use of teargas, mace or similar substances by an **ASSURED** within the scope of their employment by the **NAMED ASSURED**. This coverage extension applies only if the **NAMED ASSURED'S** operations meet all the standards of any statute, ordinance, regulation or license requirement of any federal, state or local government which apply to those operations.

F. Loss of, damage to, or loss of use of **PROPERTY OF THE ASSURED, BODILY INJURY, PERSONAL INJURY** or **PROPERTY DAMAGE**, directly or indirectly caused by the presence of asbestos or lead in any form, except as covered in **Coverage Section I Property – Insuring Agreements** and **Coverage Section V Part A Workers' Compensation for a Qualified Self-Insured – Insuring Agreements;**

G. Any claim based upon the **ASSURED'S** failure to comply with the Federal Employee Retirement Income Security Act of 1974 (ERISA), including subsequent amendments or any similar federal, state or local law or regulations;

H. Any claim arising out of investment activities, or the administration of self-insurance funds, except as covered in **Coverage Section VII Crime;**

I. **Nuclear Incident:**

  (a) Loss or damage to **PROPERTY OF THE ASSURED**, or liability from **PROPERTY DAMAGE, BODILY INJURY** or **PERSONAL INJURY** accruing to the **ASSURED** directly or indirectly from, any and all forms of radioactive **CONTAMINATION**;

**Pkg2016.1**

(b) Any loss or damage to **PROPERTY OF THE ASSURED,** or liability from **PROPERTY DAMAGE, BODILY INJURY** or **PERSONAL INJURY** accruing to the **ASSURED** directly or indirectly, from any Pool of Insurers or Reinsurers formed for the purpose of covering atomic or Nuclear Energy risks;

(c) Any loss or liability accruing to the **ASSURED,** directly or indirectly, for physical damage of **PROPERTY OF THE ASSURED** including **BUSINESS INTERRUPTION** or consequential loss arising out of such physical damage, in addition to **PROPERTY DAMAGE, BODILY INJURY,** or **PERSONAL INJURY,** due to:

    (i) **NUCLEAR REACTOR** power plants including all auxiliary property on this site, or

    (ii) Any **NUCLEAR MATERIALS**, or the dispersal or discharge of **NUCLEAR MATERIALS**, at any **NUCLEAR FACILITY** owned by, or operated by or on behalf of, any **ASSURED**;

    (iii) Any other **NUCLEAR REACTOR** installation, including laboratories handling radioactive materials in connection with reactor installations, and critical facilities as such;

    (iv) Installations for fabricating complete fuel elements or for processing substantial quantities of, **NUCLEAR MATERIALS** and for reprocessing, salvaging, chemically separating, storing or disposing of **SPENT NUCLEAR FUEL** or **WASTE** materials, or

    (v) Installations other than those listed above using substantial quantities of radioactive isotopes or other products of nuclear fission;

    (vi) Any **NUCLEAR MATERIALS** contained in spent fuel or **WASTE** and at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **ASSURED**; or

    (vii) Loss which arises out of the furnishing by an Assured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **NUCLEAR FACILITY**;

(d) Any loss or damage or liability resulting from the **HAZARDOUS PROPERTIES** of **NUCLEAR MATERIALS** and with respect to which:

    (i) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

    (ii) The **ASSURED** is, or had this Policy not been issued, would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

(e) Any loss relating to expenses incurred with respect to:

    (i) Immediate medical or surgical relief or first aid;

    (ii) **BODILY INJURY, PERSONAL INJURY, PROPERTY DAMAGE,** or **PROPERTY OF THE ASSURED** resulting from the **HAZARDOUS PROPERTIES** of **NUCLEAR MATERIALS** and arising out of the operation of **NUCLEAR FACILITY** by any person or organization.

**DEFINITIONS** as used in this Exclusion:

(1) **CONTAMINATION** means any unclean or unsafe or damaging or injurious or unhealthful condition arising out of the presence of **NUCLEAR MATERIALS**, **SPENT NUCLEAR FUEL** or **WASTE**, whether permanent or transient in any **ENVIRONMENT**.

**Pkg2016.1**

(2) **ENVIRONMENT** includes any person, any real or personal property, animals, crops and vegetation, land including land under the building, bodies of water, underground water or water table supplies, air and any other feature of the earth or its atmosphere, whether or not altered, developed or cultivated, including, but not limited to, any of the above owned, or controlled, or occupied by any **ASSURED**.

(3) **HAZARDOUS PROPERTIES** include radioactive, toxic or explosive properties.

(4) **NUCLEAR FACILITY** means:

    (a) Any **NUCLEAR REACTOR**;

    (b) Any equipment or device designed or used for separating the isotopes of uranium or plutonium, or processing or utilizing spent fuel, or handling, processing or packaging **WASTE**;

    (c) Any equipment or device used for the processing, fabricating or alloying of **NUCLEAR MATERIALS** in the custody of the **ASSURED** at the premises where such equipment or device is located;

    (d) Any structure, basin, excavation, premises or place prepared or used for the storage of **WASTE**, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(5) **NUCLEAR MATERIALS** means, source material, special nuclear material, byproduct material and have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

(6) **NUCLEAR REACTOR** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(7) **SPENT NUCLEAR FUEL** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **NUCLEAR REACTOR**.

(8) **WASTE** means any waste material (1) containing byproduct material from any ore processed primarily for its source material content and (2) resulting from the operation by any person or organization of any **NUCLEAR FACILITY** included within the definition of **NUCLEAR FACILITY**.

**J.** Any loss, damage, cost, claim, expense, **BODILY INJURY**, **MEDICAL PAYMENTS**, or liability of whatsoever nature directly or indirectly caused by, resulting from or in any way involving **FUNGAL PATHOGENS**. This exclusion shall apply regardless of any other cause or event that contributes concurrently or in sequence to the loss, damage, cost, claim, expense, **BODILY INJURY**, **MEDICAL PAYMENTS**, or liability.

This exclusion shall not apply to:

    (a) **Coverage Section I Property**; but only when such loss arises directly from a peril not otherwise excluded under **Coverage Section I Property**.

    (b) **Coverage Section V Part A Excess Workers' Compensation for a Qualified Self-Insurer – Insuring Agreements**; but only when coverage for losses arising from **FUNGAL PATHOGENS** is required by law or regulation.

    (c) **Coverage Section II General Liability**; **BODILY INJURY** or **PROPERTY DAMAGE** arising from the **NAMED ASSURED'S** Food Products

**Pkg2016.1**

**K.**   Any claim, including defense of same, arising directly or indirectly from any actual or alleged **SEXUAL ABUSE** or **SEXUAL HARASSMENT** of any person by any **ASSURED**, or anyone to whom the **NAMED ASSURED** is obligated by virtue of a written contract or agreement; except as covered in    Coverage **Section II General Liability – Insuring Agreements C. SEXUAL HARASSMENT Liability** and **D. SEXUAL ABUSE Liability, Coverage Section IV Public Officials Miscellaneous Liability – Insuring Agreements C. SEXUAL HARASSMENT Liability** and **D. SEXUAL ABUSE Liability, and Coverage Section VIII Law Enforcement Liability – Insuring Agreements C. SEXUAL HARASSMENT Liability** and **D. SEXUAL ABUSE Liability** -

**L.**   Loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any **ACT OF TERRORISM**, and/or the threat thereof, regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

Loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any **ACT OF TERRORISM**.

This exclusion will apply to any loss or claim unless specific limits and a **SELF INSURED RETENTION** are listed under **Coverage Section IX Terrorism**.

**M.**   Loss of, damage to, or loss of use of **PROPERTY OF THE ASSURED**, **BODILY INJURY**, **PERSONAL INJURY** or **PROPERTY DAMAGE**, and any loss or claim directly or indirectly caused by or arising out of:

(a)   Loss, theft, loss of use of, corruption, or inability to access or manipulate tangible or intangible **ELECTRONIC DATA** or paper data, whether owned by the **ASSURED** or others and including but not limited to any handheld or portable device with user-generated content.

(b)   Loss, theft, breach, publication, unauthorized access, disclosure or use, collection or disposal of any person's or organization's tangible or intangible **ELECTRONIC DATA** or paper data including but not limited to private, confidential or personal identifying information, medical, financial, employment, health and educational information which triggers any local, state or federal privacy regulations, as well as patents, trade secrets, processing methods or customer lists.

(c)   Any claim for return or reimbursement of any sums or monetary value of any electronic fund transfers or transactions which is lost or diminished during the transfer, unless covered under the definition of computer theft under **Coverage Section VII Crime.**

(d)   Any threat or series of threats to commit an intentional act against a computer network or system for purposes of demanding money or other tangible or intangible value from the **ASSURED**;

(e)   Cyberterrorism or any intrusive or disruptive activities against any computer system or network, or the explicit threat to use such activities with the intention to cause harm, by any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

In no event will this insurance provide coverage for any breach notification; credit, identity and health monitoring and restoration costs; public relations costs; compliance audits, data requests, legal fees; and any local, state, federal or industry or professional organization's investigation, enforcement, remediation or monitoring costs and any fines, penalties, claims, proceedings or **SUITS** arising directly or indirectly from (a –e) above.

**Pkg2016.1**

**N.**  Loss, damage, cost or expense arising out of the failure of any **ASSURED** to adequately supply gas, oil, water, electricity or steam.

## General Policy Definitions

**1.**  **ACT OF TERRORISM** means an act, including the use of force or violence, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

**2.**  **ASSURED** means not only the **NAMED ASSURED** as stated on the **Declarations**, but also includes any past, present or future officials; members of boards or commissions; and trustees, directors, officers, volunteers, or employees of the **NAMED ASSURED** while acting within the scope of their duties as such. **ASSURED** shall also mean any person, organization, trustee or estate to whom the **NAMED ASSURED** is obligated by virtue of a written contract or written mutual aid agreement or other written agreement to provide insurance such as is offered by this Policy, but only in respect to acts or operations by or on behalf of the **NAMED ASSURED,** and subject to the limitations on coverage contained in any such written contract or written mutual aid agreement or other written agreement.

**3.**  **AUTOMOBILE** means any motor vehicle intended or designed for highway use, trailer or semi-trailer, including its equipment and any other equipment permanently attached thereto, but **AUTOMOBILE** does not include **MOBILE EQUIPMENT**. However, self-propelled vehicles with the following types of permanently attached equipment are considered **AUTOMOBILE**:

Equipment designed primarily for:

(a)  Snow removal;

(b)  Road maintenance, but not construction or resurfacing; or

(c)  Street cleaning.

**4.**  **BODILY INJURY** means physical injury (including death) to any person, and any mental anguish or shock, sickness, disease, disability or death associated with or arising from such physical injury.

**5.**  **EARTHQUAKE** means seismic geologic activity, which causes movement in the earth's surface including loss or damage from any other cause or event that contributes concurrently or in any sequence to the loss, except direct loss of or damage to **PROPERTY OF THE ASSURED** caused by ensuing fire and/or explosion. If more than one **EARTHQUAKE** shock occurs within any period of one hundred and sixty-eight (168) hours during the **PERIOD OF INSURANCE**, such **EARTHQUAKE** shock is deemed to be a single **EARTHQUAKE OCCURRENCE**.

**6.**  **ELECTRONIC DATA** means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, cloud computing platforms, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**7.**  **EMPLOYEE BENEFIT PROGRAMS** means group life insurance, group accident or health insurance, pension plans, profit sharing plans, employee savings and investment plans, employee stock subscription plans, travel or vacation plans, workers' compensation, unemployment insurance, social security, disability benefits insurance, employee welfare benefit plans and welfare plans, and any other similar **EMPLOYEE BENEFIT PROGRAMS**.

**8.**  **EMPLOYMENT PRACTICE VIOLATION** means:

Pkg2016.1

(a) Refusal to employ;

(b) Termination of employment;

(c) Practices, policies, acts or omissions such as Coercion, Demotion, Failure to Promote, Evaluation, Reassignment, Discipline, Humiliation, Retaliation, Libel, Slander, Defamation of Character, Harassment (other than **SEXUAL HARASSMENT**), including Violation of Civil Rights or Discrimination by the **ASSURED**, which are employment related;

(d) Any act relating to the selection, supervision or dismissal of any **ASSURED.**

All claims based on or arising out of the same **EMPLOYMENT PRACTICE VIOLATION** or a series of related **EMPLOYMENT PRACTICE VIOLATIONS** by one or more **ASSUREDS** shall be deemed one **EMPLOYMENT PRACTICE VIOLATION**. Only one (1) Policy issued by Underwriters, one (1) **SELF INSURED RETENTION**, and one (1) **EXCESS LIMIT OF INSURANCE** is applicable to any one **EMPLOYMENT PRACTICE VIOLATION**.

9. **FLOOD AND SURFACE WATER** means:

(a) Waves, surge, storm surge, and all other movement of tide or tidal waters; or

(b) The accumulation and movement of rain, melting snow or melting ice, including run-off; or

(c) The rising (including the overflowing or breaking of banks, boundaries, berms, retaining walls or levees) of any body of water; including but not limited to ponds, lakes, reservoirs, creeks, streams, rivers, bayous, canals, inlets, harbors, bays, seas, oceans, storm water drains and drainage ditches, viaducts, aqueducts, and other similar bodies of water; whether the bodies of water and their boundaries are man-made or naturally occurring; and whether or not the preceding (a), (b) or (c) is a result, direct or indirect, of any man-made, mechanical, natural, unnatural or catastrophic **OCCURRENCE**, happening, cause or event.

10. **FUNGAL PATHOGENS** means any fungus or mycota or any byproduct or type of infestation produced by such fungus or mycota, including but not limited to, mold, mildew, mycotoxins, spores or any biogenic aerosols.

11. **LAW ENFORCEMENT ACTIVITIES** means the activities of any **ASSURED** while acting as a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED. LAW ENFORCEMENT ACTIVITIES** does not include **EMPLOYMENT PRACTICE VIOLATIONS**.

12. **LOSS FUND**, if applicable, means the aggregate United States Dollar amount specified in the **Schedule of SELF INSURED RETENTIONS** to be paid by the **ASSURED** for covered loss amounts incurred during the **PERIOD OF INSURANCE** within the **ASSURED'S SELF INSURED RETENTION**.

13. **MAINTENANCE DEDUCTIBLE** means that United States Dollar amount specified in the **Schedule of SELF INSURED RETENTIONS** which the **ASSURED** is obligated to pay of the **ULTIMATE NET LOSS** prior to the application of the applicable **SELF INSURED RETENTION**. The **MAINTENANCE DEDUCTIBLE** is not considered part of the **SELF INSURED RETENTION**, and does not accrue to the exhaustion of the **LOSS FUND.**

14. **MEDICAL PAYMENTS** means reasonable expenses for first aid, medical, surgical, X-ray and dental services, ambulance, hospital, professional nursing and funeral services as are necessary as a result of an **OCCURRENCE** not otherwise excluded on account of **BODILY INJURY** provided the **MEDICAL PAYMENTS** are incurred within one (1) year of the **OCCURRENCE**.

**Pkg2016.1**

15. **MOBILE EQUIPMENT** means any of the following types of land vehicles, including any attached machinery or equipment:

   (a) Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   (b) Vehicles maintained for use solely on or next to premises the **ASSURED** owns or rents;

   (c) Vehicles that travel on crawler treads;

   (d) Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (i) Power cranes, shovels, loaders, diggers or drills; or

      (ii) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   (e) Vehicles not described in (a), (b), (c), or (d) above, that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (i) Air compressors, pumps and generators including spraying, welding, building, cleaning, geophysical exploration, lighting and well servicing equipment; or

      (ii) Cherry pickers and similar devices used to raise or lower workers;

   (f) Vehicles not described in (a), (b), (c), or (d) above, maintained primarily for purposes other than the transportation of persons or cargo.

16. **NAMED ASSURED** means the person and/or organization first named in Item 1. of the **Declarations** of this Policy.

17. **NAMED WINDSTORM** means a storm system that has been declared a Tropical Depression, Tropical Storm or Hurricane by the National Hurricane Center of the National Oceanic and Atmospheric Administration. As regards a **NAMED WINDSTORM**, an **OCCURRENCE** shall mean all Windstorm or Hail losses and ensuing rain damage, sustained by the insured occurring during any period of seventy-two (72) consecutive hours arising out of and directly occasioned by the **NAMED WINDSTORM**.

18. **PERIOD OF INSURANCE** means the length of time that the Policy is in force as stated in Item 3 of the **Declarations** as the Effective Date and Expiration Date.

19. **PERSONAL INJURY** means any Injury (other than **BODILY INJURY** or **PROPERTY DAMAGE)** arising out of one or more of the following:

   Wrongful Entry; Wrongful Eviction; Malicious Prosecution; Humiliation; Piracy; Infringement or Misappropriation of any Intellectual Property Rights (including: Copyrights; Patents; Trademarks; Service Marks; and Advertising, Broadcasting, and Publishing Ideas); Invasion of Rights of Privacy; Libel; Slander; Defamation of Character; Disparagement of Property; Erroneous Service of Civil Papers; False Arrest; False Imprisonment; and Detention.

   Injury includes: Mental Anguish, Shock, Sickness, Disease, Disability or Death, which do not arise from **BODILY INJURY** or **PROPERTY DAMAGE**.

**Pkg2016.1**

In addition, as respects to **LAW ENFORCEMENT LIABILITY** only, **PERSONAL INJURY** also includes any Injury (other than **BODILY INJURY** or **PROPERTY DAMAGE**) arising out of Discrimination or Violation of Civil Rights.

20. **POLLUTANTS** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals, liquids, solids, gases, thermal pollutants, waste, and all other irritants, or contaminants. Waste includes materials to be recycled, reconditioned or reclaimed.

21. **PROPERTY DAMAGE** means direct damage to or destruction or loss of property, including all resulting loss of use of property, excluding, however, damage to the **PROPERTY OF THE ASSURED**.

22. **PROPERTY OF THE ASSURED or ASSURED'S PROPERTY** means all Real and Personal Property which is in the care, custody or control of the **ASSURED** or which the **ASSURED** owns or agrees to insure by any contractual agreement normal to its operation, including: leasehold improvements and betterments; Personal Property in transit; Property in the course of construction, installation, repair, renovation and the like; **AUTOMOBILES**; **ACCOUNTS RECEIVABLE**; **DATA PROCESSING SYSTEMS**; **DATA PROCESSING MEDIA**; **FINE ARTS**; **VALUABLE PAPERS**; and **MOBILE EQUIPMENT**. However, **PROPERTY OF THE ASSURED** and **ASSURED'S PROPERTY** do not include third party **AUTOMOBILES** left in the **ASSURED'S** care, custody and control, as more fully described in **Coverage Section III AUTOMOBILE Liability – Insuring Agreements E. - Garagekeeper's Legal Liability**.

23. **RECOVERY** means all claims, **SUITS** or other causes of action that any **ASSURED** has against any person or entity resulting from a covered loss; any right of subrogation, whether the **ASSURED'S** or Underwriters resulting from a covered loss; and any rights that any **ASSURED** has to the monetary value of any damaged Property, whether tangible or intangible, for which a claim for total loss or damage is made under the Policy.

24. **SELF INSURED RETENTION** means that United States Dollar amount specified in the **SCHEDULE OF SELF INSURED RETENTIONS** which the **ASSURED** is obligated to pay of the **ULTIMATE NET LOSS,** after the application of any applicable **MAINTENANCE DEDUCTIBLE,** and before the **Specific Excess Limit of Insurance** of this Policy responds to the same loss.

25. **SEXUAL ABUSE** means any actual, attempted or alleged criminal sexual conduct of a person by another person, or persons acting in concert, regardless if criminal charges or proceedings are brought, which causes physical injuries and/or mental anguish. **SEXUAL ABUSE** also includes actual, attempted or alleged: sexual molestation, sexual assault, sexual exploitation or sexual injury.

But **SEXUAL ABUSE** does not include **SEXUAL HARASSMENT**.

26. **SEXUAL HARASSMENT** means any actual, attempted or alleged unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature of a person by another person, or persons acting in concert, which causes mental anguish:

But **SEXUAL HARASSMENT** does not include **SEXUAL ABUSE**.

27. **SUBLIMIT** means the maximum amount of **ULTIMATE NET LOSS** as specified in the **Schedule of Specific Excess Limits of Insurance** that may be attributable to a Coverage Subsection for any one **OCCURRENCE** or **CLAIM**. **SUBLIMITS** and any Aggregate Limits applicable to them are part of, and not in addition to, the **SELF INSURED RETENTION**, Specific Excess Limit of Insurance and Annual Aggregate Limit for the Coverage Section which they are a part of. Where a **SUBLIMIT** is specified as being "ground up", such **SUBLIMIT** is inclusive of, and may be contained within, the **SELF INSURED RETENTION**. Ground up **SUBLIMIT** payments within the **SELF INSURED**

**Pkg2016.1**

**RETENTION** shall contribute to the erosion of the **LOSS FUND,** if applicable, and will form part of the overall **ULTIMATE NET LOSS** for the **OCCURRENCE** or **CLAIM.**

28. **SUIT** means a civil proceeding in which injuries or damages are alleged. **SUIT** includes:

    (a)   An arbitration proceeding in which such damages are claimed and to which the **ASSURED** must submit or does submit with or without Underwriters consent; or

    (b)   Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **ASSURED** submits with or without Underwriters consent.

29. **THIRD PARTY CLAIM ADMINISTRATOR** means a duly qualified and competent firm that administers on behalf of the **ASSURED** all claims under this Policy, which shall include claims processing, adjustment, field investigation, data collection and reporting duties, including **LOSS FUND** tracking if a limit is stated in the **Declarations** under **Excess Loss Fund Protection**, in accordance with all statutory and regulatory standards and in accordance with all accepted industry standards and practices.

30. **ULTIMATE NET LOSS** means the total sum which the **ASSURED** is obligated to pay because of loss or damage covered under any Coverage Section of this Policy, either through adjudication or compromise, after first making proper deductions for all subrogation, **RECOVERY(IES)** and salvages.

    **ULTIMATE NET LOSS** also includes:

    (a)   Premium on attachment, appeal or similar bonds (but without any obligation on the part of Underwriters to apply for or furnish such bonds); or

    (b)   Expenses of lawyers, private investigators and other persons for litigation, settlement, adjustment and investigation of claims and **SUITS** which are paid as a consequence of any loss or damage covered hereunder.

However, the **ULTIMATE NET LOSS** does not include:

    (c)   Any costs, fees and other expenses incurred by the **ASSURED** for litigation, settlement, adjustment and investigation of claims or **SUITS** for any loss or damage not covered under any Section of this Policy;

    (d)   Payment for any judgments or acts deemed uninsurable by law;

    (e)   Contractual fees paid to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** by the **ASSURED** for services rendered in administering, investigating or settlement of any claim for loss or damage;

    (f)   Payments, including salaries and expenses, to any employee or official of the **ASSURED** for services rendered in administering any claim for loss or damage; or

    (g)   Expenses incurred by the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** in the hiring of experts or other specialists to establish the existence or value of a covered claim or **OCCURRENCE** unless specifically provided for in the Policy or agreed to in advance by Underwriters.

Underwriters are liable only for the **ULTIMATE NET LOSS** in excess of the applicable **MAINTENANCE DEDUCTIBLE** and **SELF INSURED RETENTION**, and not more than the **Specific Excess Limit of Insurance.** Underwriters' duty to indemnify ends when the applicable **Specific Excess Limit of Insurance** is exhausted by the payment of the **ULTIMATE NET LOSS.**

**Pkg2016.1**

31. **UNMANNED AIRCRAFT** means an aircraft that is not designed, manufactured or modified after manufacture to be controlled directly by a person from within or on the aircraft.

32. **WRONGFUL ACT** means any actual or alleged error or mis-statement, omission, act or neglect or breach of duty due to misfeasance, malfeasance, and non-feasance, Discrimination, and Violation of Civil Rights by the **ASSURED**.

All claims based on or arising out of the same **WRONGFUL ACT** or a series of related **WRONGFUL ACTS** by one or more **ASSUREDS** shall be deemed one **WRONGFUL ACT**. Only one Policy issued by Underwriters, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **WRONGFUL ACT**.

**Pkg2016.1**

## Coverage Section I Property

### Coverage Section I Property – Insuring Agreements

**A.**  **PROPERTY OF THE ASSURED** (except **AUTOMOBILES** and Personal Property in transit)**:** Underwriters agree, subject to the Policy limitations, terms and conditions to indemnify the **ASSURED** for All Risks of Direct Physical Loss or Damage, as more fully defined by the term **ULTIMATE NET LOSS**, occurring during the **PERIOD OF INSURANCE** to all Real and Personal Property, wherever located and identified in Schedules on file with Underwriters, unless provided for by the **Automatic Acquisition Clause.**

**B.**  **AUTOMOBILE PHYSICAL DAMAGE:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for All Risks of Direct Physical Loss or Damage, as more fully defined by the term **ULTIMATE NET LOSS**, occurring during the **PERIOD OF INSURANCE** to **AUTOMOBILES** owned by the **ASSURED** or on which the **ASSURED** has an obligation to provide insurance, wherever located.

**C.**  **EXTRA EXPENSE:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for **EXTRA EXPENSE,** due to the suspension of operations caused by Direct Physical Loss or Damage insured hereunder, occurring during the **PERIOD OF INSURANCE** to the **PROPERTY OF THE ASSURED** at the premises described in the Schedule of Locations on file with Underwriters.

**D.**  **Transit:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for All Risks of Direct Physical Loss or Damage, occurring during the **PERIOD OF INSURANCE** to Personal **PROPERTY OF THE ASSURED**, or property held by the **ASSURED** in trust or on commission or in the care, custody or control of the **ASSURED** or for which the **ASSURED** may be held legally liable, while in due course of transit.

**E.**  **BUSINESS INTERRUPTION:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for the actual loss of **BUSINESS INCOME** and **RENTAL VALUE** due to the necessary suspension of **OPERATIONS** during the **PERIOD OF RESTORATION**. The suspension must be caused by Direct Physical Loss or Damage insured hereunder, occurring during the **PERIOD OF INSURANCE** to the **PROPERTY OF THE ASSURED** at the premises described in the Schedule of Locations on file with Underwriters.

### Coverage Section I Property – Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section I Property** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance** over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS.**

If an Annual Aggregate applies to any coverage hereunder, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of **the Schedule of Specific Excess Limits of Insurance.**

### Coverage Section I Property – Conditions

Amounts paid by Underwriters under any of the following clauses are part of, and not in addition to, Underwriters **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section I Property** as stated in the **Schedule of Specific Excess Limits of Insurance** in the **Declarations** including any applicable Annual Aggregate**.**

**Pkg2016.1**

1. **Valuation:**

   (a) **Real and Personal Property (except ACCOUNTS RECEIVABLE, AUTOMOBILES, DATA PROCESSING, FINE ARTS, MOBILE EQUIPMENT AND VALUABLE PAPERS):**

   Underwriters will indemnify the **ASSURED** for loss or damage based on the lesser of the cost to repair, rebuild or replace the destroyed or damaged property in a condition equal to, but not superior to, or more extensive, than its condition when new, provided that the **ASSURED** has commenced repairs, rebuilding, or replacement within two years of the date of loss or damage; and subject to the following conditions:

   However, the following conditions apply:

   If property damaged or destroyed covered Real or Personal Property is not repaired, rebuilt or replaced within two years after loss or damage, Underwriters shall not be liable for any amount to repair, rebuild, or replace in excess of the **ACTUAL CASH VALUE** of the property damaged or destroyed.

   The **ASSURED** may, at its discretion, elect to apply any **RECOVERY** for rebuilding or replacement due under this Section towards a new capital expenditure provided that:

   i. The new capital expenditure is made within two years of the date of loss or damage;

   ii. The new capital expenditure is in lieu of, and not in addition to, the Real or Personal Property damaged; and

   iii. The actual cost of the new capital expenditure is equal to, or greater than, the cost to rebuild or replace the Real or Personal Property damaged.

   If the **ASSURED** decides to replace destroyed or damaged property on another site, cost of such site is not included.

   (b) **ACCOUNTS RECEIVABLE:** Underwriters will indemnify the **ASSURED** for actual loss sustained for sums due the **ASSURED,** including the expenses reasonably incurred in re-establishing the records of **ACCOUNTS RECEIVABLE:**

   i. When there is proof that a covered loss has occurred but the **ASSURED** cannot accurately establish the total amount of **ACCOUNTS RECEIVABLE** outstanding as of the date of such loss, such amount shall be based on the **ASSURED'S** monthly statements and shall be computed as follows:

      (1) Determine the total of the average monthly amounts of **ACCOUNTS RECEIVABLE** at the end of the twelve (12) months immediately preceding the month in which the loss or damage occurs;

      (2) Adjust that total for any normal fluctuations in the amount of **ACCOUNTS RECEIVABLE** for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

   ii. There shall be deducted from the total amount of **ACCOUNTS RECEIVABLE**, however established:

      (1) The amount of accounts not lost or damaged;

      (2) The amount of the accounts the **ASSURED** is able to collect or re-establish;

**Pkg2016.1**

(3) An amount to allow for probable bad debts that the **ASSURED** is normally unable to collect;

(4) All unearned interest and services charges.

(c) **AUTOMOBILE:** Underwriters will indemnify the **ASSURED** based on the lesser of the cost to repair the **AUTOMOBILE**, or the **ACTUAL CASH VALUE** of the **AUTOMOBILE** at the time of loss; including the cost to rent a vehicle of like kind.

(d) **DATA PROCESSING:** Underwriters will indemnify the **ASSURED** for:

   i. **DATA PROCESSING SYSTEMS** based upon the lesser of the actual cost to replace or repair the property. If the property is replaced, based upon the most closely equivalent property available similar in kind and function to that insured hereunder.

   ii.. **DATA PROCESSING MEDIA** based upon the lesser of the actual cost to replace, repair or reproduce the property, or if not replaced, repaired or reproduced, the blank hardware value of the **DATA PROCESSING MEDIA**. If the property is replaced, based upon the most closely equivalent property available similar in kind and function to that insured hereunder.

(e) **FINE ARTS:** Underwriters will indemnify the **ASSURED** based on the lesser of the cost to repair the property, or if not repairable the replacement cost, or if not replaceable the appraised or market value.

(f) **MOBILE EQUIPMENT:** Underwriters will indemnify the **ASSURED** for loss or damage based on the lesser of the cost to repair, rebuild or replace the destroyed or damaged property in a condition equal to, but not superior to, or more extensive, than its condition when new.

(g) **VALUABLE PAPERS:** Underwriters will indemnify the **ASSURED** based on the lesser of the cost to replace, repair or reproduce the property with other of like kind, or if not replaced, repaired or reproduced the blank value of the **VALUABLE PAPERS**.

(h) **Vacant Buildings:** Underwriters will indemnify the **ASSURED** based on the lesser of the cost to repair a covered building or the **ACTUAL CASH VALUE** of a covered building that has been vacant for a period of more than ninety (90) consecutive days at the time of loss.

   Vacant means a covered building that is abandoned.

   A covered building that is unoccupied is not considered vacant. A covered building is considered unoccupied when the building contains contents to conduct the **ASSURED'S** customary operations, but such operations are temporarily suspended.

   A covered building under construction or renovation is not considered vacant.

**2.** **Expense to Reduce or Prevent Loss:** Underwriters will indemnify the **ASSURED** for expenses necessarily incurred to reduce or prevent any loss under this Policy, not exceeding, however, the amount by which the loss under this [insurance] is thereby reduced.

**3.** **Debris Removal:** In the event of a direct physical loss or damage to the property covered under this Policy, Underwriters will indemnify the **ASSURED** for expenses incurred in removal of debris, and the cost of clean-up (other than **POLLUTANTS**) of the insured property destroyed or damaged, from the premises of the **ASSURED**.

**4.** **Asbestos and Lead Clean Up and Removal:** Notwithstanding **General Policy Exclusion F.** in this Policy, Underwriters agree to extend **Coverage Section I Property** to cover expense to remove damaged asbestos or lead from any structure due to the enforcement of any law or

**Pkg2016.1**

ordinance regulating asbestos or lead, when the asbestos or lead is itself damaged by a Peril not otherwise excluded under this Policy, and then only to the extent of such damage.

5. **Architects' and Engineers' Fees:** This Policy covers the additional assessment involving architects' and engineers' fees for consultations arising from losses resulting from a Peril not otherwise excluded under this Policy.

6. **Civil Authority Clause:** Notwithstanding anything contained in this Policy, property which is insured under this Policy is also covered against the risk of damage or destruction by civil authority during a conflagration, and for the purpose of retarding the same; provided that neither such conflagration or destruction is caused or contributed to by war (including undeclared or civil war), warlike action by a military force (including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents), insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. This coverage includes damage or destruction by civil authority during a conflagration, and for the purpose of retarding the same, if caused by terrorists or secretly by a foreign enemy or agent of any government or sovereign power, when not in connection with the operations of armed forces in or against the country where the described location is situated.

7. **Ordinance Deficiency Clause:** If Building property is damaged or destroyed by Perils not otherwise excluded under this Policy, Underwriters shall be liable for the increased cost to repair or reconstruct that Building property, including the undamaged part of that Building property, but only when the increased cost is a consequence of enforcement of any federal, state or municipal law, ordinance or code which necessitates such increased cost to repair or reconstruct to meet the minimum of such requirements. If demolition is required to comply with such enforcement, Underwriters shall also be liable for such additional cost, including the cost to demolish and clear undamaged parts of the Building property. Underwriters will not pay such increased cost to repair or reconstruct if the Building property is not repaired or reconstructed.

8. **Automatic Acquisition Clause:** This insurance is automatically extended to cover additional property and/or interests of the **ASSURED**, usual and/or incidental to the operations of the **ASSURED**, which do not exceed the Newly Acquired Property Reporting Limit stated in the **Schedule of Specific Excess Limits of Insurance**, and which are acquired, or for which the **ASSURED** becomes legally liable, during the **PERIOD OF INSURANCE** under this Policy.

This Policy is further extended to cover additional property and/or interests of the **ASSURED**, usual and/or incidental to the operations of the **ASSURED**, when newly acquired property values exceed the Newly Acquired Property Reporting Limit stated in the **Schedule of Specific Excess Limits of Insurance**, provided the **ASSURED** reports details of said property and/or interests to Underwriters for premium consideration within ninety (90) consecutive days from the date the **ASSURED** acquires or becomes legally liable for the property provided that the property is acquired or interests secured during the **PERIOD OF INSURANCE** under this Policy.

9. **Unintentional Errors and Omissions:** The property insured under this Policy, and its insured value, is the property and values shown on the Schedule of Values on file with Underwriters, as submitted by the **ASSURED** prior to the inception of this Policy.

If any **PROPERTY OF THE ASSURED** is omitted or undervalued because of negligence, error or oversight of the **ASSURED,** Underwriters will accept that property provided it is usual or incidental to the **ASSURED'S** operations. Such omission will not prejudice the **ASSURED'S** right of **RECOVERY** under this Policy; except that for any **PROPERTY OF THE ASSURED** unintentionally omitted from the Schedule of Values on file with Underwriters, Underwriters shall not be liable for any amount to repair, rebuild, or replace in excess of the **ACTUAL CASH VALUE** of the property until payment of any applicable additional premium for the **PERIOD OF INSURANCE** that the **PROPERTY OF THE ASSURED** was unintentionally omitted from the Schedule of Values on file

**Pkg2016.1**

with Underwriters by the **ASSURED**, as calculated by Underwriters, has been paid. Upon receipt of payment of the additional premium by Underwriters, the liability of Underwriters will revert to its liability as outlined in **Coverage Section I Property – Conditions 1.(a).** The **ASSURED** agrees to report to Underwriters any omission of property as soon as practicable after it is discovered.

10. **Joint Loss Clause:** In the event of damage to or destruction of property, at a location designated in this Policy and also designated in a boiler and machinery insurance policy and there is a disagreement between the insurers with respect to:

    (a) Whether such damage or destruction was caused by a Peril insured against by this Policy or by an accident insured against by such boiler and machinery insurance Policy;  or

    (b) The extent of participation of this Policy and of such boiler and machinery insurance policy in a loss which is insured against, partially or wholly, by any or all policies.

Underwriters shall, upon written request of the **NAMED ASSURED**, pay to the **NAMED ASSURED** one-half of the amount of loss which is in disagreement, but in no event more than Underwriters would have paid if there had been no boiler and machinery insurance Policy in effect, subject to the following conditions:

    i. The amount of the loss which is in disagreement after making provisions for any undisputed claims payable under the said policies and after the amount of loss is agreed upon by the **ASSURED** and the insurers, is limited to the minimum amount remaining payable by any or all policies;

    ii. The boiler and machinery insurer shall simultaneously pay to the **ASSURED** one-half of said amount which is in disagreement;

    iii. The payments by the insurers hereunder and acceptance of the same by the **ASSURED** signify the agreement of the insurers to submit to and proceed with arbitration within ninety (90) consecutive days of such payments. The arbitrators shall be three in number, one of which shall be appointed by the boiler and machinery insurer and one of whom shall be appointed by Underwriters hereon and the third appointed by consent of the other two arbitrators, the decision by the arbitrators shall be binding on the insurers and that judgment upon such award may be entered in any court of competent jurisdiction;

    iv. The **ASSURED** agrees to cooperate in connection with such arbitration but not to intervene within;

    v. The provisions of this clause shall not apply unless such other Policy issued by the boiler and machinery insurance company contains a similar clause or is similarly endorsed;

    vi. Acceptance by the **ASSURED** of sums paid pursuant to the provisions of this clause including an arbitration award, shall not operate to alter, waive, surrender or in any way affect the rights of the **ASSURED** against any of the insurers.

**<u>Coverage Section I Property –  Exclusions</u>**

**In addition to the General Exclusions of this Policy, this Coverage Section does not insure against:**

**A.** Any claim for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of this Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance;**

**Pkg2016.1**

**B.** Loss by moth, termite, or other insect(s); by vermin; by wear or tear; by rust, erosion, corrosion or other gradual deterioration; or by wet rot, dry rot or **FUNGAL PATHOGEN**, unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused by such peril;

**C.** Loss as a result of lack of proper maintenance;

**D.** Loss of use (except as respects **Coverage Section I Property – Insuring Agreements B. AUTOMOBILE Physical Damage and C. EXTRA EXPENSE** and **MOBILE EQUIPMENT**), delay or loss of markets;

**E.** Direct loss by breakdown of machinery and/or explosion of steam boilers, steam pipes, steam engines or steam turbines, unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused by such peril. This exclusion does not apply to loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass;

**F.** Loss of electrical appliances or devices of any kind, including wiring, arising from electrical injury or disturbance to the said electrical appliances or devices or wiring from artificially generated electrical current unless fire and/or explosion ensues, and then only for direct loss or damage caused by such ensuing fire and/or explosion, except as may be covered under **DATA PROCESSING**;

**G.** Loss resulting from variation of humidity or temperature, shrinkage, evaporation, loss of weight or leakage in respect of a temperature controlled environment: unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused by such peril;

**H.** Loss by normal settling, normal shrinkage, or expansion of foundations, floors or ceilings;

**I.** Inventory shortage, mysterious disappearances or loss resulting from any kind of infidelity or dishonesty on the part of the **ASSURED** or any employees; whether alone or in collusion with others;

**J.** Penalties for non-completion or delay as respects property in course of construction or undergoing renovation;

**K.** Loss by mechanical derangement, inherent defect or latent defect; unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused solely by such ensuing peril;

**L.** Loss resulting from processing or faulty workmanship with regard to all Property, unless a loss from a peril not otherwise excluded ensues, and then only for direct loss or damage caused solely by such ensuing peril;

**M.** Loss of or damage to animals;

**N.** Loss of or damage to aircraft including **UNMANNED AIRCRAFT**;

**O.** Loss of or damage to watercraft over fifty (50) feet;

**P.** Loss of or damage to standing timber, growing crops, land and land value;

**Q.** Loss of or damage to accounts, bills, currency, money, notes, securities, deeds, evidences of debts;

**R.** Loss of or damage to underground pipes, sewers, flues and drains outside of the covered building, unless as otherwise listed on the Schedule of Values on file with Underwriters;

**Pkg2016.1**

**S.** Loss of or damage to **ACCOUNTS RECEIVABLE** due to electrical or magnetic injury, disturbance or erasure of electronic recordings, except by lightning, or as covered under **DATA PROCESSING**;

**T.** Loss of or damage to:

(a) **DATA PROCESSING MEDIA** due to electrical or magnetic injury, disturbance or erasure of electronic recordings, except by lightning;

(b) **DATA PROCESSING SYSTEMS** and **DATA PROCESSING MEDIA** due to dryness or dampness of atmosphere, extremes of temperature, corrosion, rust unless directly resulting from physical damage to the **DATA PROCESSING SYSTEM'S** air conditioning facilities caused by a Peril not otherwise excluded hereunder directly resulting therefrom;

(c) **DATA PROCESSING SYSTEMS** and **DATA PROCESSING MEDIA** due to loss of or damage to **DATA PROCESSING MEDIA** for accounts, bills, evidences of debt, **VALUABLE PAPERS**, records, abstracts, deeds, manuscripts or other documents, except as they may be converted to **DATA PROCESSING MEDIA** form, and then only in that form;

(d) **DATA PROCESSING SYSTEMS** and **DATA PROCESSING MEDIA** due to loss or damage caused by error in machine programming or instructions to machine.

**U.** Loss of or damage to electrical transmission and distribution lines outside of a covered building, unless as otherwise listed on the Schedule of Values on file with Underwriters.

**V.** Loss due to or resulting from **FLOOD AND SURFACE WATER** for any Property in Flood Zone A, Zone AO, Zone AH, Zones A1-A30, Zone AE, Zone A99, Zone AR, Zone AR/AE, Zone AR/AO, Zone AR/A1-A30, Zone AR/A, Zone V, Zone VE, and Zones V1-V30 or to any other Flood Zone with a designation that begins with the letter A or V.

**W.** Direct loss due to freeze as result of any intentional or negligent failure to:

(a) Properly and sufficiently maintain heat in any unoccupied or vacant building or property, regardless of the length of or reason for any unoccupancy or vacancy, in accordance with all applicable standards or guidelines.

(b) Properly and sufficiently protect machinery, pipes, other systems and/or equipment in accordance with all applicable standards, guidelines or manufacturer's instructions.

## Coverage Section I Property – Definitions

**1.** **ACCOUNTS RECEIVABLE** means the sums due the **ASSURED** from customers; interest charges on any loan to offset impaired collections pending repayment of such sums; collection expense in excess of normal collection cost.

**2.** **ACTUAL CASH VALUE** means the present day value of the cost to repair, rebuild, or replace property at the time of loss after first deducting for any physical wear and tear, and obsolescence of the property.

**3.** **DATA PROCESSING** means the **ELECTRONIC DATA PROCESSING SYSTEMS** and **DATA PROCESSING MEDIA** owned, leased or rented, or under the control of the **ASSURED** or for which the **ASSURED** is liable.

**4.** **DATA PROCESSING MEDIA** means the recording or storage devices such as films, tapes, discs, drums or cells, used for **ELECTRONIC DATA PROCESSING**.

Pkg2016.1

5. **DATA PROCESSING SYSTEMS** means the equipment and its component parts.

6. **FINE ARTS** means paintings, etchings, pictures, tapestries, and other bona fide works of art including but not limited to statuary, marbles, bronzes, antique furniture, rare books, antique silver, rare manuscripts, porcelains, rare glass, and bric-a-brac of rarity, historical value or artistic merit.

7. **OCCURRENCE** means an accident or accidental happening or accidental event or a series of related accidents or accidental happenings or accidental events involving one or more **ASSUREDS** which results in a direct physical damage or loss to the **PROPERTY OF THE ASSURED** that is both unexpected and unintended by the **ASSURED(S)**. Only one Policy, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **OCCURRENCE**.

8. **VALUABLE PAPERS** means written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, but does not mean money or securities.

### Coverage Section I Property – EXTRA EXPENSE

If property under **Coverage Section I Property** is damaged or destroyed by Perils insured against during the **PERIOD OF INSURANCE** which necessitates the incurrence of **EXTRA EXPENSE**, Underwriters will be liable for this **EXTRA EXPENSE**, not exceeding the actual loss sustained, and not exceeding such length of time, hereinafter referred to as the **PERIOD OF RESTORATION**. It is further agreed that this Extension in coverage does not increase, but just forms part of, Underwriters' **Specific Excess Limit of Insurance** as shown in **the Schedule of Specific Excess Limits of Insurance**.

This Extension also includes loss to **DATA PROCESSING** when (1) the premises in which the property is located is so damaged as to prevent access to such property or (2) as a direct result of a Peril insured against, the air conditioning system or electrical system necessary for the operation of the **DATA PROCESSING SYSTEMS** is so damaged as to reduce or suspend the **ASSURED'S** ability to actually perform the operations normally performed by the **DATA PROCESSING SYSTEMS**. **EXTRA EXPENSE** for **DATA PROCESSING** includes the expense of using other property or facilities of other concerns or other necessary emergency expenses.

### Coverage Section I Property – EXTRA EXPENSE Conditions

1. **Resumption of Operations:** It is a condition of this Policy that as soon as practical, the **ASSURED** will resume **NORMAL** business operations and dispense with **EXTRA EXPENSE**.

2. **Interruption by Civil Authority:** Coverage hereunder is extended to include actual loss sustained when access to the premises in which the **PROPERTY OF THE ASSURED** is located is prohibited by order of civil authority as a direct result of loss caused by a Peril insured against.

### Coverage Section I Property – EXTRA EXPENSE Exclusions

In addition to **General Policy – Exclusions** and **Coverage Section I Property – Exclusions**, this Extension does not insure against:

A. The suspension, lapse or cancellation of any lease, license, contract or order beyond the **PERIOD OF RESTORATION**;

**B.**   Interference at premises by strikers or other persons with the rebuilding, repairing or replacing of the property damaged or destroyed, or with the resumption or continuation of business;

**C.**   Loss of income, profits or earnings;

**D.**   The cost of repairing or replacing any of the Real or Personal Property covered hereunder, or the cost of research or other expense necessary to replace or restore damaged or destroyed books of account, abstracts, drawings, card index systems or other records (including film, tape, disc, drum, cell or other magnetic recordings or **DATA PROCESSING MEDIA**), that have been damaged or destroyed by the Perils insured against, except cost in excess of the normal cost of such repair, replacement or restoration necessarily incurred for the purpose of reducing loss under this Policy. In no event shall such excess cost exceed the amount by which the total **EXTRA EXPENSE** loss otherwise payable under this Policy is thereby reduced;

**E.**   Loss resulting from theft of any property which at the time of loss is not an integral part of a building or structure (except direct loss by pillage and looting occurring during and at the immediate place or a riot or civil commotion), unless loss by a Peril covered under this Policy ensues from theft or attempted theft, and then Underwriters are liable for only such ensuing loss;

**F.**   Any other consequential loss.

### Coverage Section I Property – EXTRA EXPENSE Definitions

**1.**   **EXTRA EXPENSE** means the excess (if any) of the total cost incurred during the **PERIOD OF RESTORATION** chargeable to the continuance of the **ASSURED'S** operations, over and above the total cost that would normally have been incurred to conduct those operations during the same period had there been no direct physical loss or damage to the property.

Any salvage value of property obtained for temporary use during the **PERIOD OF RESTORATION** which remains after resumption of **NORMAL** operations, will be taken into consideration in the adjustment of any loss incurred.

**2.**   **NORMAL** means the condition that would have existed had no loss occurred.

**3.**   **PERIOD OF RESTORATION** means the period of time that:

(a)  Begins after a direct physical loss or damage to the **ASSURED'S** property; and

(b)  Ends the earlier of:

(i)   The date when the property or such part of property that was damaged or destroyed at the Schedule of Locations on file with Underwriters is repaired, rebuilt or replaced with reasonable speed or similar quality; or

(ii)  The date when the property or such part of property that was damaged or destroyed could have been repaired, rebuilt or replaced with the exercise of due diligence; or

(iii) The date when business is resumed at a new permanent location or at the same repaired, rebuilt or replaced location.

**PERIOD OF RESTORATION** does not include any increased period required due to the enforcement of any ordinance or law that:

(c)  Regulates the construction, use or repair, or requires the tearing down of any property; or

**Pkg2016.1**

(d) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of **POLLUTANTS**.

The **PERIOD OF RESTORATION** is not limited by the expiration date of this Policy.

### Coverage Section I Property – Transit

This Policy covers Personal **PROPERTY OF THE ASSURED** or property held by the **ASSURED** in trust or on commission or in the care, custody or control of the **ASSURED** or for which the **ASSURED** may be held legally liable in due course of transit against All Risks of Direct Physical Loss or Damage to the property insured occurring during the **PERIOD OF INSURANCE** of this Policy (including general average and salvage charges on shipments covered while waterborne). It is further agreed that this Extension in coverage does not increase, but just forms part of, Underwriters **Specific Excess Limits of Insurance** as shown in the **Schedule of Specific Excess Limits of Insurance**.

The **ASSURED** may accept ordinary Bills of Lading or receipts insured by carriers including those containing released and/or partially released value provisions, but the **ASSURED** shall not agree to release carriers from their common law or statutory liability.

### Coverage Section I Property – Transit Exclusions

In addition to **General Policy – Exclusions** and **Coverage Section I Property – Exclusions**, this Extension does not insure against:

**A.** Shrinkage, evaporation, loss of weight, leakage, breakage of glass or other fragile articles, marring, scratching, exposure to light, or change in color, texture or flavor, unless such loss is caused by a Peril not otherwise excluded in this Policy;

**B.** Loss caused by or resulting from misappropriation, conversion, infidelity or any dishonest act on the part of the **ASSURED** or other party of interest, or employees or agents or others to whom the property may be delivered or entrusted (carriers for hire excepted);

**C.** Loss caused by breakdown or derangement of refrigerating units;

**D.** Shipments by mail after delivery into the custody of any governmental postal service.

### Coverage Section I Property – BUSINESS INTERRUPTION

If property under **Coverage Section I Property** is damaged or destroyed by Perils insured against during the **PERIOD OF INSURANCE** which necessitates suspension of operations, Underwriters will be liable for loss of **BUSINESS INCOME** and **RENTAL VALUES** not exceeding the actual loss sustained, and not exceeding such length of time, hereinafter referred to as the **PERIOD OF RESTORATION**. It is further agreed that this Extension in coverage does not increase, but just forms part of, Underwriters **Specific Excess Limits of Insurance** as shown in the **Schedule of Specific Excess Limits of Insurance**.

### Coverage Section I Property – BUSINESS INTERRUPTION Conditions

**1.** **Valuation**: Underwriters will indemnify the **ASSURED** for the amount of **BUSINESS INCOME** or **RENTAL VALUES** loss based on:

(a) The Net Income of the business before the direct physical loss or damage occurred;

**Pkg2016.1**

(b) The likely Net Income of the business if no loss or damage occurred;

(c) The operating expenses including payroll expenses, necessary to resume **OPERATIONS** with the same quality of service that would have existed if no direct physical loss or damage occurred; and

(d) Other relevant sources of information including:

    (i) Financial records and accounting procedures;

    (ii) Bills, invoices, and other vouchers;

    (iii) Deeds, liens or contracts.

2. **Resumption of OPERATIONS**: Underwriters will reduce the amount of the **ASSURED'S BUSINESS INCOME** or **RENTAL VALUES** loss to the extent the **ASSURED** can resume **OPERATIONS**, with reasonable speed, in whole or in part, by using damaged or undamaged property at the described scheduled premises or elsewhere.

If the **ASSURED** does not resume **OPERATIONS** with reasonable speed, or does not resume **OPERATIONS** in whole or in part, Underwriters will indemnify the **ASSURED** for a **BUSINESS INCOME** or **RENTAL VALUES** loss based on the length of time it would have taken to resume **OPERATIONS** with reasonable speed, or to resume **OPERATIONS** in whole or in part.

3. **Interruption by Civil Authority**: Coverage hereunder is extended to include actual loss sustained when access to the premises in which the **PROPERTY OF THE ASSURED** is located is prohibited by order of civil authority as a direct result of loss caused by a Peril insured against.

4. **Expenses to Reduce Loss**: If there is a **BUSINESS INCOME** or **RENTAL VALUES** loss Underwriters will indemnify the **ASSURED** for expenses necessarily incurred to reduce further loss of **BUSINESS INCOME** or **RENTAL VALUES** loss. The total loss payment for **BUSINESS INCOME** or **RENTAL VALUES** loss, and expense to reduce loss will not be more than the **BUSINESS INCOME** or **RENTAL VALUES** loss that would have been payable under this Extension if the expenses to reduce loss had not been incurred.

5. **BUSINESS INCOME**: If the necessary suspension of the **ASSURED'S OPERATIONS** produces a **BUSINESS INCOME** loss payable under this Policy, Underwriters will indemnify the **ASSURED** for the actual loss of **BUSINESS INCOME** incurred during the **PERIOD OF RESTORATION** that would have existed if no direct physical loss or damage had occurred. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

6. **RENTAL VALUES**: If the necessary suspension of the **ASSURED'S OPERATIONS** produces a **RENTAL VALUES** loss payable under this Policy, Underwriters will indemnify the **ASSURED** for the actual loss of **RENTAL VALUES** incurred during the **PERIOD OF RESTORATION**, and up to ninety (90) consecutive days thereafter, that would have existed if no direct physical loss or damage had occurred. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

<u>**Coverage Section I Property – BUSINESS INTERRUPTION Exclusions**</u>

In addition to **General Policy – Exclusions** and **Coverage Section I Property – Exclusions**, this Extension does not insure against:

A. The suspension, lapse or cancellation of any lease, license, contract or order beyond the **PERIOD OF INSURANCE**;

**Pkg2016.1**

**B.** Interference at premises by strikers or other persons with the rebuilding, repairing or replacing the property damaged or destroyed or with the resumption or continuation of business;

**C.** Enforcement of any local or state ordinance or law regulating the construction, repair or demolition of buildings or structures;

**D.** Any other consequential loss.

### Coverage Section I Property – BUSINESS INTERRUPTION Definitions

**1.** **BUSINESS INCOME** means the:

(a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

(b) Continuing normal operating expenses incurred, including payroll.

**2.** **BUSINESS INTERRUPTION** means the loss sustained during the suspension of **OPERATIONS** as a result of direct physical damage to the property insured.

**3.** **OPERATIONS** means:

(a) The **ASSURED'S** business activities occurring at the scheduled premises; and

(b) The tenantability of the scheduled premises, (only if coverage for **BUSINESS INTERRUPTION** includes **RENTAL VALUES)**.

**4.** **PERIOD OF RESTORATION** means the period of time that:

(a) Begins after a direct physical loss or damage to the **ASSURED'S** property; and

(b) Ends on the earlier of:

(i) The date when the property or such part of property that was damaged or destroyed at the Schedule of Locations on file with Underwriters is repaired, rebuilt or replaced with reasonable speed or similar quality; or

(ii) The date when the property or such part of property that was damaged or destroyed could have been repaired, rebuilt or replaced with the exercise of due diligence; or

(iii) The date when business is resumed at a new permanent location or at the same repaired, rebuilt or replaced location.

**PERIOD OF RESTORATION** does not include any increase period required due to the enforcement of any ordinance or law that:

(c) Regulates the construction, use or repair, or requires the tearing down of any property; or

(d) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of **POLLUTANTS**.

The **PERIOD OF RESTORATION** is not limited by the Expiration Date of this Policy.

**5.** **RENTAL VALUES** means the:

**Pkg2016.1**

(a) Total anticipated rental income from tenant occupancy at the premises in the Schedule of Locations on file with Underwriters as furnished and equipped by the **ASSURED**; and

(b) Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be the **ASSURED'S** obligations; and

(c) Fair **RENTAL VALUES** for any portion of the premises stated in the Schedule of Locations on file with Underwriters, which is occupied by the **ASSURED**.

**Pkg2016.1**

## Coverage Section II General Liability
### Coverage Section II General Liability – Insuring Agreements

A. **General Liability:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is legally obligated to pay by reason of the liability imposed upon the **ASSURED** by law or assumed by the **ASSURED** under contract or agreement, for damage direct or consequential, and expenses, all as more fully defined by the term **ULTIMATE NET LOSS**, on account of **PERSONAL INJURY** or **BODILY INJURY**, suffered or alleged to have been suffered by any person(s) or organization(s), and/or **PROPERTY DAMAGE** or the loss of use thereof, arising out of an **OCCURRENCE** from any cause including **HOST LIQUOR LIABILITY** and/or **LIQUOR LIABILITY**, and **INCIDENTAL MEDICAL MALPRACTICE** (except **INCIDENTAL MEDICAL MALPRACTICE**, arising out of **LAW ENFORCEMENT ACTIVITIES**) occurring during the **PERIOD OF INSURANCE**.

B. **Premises MEDICAL PAYMENTS:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all reasonable **MEDICAL PAYMENTS** incurred by the **ASSURED** to others (except employees of the **ASSURED** injured in the course of their employment, and to and for students), as are necessary at the time of an **OCCURRENCE** on account of **BODILY INJURY** occurring during the **PERIOD OF INSURANCE**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance under Coverage Section II General Liability**.

C. **SEXUAL HARASSMENT Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, for the liability on the part of the **NAMED ASSURED**, including liabilities arising from negligent hiring, training and supervision, arising out of any **OCCURRENCE** resulting from any actual or alleged acts by any past, present or future official, board or commission member, trustee, director, employee or volunteer worker, of the **NAMED ASSURED** or other person or persons of **SEXUAL HARASSMENT** first committed during the **PERIOD OF INSURANCE** against another person who is not an **ASSURED** under this Policy. This provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify a past, present or future official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED**. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL HARASSMENT** Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability.**

Underwriters will not make payment for any loss, **OCCURRENCE**, **SUIT** or for any **DEFENSE COSTS** for any past, present or future official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED** or other person or persons in respect of actual or alleged **SEXUAL HARASSMENT**; however, with respect only to this **Coverage Section II General Liability – Insuring Agreement C SEXUAL HARASSMENT,** Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any loss, **OCCURRENCE** or **SUIT** for any actual or alleged **SEXUAL HARASSMENT** against another person who is not an **ASSURED** under this Policy alleged to have been committed by a past, present or future official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED** only, Underwriters will indemnify that official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a loss or by an adjudication, it is determined that the official, board or commission member, trustee, director, employee or volunteer worker of the **NAMED ASSURED** committed an act of **SEXUAL HARASSMENT**. Coverage only applies if the act of **SEXUAL HARASSMENT** was first committed during the **PERIOD OF INSURANCE**. Further, this coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL HARASSMENT**

**Pkg2016.1**

Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability.**

**D.** **SEXUAL ABUSE Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, for the liability on the part of the **NAMED ASSURED,** including liabilities arising from negligent hiring, training and supervision, out of any **OCCURRENCE** resulting from any actual or alleged acts by past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** or other person or persons of **SEXUAL ABUSE** first committed during the **PERIOD OF INSURANCE** against another person who is not an **ASSURED** under this Policy. This provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify an past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED**. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL ABUSE** Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability.**

Underwriters will not make payment for any loss, **OCCURRENCE**, **SUIT** or for any **DEFENSE COSTS** for past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** or other person or persons in respect of actual or alleged **SEXUAL ABUSE**; however, with respect only to this **Coverage Section II General Liability – Insuring Agreement D. SEXUAL ABUSE**, Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any loss, **OCCURRENCE** or **SUIT** for any actual or alleged **SEXUAL ABUSE** against another person who is not an **ASSURED** under this Policy alleged to have been committed by a past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** only, Underwriters will indemnify that official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a loss or by an adjudication, it is determined that the official, board or commission member, trustee, director, employee, or volunteer worker committed of the **NAMED ASSURED** an act of **SEXUAL ABUSE**. Coverage only applies if the act of **SEXUAL ABUSE** was first committed during the **PERIOD OF INSURANCE**. Further, this coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL ABUSE** Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability.**

Neither this coverage nor any subsequent coverage provided by Underwriters will apply to any **SEXUAL ABUSE** involving the same official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** or other person or persons which occurred after the **DISCOVERY** by any of the **NAMED ASSURED'S** officials, trustees, directors, officers or partners of any actual, attempted or pending alleged **SEXUAL ABUSE** by said perpetrator.

Following **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**, the **NAMED ASSURED** shall give notification of such **DISCOVERY** to Underwriters as soon as practicable but no more than 120 consecutive days after the initial **DISCOVERY**, and in any event within the **PERIOD OF INSURANCE** or sixty (60) consecutive days after the expiration of the **PERIOD OF INSURANCE** during which the **OCCURRENCE** of **SEXUAL ABUSE** first took place; whichever is later. Any failure to comply with this provision for any reason whatsoever will result in the absolute exclusion of any resulting **SEXUAL ABUSE** claim or claims, irrespective of whether Underwriters have been prejudiced by said failure.

**Pkg2016.1**

**E.** **Damage to Premises Rented to the ASSURED**: Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is legally obligated to pay for loss or damage caused by fire, explosion, smoke, riot or civil commotion occurring during the **PERIOD OF INSURANCE** to premises rented to the **ASSURED** or temporarily occupied by the **ASSURED** with the permission of the owner. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **Damage to Premises Rented to the ASSURED** is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section II General Liability**.

**Coverage Section II General Liability – Excess Limits of Insurance**

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section II General Liability** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS**.

If an Annual Aggregate applies to any coverage under this Coverage **Section II General Liability**, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance.**

**Coverage Section II General Liability – Exclusions**

**In addition to the General Policy – Exclusions, this Coverage Section does not insure against:**

**A.** Any claim for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of this Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance**;

**B.** **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY** which the **ASSURED** intended or expected; unless resulting from:

    (a) **BODILY INJURY** resulting from the use of reasonable force to protect persons or property;

    (b) Corporal punishment (unless providing coverage for corporal punishment is prohibited by law).

    (c) **Coverage Section II General Liability – Insuring Agreements C. SEXUAL HARASSMENT Liability** and **Coverage Section II General Liability – Insuring Agreements D. SEXUAL ABUSE Liability**; but only to the extent that coverage for **SEXUAL HARASSMENT** and **SEXUAL ABUSE** is specifically given, and only if a **SUBLIMIT** for **SEXUAL HARASSMENT** and **SEXUAL ABUSE** coverage is stated in the **Schedule of Specific Excess Limits of Insurance.**

**C.** Liability arising out of the ownership, maintenance or use, including loading or unloading, of watercraft over 50 feet, except with respect to use of same where operations are performed by independent contractors;

**D.** Damage to or destruction of **PROPERTY OF THE ASSURED**;

**E.** Liability arising out of the ownership, maintenance, loading or unloading, use or operations of any aircraft including **UNMANNED AIRCRAFT**, airfields, runways, hangars, buildings, or other properties in connection with aviation activities, other than premises liability in buildings to which the general public is admitted;

**Pkg2016.1**

F.    Any claim for which the **ASSURED** may be held liable under any Workers' Compensation, unemployment compensation, disability benefits law, employers' liability or under any similar law; or to **BODILY INJURY** to any employee of the **ASSURED**; or to any liability for indemnity or contribution brought by any party against the **ASSURED** for **BODILY INJURY** to any employee of an **ASSURED**;

G.    The cost of any investigation, disciplinary or criminal proceedings against an individual **ASSURED** except that Underwriters may, at their own option and expense, associate counsel in the defense of any such investigation, criminal or disciplinary proceeding. Should Underwriters elect to associate counsel, such elections shall not constitute a waiver or estoppel of any rights Underwriters may have pursuant to the terms, conditions, exclusions and limitations of this Policy;

H.    Any claim arising from **WRONGFUL ACTS** and/or **EMPLOYMENT PRACTICE VIOLATIONS**;

I.    Any claim arising from **LAW ENFORCEMENT ACTIVITIES**;

J.    Any claim arising out of Medical Malpractice, but not to exclude **INCIDENTAL MEDICAL MALPRACTICE**.

### Coverage Section II General Liability – Definitions

1.    **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** shall exist when any of the **NAMED ASSURED'S** officials, trustees, directors, officers, partners or any person that the **NAMED ASSURED** has made responsible in an official capacity to prevent **SEXUAL ABUSE** has taken receipt, learned, or in the exercise of reasonable care should have known:

   (a)    of any lawsuit alleging **SEXUAL ABUSE;** or

   (b)    of any demand for money or services based upon alleged **SEXUAL ABUSE;** or

   (c)    of any criminal investigation or prosecution alleging **SEXUAL ABUSE;** or

   (d)    of any allegation by an alleged victim or by a parent or guardian of the alleged victim of **SEXUAL ABUSE,** whether the allegation is or is not accompanied by a demand for money or services; or

   (e)    of any report from any other person alleging **SEXUAL ABUSE**, and a person or group designated by the **NAMED ASSURED** to investigate the allegation has investigated and as a result of the investigation has recommended that any action of any kind be taken by or on behalf of the **NAMED ASSURED** with respect either to the alleged **ASSURED** or the alleged victim; or

   (f)    that the alleged **ASSURED** has admitted to acts of **SEXUAL ABUSE**.

2.    **DEFENSE COSTS** means the expenses incurred for the investigation and defense of an **OCCURRENCE** or **SUIT** arising out of the **SEXUAL HARASSMENT** or **SEXUAL ABUSE** or a series of related **SEXUAL HARASSMENTS** or **SEXUAL ABUSES** by one or more **ASSUREDS**. However, the salaries, expense and administrative cost of the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** are not included within the meaning of **DEFENSE COSTS**.

3.    **HOST LIQUOR LIABILITY** and/or **LIQUOR LIABILITY** means indemnification for the **ASSURED'S** liability for the sale or distribution of alcoholic beverage by reason of any local, State or Federal liquor control laws in force at the time of the **OCCURRENCE**.

**Pkg2016.1**

4. **INCIDENTAL MEDICAL MALPRACTICE** means **BODILY INJURY** or **PERSONAL INJURY** arising out of the rendering of or failure to render emergency and/or first aid medical services which shall be understood to include, but not limited to, the dispensing of medication and/or the administering of inoculations and/or blood tests and the like (i.e.: medicines/tests normally administered by a Healthcare Department that are preventative in nature and do not require advanced medical diagnosis) but where there are no overnight stays.

However, **INCIDENTAL MEDICAL MALPRACTICE** does not include services provided by:

(a)  a hospital or emergency room facility;

(b)  a physician, medical doctor, osteopath, chiropractor, resident, extern, or intern;

(c)  a psychiatrist;

(d)  a pharmacist;

(e)  a dentist, orthodontist, or periodontist.

5    **OCCURRENCE** means an accident or a happening or event or a continuous or repeated exposure to conditions which results in **BODILY INJURY**, **PROPERTY DAMAGE**, **PERSONAL INJURY**, **SEXUAL HARASSMENT** or **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**.

All **BODILY INJURIES**, **PERSONAL INJURIES** or **SEXUAL HARASSMENT** or **SEXUAL ABUSE** to one or more persons and/or **PROPERTY DAMAGE** arising out of an accident or a happening or event or a continuous or repeated exposure to conditions shall be deemed one **OCCURRENCE**. Only one Policy, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **OCCURRENCE**.

**Pkg2016.1**

## Coverage Section III AUTOMOBILE Liability

### Coverage Section III AUTOMOBILE Liability – Insuring Agreements

**A.**   **AUTOMOBILE Liability:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is obligated to pay by reason of the liability imposed upon the **ASSURED** by law or assumed by the **ASSURED** under contract or agreement, including non-owned and hired **AUTOMOBILES**, for damages direct or consequential, and expenses, all as more fully defined by the term **ULTIMATE NET LOSS**, arising out of any **OCCURRENCE** on account of **BODILY INJURY** or **PERSONAL INJURY**, suffered or alleged to have been suffered by any person(s) or organization(s) and/or **PROPERTY DAMAGE**, arising out of the ownership, operation, maintenance or use of an **AUTOMOBILE**, occurring during the **PERIOD OF INSURANCE**.

**B.**   **AUTOMOBILE MEDICAL PAYMENTS:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all reasonable **MEDICAL PAYMENTS** incurred by the **ASSURED** to others (except employees of the **ASSURED** injured in the course of their employment) as are necessary at the time of an **OCCURRENCE** on account of **BODILY INJURY** arising out of the ownership, operation, maintenance or use of an **AUTOMOBILE** occurring during the **PERIOD OF INSURANCE**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

**C.**   **Uninsured Motorist/Underinsured Motorist:** Uninsured/Underinsured Motorist Coverage is afforded in respect of any **OCCURRENCE** at least to the minimum extent required by the law of the State in which each owned or hired **AUTOMOBILE** is principally garaged. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

**D.**   **No Fault Insurance:** No Fault insurance is afforded in respect of any **OCCURRENCE** at least to the minimum extent required by the law of the State in which each owned or hired **AUTOMOBILE** is principally garaged. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

**E.**   **Garagekeeper's Legal Liability:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is legally obligated to pay for loss or damage occurring during the **PERIOD OF INSURANCE** to **AUTOMOBILES** left in the **ASSURED'S** care for which the **ASSURED** is legally obligated. This coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **Garagekeeper's Legal Liability** is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section III Automobile Liability.**

### Coverage Section III AUTOMOBILE Liability – Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section III AUTOMOBILE Liability** is limited to, and not to exceed the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS.**

If an Annual Aggregate applies to any coverage under this **Coverage Section III AUTOMOBILE Liability**, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance**.

### Coverage Section III AUTOMOBILE Liability – Exclusions

**In addition to General Policy – Exclusions, this Coverage Section does not insure against:**

Pkg2016.1

**A.** Any claims for damages, whether direct or consequential, or for any cause of action which is covered under any other Coverage Section of this Policy, whether or not a limit is stated in the **Schedule of Excess Limits of Insurance**;

**B.** Any claim that is paid or is payable to or for the **ASSURED** under any Worker's Compensation, disability benefits law, employers' liability or under any similar law or to **BODILY INJURY** to any employee or to any liability for indemnity or contribution brought by any party for **BODILY INJURY** to any employee;

**C.** Covered **AUTOMOBILES** used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity;

### Coverage Section III AUTOMOBILE Liability – Definitions

**1.** **OCCURRENCE** means an accident or a happening or event or a continuous or repeated exposure to conditions which results in **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY** during the **PERIOD OF INSURANCE**.

All **BODILY INJURIES** or **PERSONAL INJURIES** to one or more persons and/or **PROPERTY DAMAGE** arising out of an accident or a happening or event or a continuous or repeated exposure to conditions shall be deemed one **OCCURRENCE**. Only one Policy, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **OCCURRENCE**.

**2.** **ASSURED** means not only the **ASSURED** as defined in the **GENERAL POLICY DEFINITIONS**, but under this **Coverage Section III AUTOMOBILE Liability** also includes any person while using an owned or hired **AUTOMOBILE** with the permission of the **ASSURED**.

**Pkg2016.1**

## Coverage Section IV Public Officials Miscellaneous Liability

### This is a Claims Made Section

### Coverage Section IV Public Officials Miscellaneous Liability — Insuring Agreements

Coverage is provided for one or more of the coverage options in this Coverage Section only if a **Specific Excess Limit of Insurance** is stated in the **Schedule of Specific Excess Limits of Insurance**, and a **SELF INSURED RETENTION** is stated in the **Schedule of SELF INSURED RETENTIONS** for each Coverage chosen.

**A.** **Errors & Omissions:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **ASSURED** for all sums for which the **ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of a **WRONGFUL ACT**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

This coverage applies only if a **CLAIM** for damages, because of a **WRONGFUL ACT**, is "first made" against the **ASSURED** during the **PERIOD OF INSURANCE**. The **WRONGFUL ACT** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the based on or arising out of one **WRONGFUL ACT** shall be considered "first made" when the first of such **CLAIMS** is made to the **ASSURED**. A **CLAIM** shall not be prejudiced if the **ASSURED,** through clerical oversight or clerical mistake, fails to notify Underwriters within the time provided for under this Coverage Section.

**B.** **Employment Practice Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **ASSURED** for all sums for which the **ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of an **EMPLOYMENT PRACTICE VIOLATION**, including mental anguish resulting from an **EMPLOYMENT PRACTICE VIOLATION**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

This coverage applies only if a **CLAIM** for damages, because of an **EMPLOYMENT PRACTICE VIOLATION**, is "first made" against the **ASSURED** during the **PERIOD OF INSURANCE**. The **EMPLOYMENT PRACTICE VIOLATION** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the Extended Reporting Period applicable to this coverage, if any. All **CLAIMS** based on or arising out of one **EMPLOYMENT PRACTICE VIOLATION** shall be considered "first made" when the ~~first of~~ such **CLAIMS** is made to the **ASSURED**. A **CLAIM** shall not be prejudiced if the **ASSURED,** through clerical oversight or clerical mistake, fails to notify Underwriters within the time provided for under this Coverage Section.

**C.** **SEXUAL HARASSMENT Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums for which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of **SEXUAL HARASSMENT** by any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** to an **ASSURED**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance.**

Pkg2016.1

This coverage applies only if a **CLAIM** for damages, because of **SEXUAL HARASSMENT**, is "first made" against the **ASSURED** during the **PERIOD OF INSURANCE**. The **SEXUAL HARASSMENT** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the Extended Reporting Period applicable to this coverage, if any. A **CLAIM** shall not be prejudiced if the **ASSURED**, through clerical oversight or clerical mistake, fails to notify Underwriters within the time provided for under this Coverage Section. All **CLAIMS** based on or arising out of one **SEXUAL HARASSMENT** shall be considered first made when the first of such **CLAIMS** is made to the **ASSURED**, regardless of:

(a)  The number of persons **SEXUALLY HARASSED**;

(b)  The number of locations where the **SEXUAL HARASSMENT** occurred;

(c)  The number of acts of **SEXUAL HARASSMENT** prior to or after the first **CLAIM** is made; or

(d)  The period of time over which the **SEXUAL HARASSMENT** took place, whether the **SEXUAL HARASSMENT** is during, before or after the **PERIOD OF INSURANCE**. However, only acts of **SEXUAL HARASSMENT** that take place after the Retroactive Date and before the end of the **PERIOD OF INSURANCE** are covered.

Underwriters will not make payment for any loss, **CLAIM** or for any **DEFENSE COSTS** for any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** in respect of actual or alleged **SEXUAL HARASSMENT** to an **ASSURED**. However, with respect only to this Insuring Agreement C., Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any **CLAIM** or **SUIT** for **SEXUAL HARASSMENT** against an **ASSURED** by any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED**, Underwriters will indemnify that official, board or commission member, trustee, director, employee, or volunteer worker for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a **CLAIM** or by an adjudication, it is determined that the official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** committed an act of **SEXUAL HARASSMENT** against an **ASSURED**. This coverage forms part of the overall **SEXUAL HARASSMENT LIABILITY** limit and not in addition thereof as stated in the **Schedule of Specific Excess Limits of Insurance**.

D.  **SEXUAL ABUSE Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums for which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of **SEXUAL ABUSE** by past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** to an **ASSURED**. This coverage applies only if a **SUBLIMIT** is stated in the **Schedule of Specific Excess Limits of Insurance**.

This coverage applies only if a **CLAIM** for damages, because of **SEXUAL ABUSE**, is "first made" against the **ASSURED** during the **PERIOD OF INSURANCE**. The **SEXUAL ABUSE** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty  (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the Extended Reporting Period applicable to this coverage, if any.

All **CLAIMS** based on or arising out of one **SEXUAL ABUSE** shall be considered first made when the first of such **CLAIMS** is made to the **ASSURED**, regardless of:

**Pkg2016.1**

(a) The number of persons **SEXUALLY ABUSED**;

(b) The number of locations where the **SEXUAL ABUSE** occurred;

(c) The number of acts of **SEXUAL ABUSE** prior to or after the first **CLAIM** is made; or

(d) The period of time over which the **SEXUAL ABUSE** took place, whether the **SEXUAL ABUSE** is during, before or after the **PERIOD OF INSURANCE**. However, only acts of **SEXUAL ABUSE** that take place after the Retroactive Date and before the end of the **PERIOD OF INSURANCE** are covered.

Underwriters will not make payment for any loss, **CLAIM** or for any **DEFENSE COSTS** for any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** in respect of actual or alleged **SEXUAL ABUSE** to an **ASSURED**. However, with respect only to this **Coverage Section IV Public Officials Miscellaneous Liability - Insuring Agreement D. SEXUAL ABUSE** liability. Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any **CLAIM** or **SUIT** for **SEXUAL ABUSE** against an **ASSURED** by any past, present or future official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED**, Underwriters will indemnify that official, board or commission member, trustee, director, employee, or volunteer worker of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a **CLAIM** or by an adjudication, it is determined that the official, board or commission member, trustee, director, employee, or volunteer worker committed an act of **SEXUAL ABUSE** against an **ASSURED**. This coverage forms part of the overall **SEXUAL ABUSE LIABILITY** limit and not in addition thereof as stated in the **Schedule of Specific Excess Limits of Insurance.**

Neither this coverage nor any subsequent coverage provided by Underwriters will apply to any **SEXUAL ABUSE** involving the same official, board or commission member, trustee, director, employee, or volunteer worker which occurred after the **DISCOVERY** by any of the **NAMED ASSURED'S** officials, trustees, directors, officers or partners of any actual, attempted or pending alleged **SEXUAL ABUSE** by said perpetrator.

Following **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**, the **NAMED ASSURED** shall give notification of such **DISCOVERY** to Underwriters as soon as practicable but no more than one hundred and twenty (120) consecutive days after the initial **DISCOVERY**, and in any event within sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE** or any Extended Reporting Period. Any failure to comply with this provision for any reason whatsoever will result in the absolute exclusion of any resulting **SEXUAL ABUSE CLAIM** or **CLAIMS**, irrespective of whether Underwriters have been prejudiced by said failure.

## Coverage Section IV Public Officials Miscellaneous Liability – Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **CLAIM** for any coverage under **Coverage Section IV – Public Officials Miscellaneous Liability** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION** as stated in the **Schedule of SELF INSURED RETENTIONS**.

If an Annual Aggregate applies to any coverage under this **Coverage Section IV Public Officials Miscellaneous Liability**, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance**.

**Pkg2016.1**

## Coverage Section IV Public Officials Miscellaneous Liability – Conditions

**A.  Basic Extended Reporting Period:**

A Basic Extended Reporting Period is automatically provided without additional charge.  This period starts with the end of the **PERIOD OF INSURANCE**, and lasts for sixty (60) consecutive days.

If, however, this Policy and this Coverage Section is succeeded by similar Claims Made insurance coverage, with any insurer, on which the Retroactive Date is the same as or earlier than the Retroactive Date shown in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance** of this Policy, the succeeding Policy shall be deemed to be a renewal of this Policy, and the **ASSURED** shall have no right to an Extended Reporting Period from Underwriters.

The Basic Extended Reporting Period does not apply to **CLAIMS** that are covered under any subsequent insurance applicable to this Coverage Section which the **ASSURED** purchases, or that would have been covered but for exhaustion of the amount of  insurance applicable to such **CLAIMS**.

**B.  Supplemental Extended Reporting Period:**

Underwriters will provide an Extended Reporting Period, as described below, if:

(a)  This Policy or this Coverage Section of this Policy is cancelled or non-renewed;   or

(b)  Underwriters renew or replace this Policy, or this Coverage Section of this Policy, with insurance that does not apply to a **WRONGFUL ACT, EMPLOYMENT PRACTICE VIOLATION, SEXUAL HARASSMENT** or **SEXUAL ABUSE** on a Claims Made basis.

A Supplemental Extended Reporting Period of one (1) year duration is available but only by endorsement to this Policy and for an additional premium not to exceed 100% of the annual premium for this Coverage Section. This supplemental period starts when the Basic Extended Reporting Period ends.

The **ASSURED** must give Underwriters a written request for the endorsement within thirty (30) consecutive days after the end of the **PERIOD OF INSURANCE**. The Supplemental Extended Reporting Period will not go into effect unless the **ASSURED** pays the additional premium within thirty (30) consecutive days. This endorsement will set forth the terms consistent with the Coverage Section.

Underwriters shall determine the additional premium in accordance with its applicable rules, rates and underwriting practices. Coverage for **CLAIMS** received during such Supplemental Extended Reporting Period is excess over any other valid and collectible insurance available under any other policies.

Extended Reporting Periods do not reinstate or increase the applicable **SELF INSURED RETENTION**, the **LOSS FUND**, the applicable **Specific Excess Limit of Insurance**, or the **Excess Loss Fund Protection**.

Extended Reporting Periods do not extend the **PERIOD OF INSURANCE** or change the scope of coverage provided within this Coverage Section. They apply to **CLAIMS** arising out of a **WRONGFUL ACT, EMPLOYMENT PRACTICE VIOLATION, SEXUAL HARASSMENT** or **SEXUAL ABUSE** that take place before the end of the **PERIOD OF INSURANCE** that this Policy and this Coverage Section are in force. Once in effect, Extended Reporting Periods may not be canceled.

**Pkg2016.1**

**C.**     **Reporting to Underwriters:**

For the purposes of compliance with the reporting requirements of this Coverage Section, the **ASSURED'S** reporting of a **CLAIM** to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** shall be considered reporting of the **CLAIM** to Underwriters, provided that:

(a)  The **CLAIM** is reported to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** no later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE** or the applicable **Extended Reporting Period**, if any; and

(b)  The **CLAIM**, if not otherwise reportable to Underwriters pursuant to **General Policy Condition 7**, appears on the **ASSURED'S** list of **CLAIMS** or loss run, as reported by the **THIRD PARTY CLAIM ADMINISTRATOR** to Underwriters, that includes all **CLAIMS** for the **PERIOD OF INSURANCE** or applicable **Extended Reporting Period**, if any.

## Coverage Section IV Public Officials Miscellaneous Liability – Exclusions

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

**A.**     Any **CLAIM** for damages, whether direct or consequential, for **BODILY INJURY**, **PERSONAL INJURY**, or **PROPERTY DAMAGE**; or for any cause of action which is covered under any other Coverage Section of this Policy;

**B.**     Any **CLAIM** based upon or attributable to any **ASSURED** gaining in fact any personal profit or advantage to which they were not legally entitled including remuneration paid in violation of law as determined by the Courts;

**C.**     Any **CLAIM** based upon or attributable to the rendering or failure to render any opinion, treatment, consultation or service unless acting within the scope of their duties as an **ASSURED**;

**D.**     Any **CLAIM** arising out of or in any way involving any employee benefit plan, except as covered under this **Coverage Section IV – Public Officials Miscellaneous Liability – Insuring Agreements B. Employment Practice Liability** for discrimination;

**E.**     **CLAIMS**, **SUITS**, proceedings, demands, or actions seeking relief or redress in any form other than monetary damages, including defense of same; or any loss, fees, costs or expenses which the **ASSURED** may be obligated to pay to any third-party as a result of any adverse judgment for declaratory relief or administrative relief or injunctive relief, except that this exclusion shall not apply to any **CLAIM** made to the Equal Employment Opportunity Commission (E.E.O.C.), or such similar federal, state or local administrative agency established to handle or adjudicate **EMPLOYMENT PRACTICE VIOLATIONS** that involve or arise from alleged employment discrimination other than **CLAIMS** brought under the federal Fair Labor Standards Act or similar state act or law;

**F.**     Any cost, civil fine, penalty or expense against any **ASSURED** arising from any complaint or enforcement action from any federal, state or local governmental regulatory agency;

**G.**     Any **CLAIM** for which an **ASSURED** is entitled to indemnity under any Policy or policies the term of which has expired prior to the inception date of this Policy, or for which an **ASSURED** would be entitled to indemnity except for the exhaustion of the limit of such prior insurance;

**H.**     Any **CLAIM** arising out of any pending or prior litigation or hearing, as well as future **CLAIMS** arising out of any pending or prior litigation or hearing. If this Policy is a renewal of a Policy issued by Underwriters, this exclusion shall only apply with respect to **CLAIMS** arising out of any pending

**Pkg2016.1**

or prior litigation or hearing, prior to the effective date of the first Policy issued and continuously renewed by Underwriters.

**I.** Any **CLAIM** brought as a counter-**CLAIM** or cross **CLAIM** by an **ASSURED** against any other **ASSURED** however, this exclusion does not apply to **EMPLOYMENT PRACTICE VIOLATIONS**;

**J.** Any **CLAIM** alleging, based upon, arising out of or attributable to breach of any express, implied, actual or constructive contract, agreement, warranty, guarantee or promise, unless liability would have attached to the **ASSURED** even in the absence of such contract, agreement, warranty, guarantee or promise. However, this exclusion shall not apply to **CLAIMS** alleging violation of employment contracts brought by employees or officials;

**K.** Any **CLAIM** for the return of money or property, other than **PROPERTY OF THE ASSURED**, that is being held by the **ASSURED**, or that is in the care, custody, or control of the **ASSURED**;

**L.** Any **CLAIM** for the return of any fees, taxes, assessments, or other similar payments made to the **ASSURED.**

**M.** Any **CLAIM** arising from **LAW ENFORCEMENT ACTIVITIES**.

### Coverage Section IV Public Officials Miscellaneous Liability – Definitions

**1.** **CLAIM** means all notices or **SUITS** demanding payment of money based on, or arising out of the same **WRONGFUL ACT, SEXUAL HARASSMENT** or **SEXUAL ABUSE** or a series of related **WRONGFUL ACTS, SEXUAL HARASSMENT** or **SEXUAL ABUSE** by one or more **ASSUREDS**.

However, as respects to **EMPLOYMENT PRACTICE LIABILITY**, **CLAIM** means: all notices or **SUITS** demanding payment of money, or charges filed with the Equal Employment Opportunity Commission or comparable federal, state or local administrative agency based on, or arising out of the same **EMPLOYMENT PRACTICE VIOLATION** or a series of related **EMPLOYMENT PRACTICE VIOLATIONS** by one or more **ASSUREDS**.

**2.** **DEFENSE COSTS** means the expenses incurred for the investigation and defense of a **CLAIM** or **SUIT** arising out of the same **EMPLOYMENT PRACTICE VIOLATION, WRONGFUL ACT, SEXUAL HARASSMENT** or **SEXUAL ABUSE** or a series of related **EMPLOYMENT PRACTICE VIOLATIONS, WRONGFUL ACTS, SEXUAL HARASSMENTS** or **SEXUAL ABUSES** by one or more **ASSUREDS**. However, the salaries, expense and administrative cost of the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** are not included within the meaning of **DEFENSE COSTS**.

**3.** **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** shall exist when any of the **NAMED ASSURED'S** officials, trustees, directors, officers, partners or any person that the **NAMED ASSURED** has made responsible in an official capacity to prevent **SEXUAL ABUSE** has taken receipt, learned, or in the exercise of reasonable care should have known:

(a) Of any lawsuit alleging **SEXUAL ABUSE;** or

(b) Of any demand for money or services based upon alleged **SEXUAL ABUSE;** or

(c) Of any criminal investigation or prosecution alleging **SEXUAL ABUSE;** or

(d) Of any allegation by an alleged victim or by a parent or guardian of the alleged victim of **SEXUAL ABUSE,** whether the allegation is or is not accompanied by a demand for money or services; or

**Pkg2016.1**

(e)  Of any report from any other person alleging **SEXUAL ABUSE**, and a person or group designated by the **NAMED ASSURED** to investigate the allegation has investigated and as a result of the investigation has recommended that any action of any kind be taken by or on behalf of the **NAMED ASSURED** with respect either to the alleged **ASSURED** or the alleged victim; or

(f)  That the alleged **ASSURED** has admitted to acts of **SEXUAL ABUSE**.

## Coverage Section V Excess Workers' Compensation and Employers' Liability f or a Qualified Self -Insurer

**Who is Insured**: Under this Coverage Section, the **NAMED ASSURED** as stated in the Declarations. If the **NAMED ASSURED** is a partnership or joint venture, each partner or member of the joint venture is insured only in the capacity as employer of employees of the partnership or joint venture.

### Coverage Section V Excess Workers' Compensation and Employers' Liability f o r a Qualified Self-Insurer SELF INSURED RETENTION and Specific Excess Limits of Insurance

**SELF INSURED RETENTION**:   The **ASSURED** will pay all sums up to the amount stated in the **Schedule of SELF INSURED RETENTIONS**.

Underwriters will indemnify the **NAMED ASSURED** for **ULTIMATE NET LOSS** resulting from any one **ACCIDENT** or disease for **Coverage Section V Workers' Compensation and Employers' Liability** for the **Specific Excess Limit of Insurance** stated in the **Schedule of Specific Excess Limits of Insurance** over the **SELF INSURED RETENTION** stated in the **Schedule of SELF INSURED RETENTIONS**. The **SELF INSURED RETENTION** and **Specific Excess Limit of Insurance** apply to sums paid by the **NAMED INSURED** as a Qualified Self Insurer of Workers' Compensation and Employers' Liability as follows:

(1)     To one or more employees because of **BODILY INJURY** or death in any one **ACCIDENT**.

(2)     To any one employee for **BODILY INJURY** or death by disease.

The most Underwriters will indemnify the **NAMED ASSURED** will not change regardless of the number of persons or organizations who are **ASSUREDS**, claims made or **SUITS** brought against any or all persons or organizations who are **ASSUREDS**, or persons or organizations making a claim or bringing a **SUIT**.

### Coverage Section V Part A Excess Workers' Compensation For a Qualified Self-Insurer – Insuring Agreements

**A.**   Underwriters agree to indemnify the **ASSURED** promptly when due for those sums that the **ASSURED** shall become legally obligated to pay as a Qualified Self-Insurer under **WORKERS' COMPENSATION LAW**, subject to the terms of this Policy, this Coverage Section and the exclusions that follow.

This insurance applies to **BODILY INJURY** by **ACCIDENT** or **BODILY INJURY** by disease including resulting death, provided:

(1)   The **BODILY INJURY** by **ACCIDENT** occurs during the **PERIOD OF INSURANCE** this Policy and this coverage are in force;   or

(2)   The **BODILY INJURY** by disease is caused or aggravated by the conditions of employment by the **ASSURED**. The employee's last day of last exposure to those conditions of that employment causing   or aggravating such **BODILY INJURY** by disease must occur during the **PERIOD OF INSURANCE** this Policy and this coverage are in force.

**B.**    **Other STATES Excess Workers' Compensation Extension:** This coverage Extension applies in other **STATES** than the **STATE** of hire if an employee of the **ASSURED** is injured in such a **STATE** and if the work of such injured employee of the **ASSURED** was within the scope of such employee's

**Pkg2016.1**

employment, at the direction of the **ASSURED**, and was temporary and transitory in such other **STATE** provided the **ASSURED** is not insured or a Qualified Self-Insurer in such other **STATE**.

All other terms, conditions and exclusions applicable to **Coverage Section V Part A Workers' Compensation** shall apply to this coverage Extension.

**Coverage   Section   V   Part   A   Excess   Workers'
Compensation  For a Qualified Self-Insurer –  Exclusions**

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

**A.**  Any claims**,** whether direct or consequential, or any cause of action which is covered under any other Coverage Section of this Policy;

**B.**  Loss payable under the **WORKERS' COMPENSATION LAW** of any **STATE** if the **ASSURED** is protected from the loss by any other insurance;

**C.**  Punitive or exemplary claims because of:

(a)  **BODILY INJURY** to any employee;

(b)  The **ASSURED'S** conduct or the conduct of anyone acting for the **ASSURED** in investigation, trial or settlement, or failure to pay, or delay in payment of any Workers' Compensation claim;

(c)  The **ASSURED'S** failure to comply with any health or safety law or regulation or any **WORKERS' COMPENSATION LAW**;

**D.**  Any payments made by the **ASSURED** arising out of operations for which the **ASSURED** has rejected any **WORKERS' COMPENSATION LAW**;

**E.**  Any assessment made upon self-insurers, whether imposed by statute, regulation or otherwise.

**Coverage  Section  V  Part  B  Employers ' Liability – Insuring Agreement**

Underwriters agree to indemnify the **ASSURED** promptly for **DAMAGES** that the **ASSURED** is legally obligated to pay as a Qualified Self-Insurer of Employers' Liability, subject to the terms of this Policy, this Coverage Section and the exclusions that follow.

This insurance applies to **BODILY INJURY** by **ACCIDENT** or disease which arises out of and in the course of the injured employee's employment by the **ASSURED**, provided:

(1)  The **BODILY INJURY** by **ACCIDENT** occurs during the period this Policy and this coverage are in force;  or

(2)  The **BODILY INJURY** by disease is caused or aggravated by the conditions of employment by the **ASSURED**.  The employee's last day of last exposure to those conditions of that employment causing or aggravating such **BODILY INJURY** by disease must occur during the period this Policy and this coverage are in force and employment by the **ASSURED** is necessary or incidental to work conducted by the **ASSURED** in the **STATE** of hire, or as covered under the **Coverage Section V Other STATES Excess Workers' Compensation Extension**.

**Coverage  Section  V  P art  B  Employers ' Liability – Exclusions**

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

Pkg2016.1

A. Any claims, whether direct or consequential, or for any cause of action which is covered under any other Coverage Section of this Policy;

B. Liability assumed under a contract or agreement; however, this exclusion does not apply to a warranty that the **ASSURED'S** work will be done in a workmanlike manner;

C. Punitive or exemplary **DAMAGES**;

D. **BODILY INJURY** to an employee while employed in violation of law;

E. **DAMAGES** arising out of operations for which the **ASSURED** or the **ASSURED'S** supervisory personnel have:

    (a) Violated or failed to comply with any **WORKERS' COMPENSATION LAW**;

    (b) Rejected any **WORKERS' COMPENSATION LAW**;

    (c) Intentionally caused or aggravated **BODILY INJURY**;

F. Any obligation imposed by a workers compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law;

G. **BODILY INJURY** occurring outside the United States of America, its territories or possessions. This exclusion does not apply to **BODILY INJURY** to a citizen or resident of the United States of America who is temporarily working outside of the United States of America, its territories or possessions for the **ASSURED**;

H. Any obligation imposed by the:

    (a) Merchant Marine Act of 1920 known as the Jones Act, 46 U.S. Code, Section 688, 1970;

    (b) Federal Employers' Liability Act (F.E.L.A.), 45 U.S. Code, Sections 51-60, 1970;

    (c) U.S. Longshoremen's and Harbor Workers' Compensation Act (U.S.L. & H. Act);

    (d) Defense Base Act, U.S. Code (1946) Title 42, Sections 1651-54, Public Law. 77th Congress, as amended;

    (e) Outer Continental Shelf Lands Act, U.S. Code (1946) Title 33, Sections 901-49 as extended by Act of August 7, 1953, Public Law 212, 83rd Congress; or Section 8171, Public Law 85-538, 85th Congress.

### Coverage Section V Excess Workers' Compensation and Employers' Liability f o r a Qualified Self-Insurer – Definitions

1. **ACCIDENT** means each accident or **OCCURRENCE** or series of accidents or occurrences arising out of any one event. An **ACCIDENT** is deemed to end 72 hours after the event commences. Each subsequent 72 hours is deemed to be a separate **ACCIDENT** period. Disease means an **ACCIDENT** only if it results in **BODILY INJURY** directly caused from that **ACCIDENT**.

2. **DAMAGES** means those amounts which the **ASSURED** is obligated to pay due to **BODILY INJURY** by **ACCIDENT** or disease for:

    (a) Which the **ASSURED** is liable to a third party by reason of a claim, **SUIT**, or proceeding against the **ASSURED** to recover **DAMAGES** obtained from the third party;

**Pkg2016.1**

(b) Care and loss of services of an injured employee of the **ASSURED**;

(c) Consequential **BODILY INJURY** to a spouse, child, parent, brother or sister of the injured employee of the **ASSURED**;

provided such **DAMAGES** in (a), (b), and (c) above are the direct consequence of **BODILY INJURY** that arises out of and in the course of the injured employee's employment by the **ASSURED**;

(d) **BODILY INJURY** to an employee of the **ASSURED** arising out of and in the course of employment, claimed against the **ASSURED** in a capacity other than as employer.

3.  **STATE** means any **STATE** of the United States of America and the District of Columbia.

4.  **SUIT** means a civil proceeding in which **BODILY INJURY** is alleged.  **SUIT** includes:

(a) An arbitration proceeding in which such **BODILY INJURY** is claimed and to which the **ASSURED** must submit,   or

(b) Any other alternative dispute resolution proceeding in which such **BODILY INJURY** is claimed and to which the **ASSURED** submits to with Underwriters' consent.

5.  **WORKERS' COMPENSATION LAW** means the workers' or workmen's compensation law and occupational disease law of each **STATE** of hire, or as covered under **Coverage Section V Other STATES Excess Workers' Compensation** and includes any amendments to those laws which are in effect during the **PERIOD OF INSURANCE**. It does not include provisions of any law that provides non-occupational disability benefits.

**Pkg2016.1**

## Coverage Section VI Employee Benefits Liability

### This is a Claims Made Section

### Coverage Section VI Employee Benefits Liability – Insuring Agreement

Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions to indemnify the **ASSURED** for all sums for which the **ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**, by reason of a **NEGLIGENT ACT**, **ERROR OR OMISSION** committed in the **ADMINISTRATION** of the **ASSURED'S EMPLOYEE BENEFIT PROGRAMS**.

This coverage applies only if a **CLAIM** for damages, because of a **NEGLIGENT ACT**, **ERROR OR OMISSION**, is first made against the **ASSURED** during the **PERIOD OF INSURANCE**. The **NEGLIGENT ACT**, **ERROR OR OMISSION** must have first occurred on or after Retroactive Date shown in the **Schedule of Specific Excess Limits of Insurance**, but in no event any later than the last day of the **PERIOD OF INSURANCE**. The **CLAIM** must be reported to Underwriters as soon as practical but in no event later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE**, or during the **EXTENDED REPORTING PERIOD** applicable to this coverage, if any. All **CLAIMS** based on or arising out of one **NEGLIGENT ACT**, **ERROR OR OMISSION** shall be considered "first made" when the first of such **CLAIMS** is made to the **ASSURED**. A **CLAIM** shall not be prejudiced if the **ASSURED**, through clerical oversight or clerical mistake, fails to notify Underwriters within the time provided for under this Coverage Section.

### Coverage Section VI Employee Benefits Liability – Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **CLAIM** for **Coverage Section VI Employee Benefits Liability** is limited to and not to exceed the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS**.

If an Annual Aggregate applies to any coverage under this Coverage Section, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance**.

### Coverage Section VI Employee Benefits Liability – Conditions

1.   **Basic Extended Reporting Period:**

A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the **PERIOD OF INSURANCE**, and lasts for sixty (60) consecutive days.

If, however, this Policy and this Coverage Section is immediately succeeded by similar Claims Made insurance coverage, with any insurer, on which the Retroactive Date is the same as or earlier than the Retroactive Date shown in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance** of this Policy, the succeeding Policy shall be deemed to be a renewal of this Policy, and the **ASSURED** shall have no right to an Extended Reporting Period from Underwriters.

The Basic Extended Reporting Period does not apply to **CLAIMS** that are covered under any subsequent insurance applicable to this Coverage Section which the **ASSURED** purchases, or that would have been covered but for exhaustion of the amount of insurance applicable to such **CLAIMS**.

**Pkg2016.1**

2. **Supplemental Extended Reporting Period:**

Underwriters will provide an Extended Reporting Period, as described below, if:

(a) This Policy or this Coverage Section of this Policy is canceled or non-renewed;   or

(b) Underwriters renew or replace this Policy, or this Coverage Section of this Policy, with insurance that does not apply to a **NEGLIGENT ACT, ERROR OR OMISSION** on a Claims Made basis.

A Supplemental Extended Reporting Period of one (1) year duration is available but only by endorsement to this Policy and for an additional premium not to exceed 100% of the annual premium for this Coverage Section. This supplemental period starts when the Basic Extended Reporting Period ends.

The **ASSURED** must give Underwriters a written request for the endorsement within thirty (30) consecutive days after the end of the **PERIOD OF INSURANCE**. The Supplemental Extended Reporting Period will not go into effect unless the **ASSURED** pays the additional premium within thirty (30) consecutive days. This endorsement will set forth the terms consistent with the Coverage Section.

Underwriters shall determine the additional premium in accordance with its applicable rules, rates and underwriting practices. Coverage for **CLAIMS** received during such Supplemental Extended Reporting Period is excess over any other valid and collectible insurance available under any other policies.

Extended Reporting Periods do not reinstate or increase the applicable **SELF INSURED RETENTION**, the **LOSS FUND**, the applicable **Specific Excess Limit of Insurance**, or the **Excess Loss Fund Protection**.

Extended Reporting Periods do not extend the **PERIOD OF INSURANCE** or change the scope of coverage provided within this Coverage Section. They apply to **CLAIMS** arising out of a **NEGLIGENT ACT, ERROR OR OMISSION** that take place before the end of the period that this Policy and this Coverage Section are in force.  Once in effect, Extended Reporting Periods may not be canceled.

3. **Reporting to Underwriters:**

For the purposes of compliance with the reporting requirements of this Coverage Section, the **ASSURED'S** reporting of a **CLAIM** to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** shall be considered reporting of the **CLAIM** to Underwriters, provided that:

(a) The **CLAIM** is reported to the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** no later than sixty (60) consecutive days following the expiration of the **PERIOD OF INSURANCE** or the applicable Extended Reporting Period, if any; and

(b) The **CLAIM**, if not otherwise reportable to Underwriters pursuant to **GENERAL POLICY CONDITION 7**, appears on the **ASSURED'S** list of **CLAIMS** or loss run, as reported by the **THIRD PARTY CLAIM ADMINISTRATOR** to Underwriters, that includes all **CLAIMS** for the **PERIOD OF INSURANCE** or applicable Extended Reporting Period, if any.

### Coverage Section VI Employee Benefits Liability –  Exclusions

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

**A.** Any **CLAIM** for damages, whether direct or consequential, or for any cause of action which is covered under any other Coverage Section of the Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance**;

**B.** Any **NEGLIGENT ACT, ERROR OR OMISSION** by, or at, the direction of the **ASSURED** that are dishonest, fraudulent, criminal or malicious;

**C.** **BODILY INJURY**, **PERSONAL INJURY**, or **PROPERTY DAMAGE**;

**D.** Any **CLAIM** based upon the **ASSURED'S** failure to comply with the federal Employee Retirement Income Security Act of 1974 (ERISA), including subsequent amendments or any similar federal, state or local law(s) or regulations;

**E.** Any **CLAIM** for failure of performance of a contract by any **ASSURED**, Insurer or Self Insurer;

**F.** Any **CLAIM** based upon the **ASSURED'S** failure to comply with any law concerning worker's compensation, unemployment insurance, social security, or disability benefits;

**G.** Any **CLAIM** based upon failure of investments, including but not limited to, stocks, bonds, funds, to perform as represented by an **ASSURED**;

**H.** Any **CLAIM** based upon advice given by an **ASSURED** to participate or not participate in any stock subscription plans;

**I.** Any **CLAIM** arising out of actual or alleged discrimination including but not limited to discrimination based on race or national origin, religion or creed, age, sex, physical disability, military status, or employment practices whether or not any of the foregoing violated any federal, state or local government law(s) or regulation(s) prohibiting such discrimination.

### Coverage Section VI Employee Benefits Liability – Definitions

**1.** **ADMINISTRATION** means:

    (a) Giving counsel to employees with respect to **EMPLOYEE BENEFIT PROGRAMS**;

    (b) Interpreting **EMPLOYEE BENEFIT PROGRAMS**;

    (c) Handling of records in connection with **EMPLOYEE BENEFIT PROGRAMS**; and

    (d) Effecting enrollment, termination, or cancellation of employees under **EMPLOYEE BENEFIT PROGRAMS**;

    Provided all such acts are authorized by the **NAMED ASSURED**.

**2.** **CLAIM** means all notices or **SUITS** demanding payment of money based on, or arising out of the same **NEGLIGENT ACT, ERROR OR OMISSION** or a series of related **NEGLIGENT ACTS, ERRORS OR OMISSIONS** by one or more **ASSUREDS**.

**3.** **NEGLIGENT ACT, ERROR OR OMISSION** means the failure to execute required actions, or mistaken actions committed in the **ADMINISTRATION** of the **ASSURED'S EMPLOYEE BENEFIT PROGRAMS**.

All **CLAIMS** based on or arising out of the same **NEGLIGENT ACT, ERROR OR OMISSION** or a series of related **NEGLIGENT ACTS, ERRORS OR OMISSIONS** by one or more **ASSUREDS** shall be deemed one **NEGLIGENT ACT, ERROR OR OMISSION**. Only one Policy, one **SELF**

**Pkg2016.1**

**INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **NEGLIGENT ACT, ERROR OR OMISSION**.

# Coverage Section VII Crime

### Coverage Section VII Crime – Insuring Agreement

Coverage is provided for one or more of the coverage options in this Coverage Section only if a **Specific Excess Limit of Insurance** is stated in the **Schedule of Specific Excess Limits of Insurance**, and a **SELF INSURED RETENTION** is stated in the **Schedule of SELF INSURED RETENTIONS** for each Coverage chosen.

Coverage in this Section is for loss or damage caused by the Perils Covered in each Coverage Section.

### Coverage Section VII Crime – Specific Excess of Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section VII – Crime** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance.**

If an Annual Aggregate applies to any coverage under this Coverage Section, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of the **Schedule of Specific Excess Limits of Insurance.**

In the event more than one Coverage Subsection could apply to a loss for which coverage is provided in this Coverage Section, only the **SELF INSURED RETENTION** for the Coverage Subsection that results in the largest **ULTIMATE NET LOSS** will be applied.

### Coverage Section VII Crime – MONEY and SECURITIES

A.   **MONEY and SECURITIES Coverage:** Underwriters will indemnify the **NAMED ASSURED** for loss of **MONEY** or **SECURITIES** owned by the **NAMED ASSURED** or for which the **ASSURED** is liable as a direct result of loss or damage caused by the Perils insured occurring during the **PERIOD OF INSURANCE** whilst inside the **PREMISES** or in **BANKING PREMISES**.

       1. PERILS INSURED:

    (a)   **THEFT**
    (b)   Disappearance
    (c)   Destruction
    (d)   **BURGLARY**
    (e)   **ROBBERY**
    (f)   **COMPUTER THEFT**

B.   **MONEY and SECURITIES Coverage Extension:** Underwriters will indemnify the **NAMED ASSURED** under this Coverage Subsection for:

1.   Damage to, a safe, vault, cash register, cash box or cash drawer located inside the **PREMISES** resulting directly from an actual or attempted **THEFT** of; or unlawful entry into such containers;

2.   Loss of **MONEY** or **SECURITIES** outside the **PREMISES** in the care and custody of a **MESSENGER**;

3.   Loss of **MONEY** or **SECURITIES** outside the **PREMISES** in the care and custody of an armored vehicle company. However, the **NAMED ASSURED** will be indemnified only the amount of loss that the **NAMED ASSURED** cannot recover:

**Pkg2016.1**

(a)   Under the **NAMED ASSURED'S** contract with the armored motor vehicle company; and

(b)   From any insurance or indemnity carried by, or for the benefit of customers of the armored motor vehicles company.

**C.   Duties in the Event of a Loss:** If the **ASSURED** has reason to believe that any loss of, or loss from damage to, **MONEY** or **SECURITIES** involves a violation of law, the **ASSURED** must notify the appropriate law enforcement authorities.

### Coverage Section VII Crime – MONEY and SECURITIES Exclusions

In addition to **Coverage Section VII Crime – Exclusions**, and the **General Policy Exclusions**, there is no coverage under **MONEY and SECURITIES** for:

**A.**   Loss of **MONEY** or **SECURITIES** after they have been transferred or surrendered to a person or place outside the **PREMISES** based upon unauthorized instructions or as a result of a threat to do bodily harm or damage to any property;

But, this exclusion does not apply to loss of **MONEY** or **SECURITIES** while outside the **PREMISES** or in **BANKING PREMISES** or in the care and custody of a **MESSENGER** if the **ASSURED**:

(a)   Had no knowledge of any threat at the time the conveyance began; or

(b)   Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**1.**   Loss resulting from the giving or surrendering of property in any exchange or purchase;

**2.**   Loss of property in any **MONEY** operated device unless the amount of **MONEY** deposited in it is recorded by a continuous recording instrument in the device;

**3.**   Loss resulting from **DISHONEST ACTS** of any of the **NAMED ASSURED'S EMPLOYEES**.

### Coverage Section VII Crime – MONEY and SECURITIES Definitions:

**1.**   **BANKING PREMISES** means the interior of that portion of any building occupied by a banking institution, similar safe depository, automatic teller machine (ATM), or similar banking device.

**2.**   **BURGLARY** means the taking of **MONEY** or **SECURITIES** from inside the **PREMISES** by a person unlawfully entering or leaving the **PREMISES** as evidenced by marks of forcible entry or exit.

**3.**   **COMPUTER THEFT** means **THEFT** of **MONEY** or **SECURITIES** following and directly related to the use of any computer to fraudulently cause a transfer of that **MONEY** or **SECURITIES** from inside the **PREMISES** or **BANKING PREMISES** to a person (other than a **MESSENGER**) outside those **PREMISES** or to a place outside those **PREMISES**.

**4.**   **DISHONEST ACTS** means dishonest or fraudulent acts committed with the intent to cause the **NAMED ASSURED** to sustain loss or damage and to obtain financial benefit for the **EMPLOYEE** or for any other **EMPLOYEE**, person or organization.

**5.**   **EMPLOYEE(S)** means any person:

**Pkg2016.1**

(a) While in the service of the **NAMED ASSURED** (and for thirty (30) consecutive days after termination of service); and

(b) Whom the **NAMED ASSURED** has the right to direct and control while performing services for the **NAMED ASSURED**.

6. **MESSENGER** means the **ASSURED** while having care and custody of the **MONEY** or **SECURITIES** outside the **PREMISES**.

7. **MONEY** means:

(a) Currency, coins, and bank notes in current use and having a face value; and

(b) Travelers checks, register checks and **MONEY** orders held for sale to the public.

But **MONEY** does not include **SECURITIES**.

8. **OCCURRENCE** means an act or series of related acts involving one or more persons; or an act or event, or a series of related acts or events not involving any person.

9. **PREMISES** means the interior of that portion of any building that the **ASSURED'S** occupies in conducting the **ASSURED'S** business.

10. **ROBBERY** means the taking of **MONEY** or **SECURITIES** from the care and custody of a person by one who has:

(a) Caused or threatened to cause that person bodily harm; or

(b) Committed an obviously unlawful act witnessed by that person.

11. **SECURITIES** means negotiable and non-negotiable instruments or contracts representing either **MONEY** or other property and includes:

(a) Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

(b) Evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **ASSURED**.

But **SECURITIES** does not include **MONEY**.

12. **THEFT** means any act of stealing.


### Coverage Section VII Crime – Forgery or Alteration

A. **Forgery or Alteration Coverage:** Underwriters will indemnify the **NAMED ASSURED** for loss involving **INSTRUMENTS** resulting directly from the Perils insured, occurring during the **PERIOD OF INSURANCE**.

1. **PROPERTY COVERED: INSTRUMENTS**

2. **Perils Insured:** Forgery or alteration of, on, or in any **INSTRUMENT**.

B. **Forgery or Alteration Coverage Extension:** Underwriters will indemnify the **NAMED ASSURED** under this Section for loss due to the **ASSURED'S** good faith acceptance of:

**Pkg2016.1**

1. Any United States or Canadian post office, express company, or national or state (or Canadian) chartered bank money order that is not paid upon presentation to the issuer; or

2. Counterfeit United States or Canadian paper currency;

3. In exchange for merchandise, money or services or as part of a normal business transaction.

C. **Duties in the Event of a Loss:** If the **ASSURED** has reason to believe that any loss of, or loss from damage to **PROPERTY COVERED** involves a violation of law, the **ASSURED** must notify the appropriate law enforcement authorities.

D. **Facsimile Signatures:** Mechanically reproduced facsimile signatures will be treated the same as handwritten signatures.

E. **Proof of Loss:** The **NAMED ASSURED** must include with proof of loss, any covered **INSTRUMENT** involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

## Coverage Section VII Crime – Forgery or Alteration Exclusions

A. Loss resulting from **DISHONEST ACTS** of any of the **NAMED ASSURED'S EMPLOYEES**.

## Coverage Section VII Crime – Forgery or Alteration Definitions

1. **INSTRUMENTS** means checks, drafts, promissory notes, or similar written promises, orders or directions to pay a certain sum in money that are:

   (a) Made or drawn by or drawn upon the **NAMED ASSURED**;

   (b) Made or drawn by one acting as the **NAMED ASSURED'S** agent; or that are purported to have been so made or drawn.

2. **DISHONEST ACTS** means dishonest or fraudulent acts committed with the intent to cause the **NAMED ASSURED** to sustain loss or damage and to obtain financial benefit for the **EMPLOYEE** or for any other **EMPLOYEE**, person or organization.

3. **EMPLOYEE(S)** means any person:

   (a) While in the service of the **NAMED ASSURED** (and for thirty (30) consecutive days after termination of service); and

   (b) Whom the **NAMED ASSURED** has the right to direct and control while performing services for the **NAMED ASSURED**.

4. **OCCURRENCE** means all loss caused by a person or in which that person is involved, whether the loss involves one or more **covered INSTRUMENTS**.

## Coverage Section VII Crime – EMPLOYEE Dishonesty

A. **EMPLOYEE Dishonesty Coverage:** Underwriters will indemnify the **NAMED ASSURED** for the loss of or damage to Real or business Personal Property, including **MONEY** and **SECURITIES**, and

**Pkg2016.1**

**INSTRUMENTS** owned or held by the **NAMED ASSURED**, or for which the **NAMED ASSURED** is liable, occurring during the **PERIOD OF INSURANCE**.

1. **PROPERTY COVERED:** Real or business Personal Property, including **MONEY** and **SECURITIES**, and **INSTRUMENTS** owned or held by the **NAMED ASSURED**, or for which the **NAMED ASSURED** is liable.

2. **Perils Covered:** Direct loss of or damage to **PROPERTY COVERED** resulting from **DISHONEST ACTS** committed by any of the **NAMED ASSURED'S EMPLOYEES**, acting alone or in collusion with other persons, which occur within the **PERIOD OF INSURANCE**.

B. **EMPLOYEE Dishonesty Coverage Extension:** Underwriters will indemnify the **NAMED ASSURED** under this Coverage Subsection for loss caused to the **NAMED ASSURED** through failure of any of the **NAMED ASSURED'S EMPLOYEES,** acting alone or in collusion with others and occurring during the **PERIOD OF INSURANCE** to perform faithfully his or her duties as prescribed by law or to account properly for all monies and property received by virtue of his or her position of employment when such failure has as its direct and immediate result a loss of **PROPERTY COVERED**.

C. **Duties in the Event of a Loss:** If the **ASSURED** has reason to believe that any loss of, or loss from damage to **PROPERTY COVERED** involves a violation of law, the **ASSURED** must notify the appropriate law enforcement authorities.

D. **EMPLOYEE Dishonesty Supplemental Coverage:** The Supplemental Coverage applies only if this **EMPLOYEE Dishonesty Coverage** renews prior dishonesty coverage and is effective on the expiration or termination date of the prior coverage.

Underwriters will indemnify the **ASSURED** for loss that would have been covered by the prior insurance, except that the time to discover the loss had expired, and which would be covered by this Policy had it been in effect when the acts or events causing the loss or damage occurred. This coverage is limited to the lesser of the limits applicable to the prior insurance or the **Specific Excess Limit of Insurance** of this coverage. This Supplemental Coverage is part of, and not in addition to the **Specific Excess Limit of Insurance** for **EMPLOYEE Dishonesty Coverage**.

E. **Loss Payment:** The **Specific Excess Limit of insurance** shown is the most that will be paid for an **OCCURRENCE** even though it may occur over more than one **PERIOD OF INSURANCE**.

### Coverage Section VII Crime – EMPLOYEE Dishonesty Exclusions

In addition to **Coverage Section VII Crime – Exclusions**, and the **General Policy Exclusions**, there is no coverage under this Coverage Subsection **EMPLOYEE Dishonesty** for:

A. Damage where the only proof of the loss or amount of the loss is dependent upon an inventory or a profit and loss computation;

B. Any part of a loss involving any **EMPLOYEE** occurring after discovery of any fraudulent or **DISHONEST ACTS** committed by the **EMPLOYEE** whether before or after being employed by the **ASSURED**. This only includes discovery by an **ASSURED** not in collusion with the **EMPLOYEE**;

C. Loss that is not discovered within one (1) year after the end of the **PERIOD OF INSURANCE**;

D. Legal expenses or any indirect loss.

**Pkg2016.1**

### Coverage Section VII Crime – EMPLOYEE Dishonesty Definitions:

1. **DISHONEST ACTS** means dishonest or fraudulent acts committed with the intent to cause the **NAMED ASSURED** to sustain loss or damage and to obtain financial benefit for the **EMPLOYEE** or for any other **EMPLOYEE**, person or organization.

2. **EMPLOYEE(S)** means any person:

   (a) While in the service of the **NAMED ASSURED** (and for thirty (30) consecutive days after termination of service); and

   (b) Whom the **NAMED ASSURED** has the right to direct and control while performing services for the **NAMED ASSURED**.

3. **INSTRUMENTS** means checks, drafts, promissory notes, or similar written promises, orders or directions to pay a certain sum in **MONEY** that are:

   (a) Made or drawn by or drawn upon the **NAMED ASSURED**;

   (b) Made or drawn by one acting as the **NAMED ASSURED'S** agent; or that are purported to have been so made or drawn.

4. **MONEY** means:

   (a) Currency, coins, and bank notes in current use and having a face value; and

   (b) Travelers checks, register checks and **MONEY** orders held for sale to the public.

   But **MONEY** does not include **SECURITIES**.

5. **OCCURRENCE** means all loss or damage caused by **DISHONEST ACTS**, whether involving one or more **EMPLOYEES**, or as the result of a single act or series of acts.

6. **SECURITIES** mean negotiable and non-negotiable **INSTRUMENTS** or contracts representing either **MONEY** or other property and includes:

   (a) Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   (b) Evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **ASSURED**.

   But **SECURITIES** does not include **MONEY**.

### Coverage Section VII Crime – Conditions

Extensions in coverage do not increase, but just form part of, Underwriters' **Specific Excess Limits of Insurance** as shown in the **Schedule of Specific Excess Limits of Insurance**.

1. **No Benefit to Bailee:** The Insurance afforded herein shall not inure directly or indirectly to the benefit of any carrier or other Bailee for hire.

2. **Valuation:**

   (a) **MONEY:** Face value.

**Pkg2016.1**

(b) **SECURITIES:** actual cash value at the close of business on the day the loss was discovered.

3.    **Property other than MONEY and SECURITIES:** actual cash value at the time of loss with deduction for depreciation. The valuation is limited to the cost to repair or replace with property of equivalent kind and quality, to the extent practicable.

<u>**Coverage Section VII Crime – Exclusions**</u>

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

A.    Any claim for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of the Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance**;

B.    Loss resulting from accounting or arithmetical errors or omissions;

C.    Loss resulting from an **ASSURED'S**, or anyone acting on an **ASSURED'S** express or implied authority, being induced by any **DISHONEST ACT** to voluntarily part with title to or possession of any property;

D.    Any loss, caused by order of any civil authority, including seizure, confiscation or destruction of property, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

**Pkg2016.1**

## Coverage Section VIII Law Enforcement Liability

### Coverage Section VIII Law Enforcement Liability – Insuring Agreements

A.   **Law Enforcement Liability:** Underwriters agree, subject to the Policy limitations, terms and conditions, to indemnify the **ASSURED** for all sums which the **ASSURED** is legally obligated to pay by reason of the liability imposed upon the **ASSURED** by law for damage, direct or consequential, and expenses, all as more fully defined by the term **ULTIMATE NET LOSS**, on account of **PERSONAL INJURY** or **BODILY INJURY** or **PROPERTY DAMAGE** or the loss of use thereof suffered or alleged to have been suffered by any person(s) or organization(s) resulting from **LAW ENFORCEMENT ACTIVITIES**, including **INCIDENTAL MEDICAL MALPRACTICE** and **MOONLIGHTING** arising out of an **OCCURRENCE** during the **PERIOD OF INSURANCE**.

B.   **Reimbursement of DEFENSE COSTS incurred prior to denial or declination of coverage:** With respect only to this Coverage Section and **Insuring Agreement A. Law Enforcement Liability**, Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any claim or **SUIT** for which coverage is denied based solely upon Coverage Section VIII Law Enforcement Exclusions B, Underwriters will indemnify the **ASSURED** for all reasonable **DEFENSE COSTS** arising out of an **OCCURRENCE** to the extent such **DEFENSE COSTS** are incurred prior to the date on which said declination of coverage is communicated to the **ASSURED**.

C.   **SEXUAL HARASSMENT Liability:** Underwriters agree, subject to the  Policy  limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS**  for the liability on the part of the **NAMED ASSURED,** including liabilities arising from negligent hiring, training and supervision, arising out of an **OCCURRENCE** resulting from any actual or alleged acts by past, present or future law enforcement officials, officers, auxiliary officers, employees or volunteers of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons of **SEXUAL HARASSMENT** first committed during the **PERIOD OF INSURANCE** against  another person who is not an **ASSURED** under this Policy. This provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability  imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED**. This coverage applies only  if a **SUBLIMIT**  and  **SELF  INSURED RETENTION** for **SEXUAL HARASSMENT Liability** is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section VIII Law Enforcement Liability.**

Underwriters will not make payment for any loss, **OCCURRENCE**, **SUIT** or for any **DEFENSE COSTS** for any past, present or future law enforcement officials, officers, auxiliary officers, employees or volunteers of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons in respect of actual or alleged **SEXUAL HARASSMENT**; however, with respect only to this **Coverage Section VIII Insuring Agreement C.** Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any loss, **OCCURRENCE** or **SUIT** for any actual or alleged **SEXUAL HARASSMENT** against another person who is not an **ASSURED** under this Policy alleged to have been committed by a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED**, only, Underwriters will indemnify that law enforcement official, officer, auxiliary officer, employee or volunteer of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a loss or by an adjudication, it is determined that the law enforcement official, officer, auxiliary officer, employee or volunteer of the **NAMED ASSURED** committed an act of **SEXUAL HARASSMENT**. Coverage only applies if the act of **SEXUAL HARASSMENT** was first committed during the **PERIOD OF INSURANCE**. Further, this coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL HARASSMENT Liability** is stated in the **Schedule**

**Pkg2016.1**

**of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section VIII LAW ENFORCEMENT ACTIVITIES.**

**D.**     **SEXUAL ABUSE Liability:** Underwriters agree, subject to the Policy limitations, exclusions, terms and conditions, to indemnify the **NAMED ASSURED** for all sums which the **NAMED ASSURED** is legally obligated to pay, as more fully defined by the term **ULTIMATE NET LOSS** for the liability on the part of the **NAMED ASSURED,** including liabilities arising from negligent hiring, training and supervision, arising out of an **OCCURRENCE** resulting from any actual or alleged acts by any past, present or future law enforcement officials, officers, auxiliary officers, employees or volunteers of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons of **SEXUAL ABUSE** first committed during the **PERIOD OF INSURANCE** against another person who is not an **ASSURED** under  this Policy. This provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED.** This coverage  applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL ABUSE** Liability is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section VIII Law Enforcement Liability.**

Underwriters will not make payment for any loss, **OCCURRENCE**, **SUIT** or for any **DEFENSE COSTS** for past, present or future law enforcement officials, officers, auxiliary officers, employees or volunteers of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons in respect of actual or alleged **SEXUAL ABUSE**; however, with respect only to this  **Coverage Section VIII Insuring Agreement D**, Underwriters agree, subject to all other Policy limitations, terms and conditions, that as to any loss, **OCCURRENCE** or **SUIT** for any actual or alleged **SEXUAL ABUSE** against another person who is not an **ASSURED** under this Policy alleged to have been committed by a law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED** only, Underwriters will indemnify that law enforcement official, officer, auxiliary officer, employee or volunteer of the **NAMED ASSURED** for all reasonable **DEFENSE COSTS** to the extent such **DEFENSE COSTS** are incurred prior to the date on which, by either agreement, admission, or settlement of a loss or by an adjudication, it is determined that law enforcement official, officer, auxiliary officer, employee or volunteer committed of the **NAMED ASSURED** an act of **SEXUAL ABUSE**. Coverage only applies if the act of **SEXUAL ABUSE** was first committed during the **PERIOD OF INSURANCE**. Further, this coverage applies only if a **SUBLIMIT** and **SELF INSURED RETENTION** for **SEXUAL ABUSE Liability** is stated in the **Schedule of Specific Excess Limits of Insurance** and the **Schedule of SELF INSURED RETENTIONS** under **Coverage Section VIII Law Enforcement Liability.**

Neither this coverage nor any subsequent coverage provided by Underwriters will apply to any **SEXUAL ABUSE** involving the same law enforcement official, officer, auxiliary officer, employee or volunteer of a law enforcement agency or department of the **NAMED ASSURED** or other person or persons which occurred after the **DISCOVERY** by any of the **NAMED ASSURED'S** officials, trustees, directors, officers or partners of any actual, attempted or pending alleged **SEXUAL ABUSE** by said perpetrator.

Following **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**, the **NAMED ASSURED** shall give notification of such **DISCOVERY** to Underwriters as soon as practicable but no more than 120 consecutive days after the initial **DISCOVERY**, and in any event within the **PERIOD OF INSURANCE** or sixty (60) consecutive days after the expiration of the **PERIOD OF INSURANCE** during which the **OCCURRENCE** of **SEXUAL ABUSE** first took place; whichever is later. Any failure to comply with this provision for any reason whatsoever will result in the absolute exclusion of any resulting **SEXUAL ABUSE** claim or claims, irrespective of whether Underwriters have been prejudiced by said failure.

**Pkg2016.1**

**Coverage Section VIII Law Enforcement Liability – Specific Excess Limits of Insurance**

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** for **Coverage Section VIII Law Enforcement Liability** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance**, over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS.**

If an Annual Aggregate applies to any coverage under this Coverage Section, the total Aggregate **Excess Limit of Insurance** for such coverage under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Section of **Schedule of Specific Excess Limits of Insurance.**

**Coverage Section VIII Law Enforcement Liability – Exclusions**

**In addition to General Policy Exclusions, this Coverage Section does not insure against:**

**A.** Any **CLAIM** for damages, whether direct or consequential, or for any cause of action which is covered under any other Section of this Policy, whether or not a limit is stated in the **Schedule of Specific Excess Limits of Insurance;**

**B.** Any **CLAIM** or **SUIT** for **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY**, including any award of attorney's fees and costs, resulting from:

    (a) Any knowing and intentional violation of any subsection of Title 42 of the U.S. Code, including but not limited to 42 U.S.C § 1981 thru 42 U.S.C. §1989 and 42 U.S.C. §1997; or

    (b) Any knowing and intentional deprivation of any rights protected under the United States Constitution or the Constitution of any State, Territory, or Protectorate of the United States; or

    (c) Any act which is not reasonably related to the execution and/or enforcement of the law; or

    (d) Any act committed with the knowledge and intent to cause **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY**, or which could reasonably be expected to cause **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL INJURY** unless the act of the **ASSURED** was reasonably necessary to lawfully prevent injury to persons or damage to property.

However, Exclusion B. shall not apply to:

    i. Any liability on the part of the **NAMED ASSURED,** including liabilities from negligent hiring, training or supervision, arising out of an act by any other **ASSURED** resulting from **LAW ENFORCEMENT ACTIVITIES** and excluded herein, but this provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify an **ASSURED**.

    ii. **Coverage Section VIII Law Enforcement Liability – Insuring Agreement C. SEXUAL HARASSMENT Liability** and **Coverage Section VIII Insuring Agreement D. SEXUAL ABUSE LIABILITY**; but only to the extent that coverage for **SEXUAL HARASSMENT** and **SEXUAL ABUSE** is specifically given, and only if a **SUBLIMIT** for **SEXUAL HARASSMENT** and **SEXUAL ABUSE** coverage is stated in the **Schedule of Specific Excess Limits of Insurance.**

**C.** Liability arising out of the ownership, maintenance or use, including loading or unloading, of watercraft over 50 feet;

**Pkg2016.1**

**D.** Damage to or destruction of **PROPERTY OF THE ASSURED**;

**E.** Liability arising out of the ownership, maintenance, loading or unloading, use or operations of any aircraft including **UNMANNED AIRCRAFT**, airfields, runways, hangars, buildings or other properties in connection with aviation activities;

**F.** Any obligation for which the **ASSURED** may be held liable under any Workers' Compensation, unemployment compensation, disability benefits law, employers' liability or under any similar law; or to **BODILY INJURY** to any employee of the **ASSURED**; or to any liability for indemnity or contribution brought by any party against the **ASSURED** for **BODILY INJURY** to any employee of an **ASSURED**;

**G.** The cost of any investigation, disciplinary or criminal proceedings against an individual **ASSURED** except that Underwriters may, at their own option and expense, associate counsel in the defense of any such investigation, criminal or disciplinary proceeding. Should Underwriters elect to associate counsel, such elections shall not constitute a waiver or estoppel of any rights Underwriters may have pursuant to the terms, conditions, exclusions and limitations of this Policy;

**H.** Any **CLAIM** arising from **WRONGFUL ACTS** except as provided under this Section for Discrimination or Violation of Civil Rights arising out of **LAW ENFORCEMENT ACTIVITIES**;

**I.** **CLAIMS**, **SUITS**, proceedings, demands, or actions seeking relief or redress in any form other than monetary damages, including defense of same; or any loss, fees, costs or expenses which the **ASSURED** may be obligated to pay to any third-party as a result of any adverse judgment for declaratory relief or administrative relief or injunctive relief, including **CLAIMS** brought under the federal Fair Labor Standards Act or similar state act or law;

### Coverage Section VIII Law Enforcement Liability – Definitions

**1.** **CLAIM** means all notices or **SUITS** demanding payment of money based on, or arising out of the same **OCCURRENCE** or a series of related **OCCURRENCES** by one or more **ASSUREDS**.

**2.** **DEFENSE COSTS** mean the expenses incurred for the investigation and defense of a **CLAIM** or **SUIT** alleging **BODILY INJURY, PERSONAL INJURY, PROPERTY DAMAGE, SEXUAL HARASSMENT** or **SEXUAL ABUSE** resulting only from **LAW ENFORCEMENT ACTIVITIES**. However, the salaries, expense and administrative cost of the **ASSURED** or the **ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** are not included within the meaning of **DEFENSE COSTS**.

**3.** **DISCOVERY** of any actual, attempted or pending alleged **SEXUAL ABUSE** shall exist when any of the **NAMED ASSURED'S** officials, trustees, directors, officers, partners or any person that the **NAMED ASSURED** has made responsible in an official capacity to prevent **SEXUAL ABUSE** has taken receipt, learned, or in the exercise of reasonable care should have known:

(a) Of any lawsuit alleging **SEXUAL ABUSE;** or

(b) Of any demand for money or services based upon alleged **SEXUAL ABUSE;** or

(c) Of any criminal investigation or prosecution alleging **SEXUAL ABUSE;** or

(d) Of any allegation by an alleged victim or by a parent or guardian of the alleged victim of **SEXUAL ABUSE,** whether the allegation is or is not accompanied by a demand for money or services; or

**Pkg2016.1**

(e)   Of any report from any other person alleging **SEXUAL ABUSE**, and a person or group designated by the **NAMED ASSURED** to investigate the allegation has investigated and as a result of the investigation has recommended that any action of any kind be taken by or on behalf of the **NAMED ASSURED** with respect either to the alleged **ASSURED** or the alleged victim; or

(f)   That the alleged **ASSURED** has admitted to acts of **SEXUAL ABUSE**.

4.   **INCIDENTAL MEDICAL MALPRACTICE** means **BODILY INJURY** or **PERSONAL INJURY** arising out of the rendering of or failure to render emergency and/or first aid medical services which shall be understood to include, but not limited to, the dispensing of medication and/or the administering of inoculations and/or blood tests and the like (i.e.: medicines/tests normally administered by a Healthcare Department that are preventative in nature and do not require advanced medical diagnosis) but where there are no overnight stays in a medical facility. However, **INCIDENTAL MEDICAL MALPRACTICE** does not include services provided by:

(a)   A hospital or emergency room facility;

(b)   A physician, medical doctor, osteopath, chiropractor, resident, extern, or intern;

(c)   A psychiatrist;

(d)   A pharmacist;

(e)   A dentist, orthodontist, or periodontist.

5.   **OCCURRENCE** means an accident or a happening or event or a continuous or repeated exposure to conditions which results in **BODILY INJURY**, **PROPERTY DAMAGE**, **PERSONAL INJURY**, **SEXUAL HARASSMENT** or **SEXUAL ABUSE** during the **PERIOD OF INSURANCE**.

All **BODILY INJURIES**, **PERSONAL INJURIES** or **SEXUAL HARASSMENT** or **SEXUAL ABUSE** to one or more persons and/or **PROPERTY DAMAGE** arising out of an accident or a happening or event or a continuous or repeated exposure to conditions shall be deemed one **OCCURRENCE**. Only one Policy, one **SELF INSURED RETENTION**, and one **Specific Excess Limit of Insurance** is applicable to any one **OCCURRENCE**.

6.   **MOONLIGHTING** means any other employment, or extra-duty assignment that enforces the law or protects persons or property, approved by the **NAMED ASSURED'S** police department, sheriff agency, or other law enforcement organization.

**Pkg2016.1**

# Coverage Section IX Terrorism

## Coverage Section IX Terrorism – Insuring Agreements

Coverage is provided for one or more of the Coverage Subsections in this Coverage Section only if a corresponding **Specific Excess Limit of Insurance** is stated in the **Schedule of Specific Excess Limits of Insurance**, and a **SELF INSURED RETENTION** is stated in the **Schedule of SELF INSURED RETENTIONS**.

Coverage in this Section is for loss or damage caused by an **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**, as defined herein per coverage section.

## Coverage Section IX Terrorism – Specific Excess Limits of Insurance

Underwriters' **Specific Excess Limit of Insurance** per **OCCURRENCE** or claim for **Coverage Section IX Terrorism** is limited to, and not to exceed, the Specific Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance,** over the **SELF INSURED RETENTION**, as stated in the **Schedule of SELF INSURED RETENTIONS.**

If an Annual Aggregate applies to any Coverage Subsection under this Coverage Section, the total Aggregate **EXCESS LIMIT OF INSURANCE** for such Coverage Subsection under this Coverage Section combined during the **PERIOD OF INSURANCE** shall not exceed the Annual Aggregate limit as stated in the applicable Coverage Subsection of the **Schedule of Specific Excess Limits of Insurance**.

## Coverage Section IX Terrorism – Property Terrorism

**Property Terrorism Coverage:** Underwriters agree, subject to the Policy limitations, terms and conditions to indemnify the **ASSURED** for physical loss or physical damage by an **OCCURRENCE**, **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**, as herein defined, occurring during the **PERIOD OF INSURANCE** to all Real and Personal Property, wherever located, and identified in Schedules on file with Underwriters (hereinafter referred to as the "Schedule").

This Policy also covers, within the sum insured, expenses incurred in the removal of debris of property covered hereunder which may be directly destroyed or damaged by an **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**. The cost of removal of debris shall not be considered in determination of the valuation of the property covered.

## Coverage Section IX – Terrorism – Property Terrorism Conditions

1. **Protection Maintenance:** It is agreed that any protection provided by the **ASSURED** for the safety of the insured property shall be maintained in good order throughout the currency of this Policy and shall be in use at all relevant times, and that such protection shall not be withdrawn or varied to the detriment of the interests of Underwriters without their consent.

2. **Valuation:** It is understood that, in the event of loss or damage, settlement shall be based upon the cost of repairing, replacing or reinstating (whichever is the least) on the same site, or nearest available site (whichever incurs the least cost) with material of like kind and quality without deduction for depreciation, subject to the following provisions: -

   (a) The repairs, replacement or reinstatement (all hereinafter referred to as "replacement") must be executed with due diligence and dispatch;

**Pkg2016.1**

(b) Until replacement has been effected the amount of liability under this Policy in respect of loss shall be limited to the **ACTUAL CASH VALUE**, as defined under **Coverage Section I Property**, at the time of loss;

(c) If replacement with material of like kind and quality is restricted or prohibited by any by-laws, ordinance or law, any increased cost of replacement due thereto shall not be covered by this Policy.

Underwriters' liability for loss under this Policy including this Condition shall not exceed the smallest of the following amounts: -

(i) The amount of the Policy applicable to the destroyed or damaged property;

(ii) The replacement cost of the property or any part thereof identical with such property and intended for the same occupancy and use;

(iii) The amount actually and necessarily expended in replacing said property or any part thereof.

3. **Proof of Loss:** The **ASSURED** shall render a signed and sworn proof of loss within sixty (60) consecutive days after the **OCCURRENCE** of a loss (unless such period be extended by the written agreement of Underwriters) stating the time, place and cause of loss, the interest of the **ASSURED** and all others in the property, the sound value thereof and the amount of loss or damage thereto.

If Underwriters have not received such proof of loss within two (2) years of the expiry date of this Policy, they shall be discharged from all liability hereunder unless an extension has been specifically filed with Underwriters.

## <u>Coverage Section IX Terrorism – Property Terrorism Exclusions</u>

**In addition to General Policy Exclusions, this Coverage subsection does not insure against:**

A. Loss or damage arising directly or indirectly from nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination, however such nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination may have been caused.

B. Loss or damage occasioned directly or indirectly by war, invasion or warlike operations (whether war be declared or not), hostile acts of sovereign or government entities, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power or martial law or confiscation by order of any Government or public authority.

C. Loss by seizure or illegal occupation.

D. Loss or damage caused by confiscation, requisition, detention, legal or illegal occupation, embargo, quarantine, or any result of any order of public or government authority which deprives the **ASSURED** of the use or value of the **PROPERTY OF THE ASSURED**, nor for loss or damage arising from acts of contraband or illegal transportation or illegal trade.

E. Loss or damage directly or indirectly arising from or in consequence of the discharge of pollutants or contaminants, which pollutants and contaminants shall include but not be limited to any solid, liquid, gaseous or thermal irritant, contaminant of toxic or hazardous substance or any substance the presence, existence or release of which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

F. Loss or damage by chemical or biological release or exposure of any kind.

**Pkg2016.1**

G.  Loss or damage by attacks by electronic means (cyber) including computer hacking or the introduction of any form of computer virus.

H.  Loss or damage caused by vandals or other persons acting maliciously or by way of protest or strikes, riots or civil commotion unless physical loss or damage is caused directly by an Act or series of Acts of Terrorism.

I.  Loss or increased cost occasioned by any Public or Civil Authority's enforcement of any ordinance or law regulating the reconstruction, repair or demolition of any property insured hereunder which was not applicable prior to the Loss.

J.  Any consequential loss or damage caused by any other ensuing cause, except where such ensuing cause is directly caused by an **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**, or where business interruption coverage is provided in addition to this Policy.

K.  Loss of use, delay or loss of markets, however caused or arising, and despite any preceding loss insured hereunder.

L.  Loss or damage caused by cessation, fluctuation or variation in, or insufficiency of, water, gas or electricity supplies and telecommunications of any type or service.

M.  Loss or increased cost as a result of threat or hoax, in the absence of physical damage due to an **ACT OF TERRORISM** or series of **ACTS OF TERRORISM**.

N.  Loss or damage caused by or arising out of burglary, house - breaking, theft or larceny or caused by any person taking part therein.

O.  Loss or damage caused to the following property:

   (a)  Land or Land Values.

   (b)  Power Transmission or feeder lines unless such Power Transmission or feeder lines are the responsibility of the **ASSURED**.

   (c)  Aircraft or any other Aerial device, or watercraft.

   (d)  Any land conveyance, including vehicles, locomotives or rolling stock, unless such land conveyance is declared hereon and solely whilst located at the property insured herein at the time of its damage.

   (e)  Animals, plants and living things of all types.

### **Coverage Section IX Terrorism – Property Terrorism Definitions**

1.  **ACT OF TERRORISM** means an act, including the use of force or violence, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

2.  **OCCURRENCE** shall mean any one loss and/or series of losses arising out of and directly occasioned by one **ACT** or series of **ACTS OF TERRORISM** for the same purpose or cause. The duration and extent of any one **OCCURRENCE** shall be limited to all losses sustained by the **ASSURED** at the property insured herein during any period of seventy-two (72) consecutive hours arising out of the same purpose or cause. However no such period of seventy-two (72) consecutive hours may extend beyond the expiration of this Policy unless the **ASSURED** shall first sustain direct

**Pkg2016.1**

physical loss or damage by an **ACT** or series of **ACTS OF TERRORISM** prior to expiration and within said period of seventy-two (72) consecutive hours nor shall any period of seventy-two (72) consecutive hours commence prior to the attachment of this Policy.

## Coverage Section IX Terrorism – Liability Terrorism

This is a claims made and reported Coverage Subsection. This means that, subject to the terms and conditions of this Coverage Subsection, the coverage provided by this Coverage Subsection only covers claims first made against the **ASSURED** or a circumstance which could reasonably be expected to give rise to a claim during the period of insurance and reported to Underwriters in writing as soon as reasonably possible and in no event longer than sixty (60) consecutive days after the expiry of this Policy. **CLAIMS EXPENSES** that are incurred in defending any claim against the **ASSURED** will reduce, and may completely exhaust, the Limit of Liability available to pay damages. Please review the coverage provided by this Coverage Subsection carefully and discuss the coverage with your insurance agent or broker.

**Liability Terrorism Coverage:** Underwriters agree, subject to the Policy limitations, terms and conditions to indemnify the **ASSURED** for any damages and **CLAIMS EXPENSES** which the **ASSURED** shall become legally liable to pay because of any claim or claims for **BODILY INJURY** and/or **PROPERTY DAMAGE**, first made against the **ASSURED** during the **PERIOD OF INSURANCE** and reported to Underwriters in writing no later than sixty (60) consecutive days after the expiry of this Policy, caused by an **ACT OF TERRORISM** and/or **SABOTAGE** occurring during the **PERIOD OF INSURANCE.** This cover is subject to the terms, conditions and exclusions stated in this Policy.

Multiple **ACTS OF TERRORISM** and/or **SABOTAGE** which occur within a period of seventy-two (72) consecutive hours and which have or appear to have a related purpose or common leadership will be deemed to be one **ACT OF TERRORISM** and/or **SABOTAGE**.

All claims arising out of the same or a continuing **ACT OF TERRORISM** and/or **SABOTAGE**, including **ACTS OF TERRORISM** and/or **SABOTAGE** which have or appear to have a related purpose or common leadership, within a period of seventy-two (72) hours shall be considered a single claim and deemed to have been made at the time the first of such claims is reported to Underwriters and shall be subject to a single **EXCESS LIMIT OF INSURANCE**.

## Coverage Section IX Terrorism – Liability Terrorism Conditions

1. **PROOF OF LOSS:** The **ASSURED** shall render a signed and sworn proof of loss within sixty (60) consecutive days after the **OCCURRENCE** of a loss (unless such period be extended by the written agreement of Underwriters) stating the time, place and cause of loss, the interest of the **ASSURED** and all others in the property, the sound value thereof and the amount of loss or damage thereto.

   If Underwriters have not received such proof of loss within two (2) years of the expiry date of this Policy, they shall be discharged from all liability hereunder unless an extension has been specifically filed with Underwriters.

## Coverage Section IX Terrorism – Liability Terrorism Exclusions

This Policy does not apply to any actual or alleged loss, liability, injury, **CLAIM EXPENSES**, cost and expense arising directly or indirectly:-

A. from or as a result of nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination, however such nuclear detonation, nuclear reaction, nuclear radiation or radioactive contamination may have been caused;

**Pkg2016.1**

B.  from or as a result of war, invasion or warlike operations (whether war be declared or not), hostile acts of sovereign or government entities, civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power or martial law or confiscation by order of any Government or public authority;

C.  from or as a result of seizure or illegal occupation unless caused directly by an insured **ACT OF TERRORISM** and/or **SABOTAGE**;

D.  from or as a result of confiscation, requisition, detention, legal occupation, embargo, quarantine, or any result of any order of public or government authority which deprives the **ASSURED** of the use or value of its property, nor for loss or damage arising from acts of contraband or illegal transportation or illegal trade;

E.  from or as a result of the discharge of **POLLUTANTS** or contaminant, which **POLLUTANTS** and contaminants shall include but not be limited to any solid, liquid, gaseous or  thermal  irritant, contaminant of toxic or hazardous substance or any substance the presence, existence or release of which endangers or threatens to endanger the health, safety or welfare of persons or the environment or loss, injury or damage directly or indirectly arising from chemical or biological release or exposure of any kind;

F.  from or as a result of attacks using electronic means including computer hacking or the introduction of any form of computer virus;

G.  from or as a result of vandals or other persons acting maliciously or by way of protest or strikes, riots or  civil commotion  unless caused directly by an insured **ACT OF TERRORISM** and/or **ACT OF SABOTAGE**;

H.  from or as a result of consequential loss, delay or loss of markets, failure to supply goods or services, or failure to perform however caused or arising, and despite any preceding loss insured hereunder;

I.  from or as a result of cessation, fluctuation or variation in, or insufficiency of, water, gas or electricity supplies, telecommunications or service of any type;

J.  from or as a result of threat or hoax;

K.  from or as a result of **BODILY INJURY** to employees or contract workers of the **ASSURED** or arising under any workers' compensation, unemployment compensation or disability laws, statutes,  or regulation;

L.  from or as a result of **BODILY INJURY** or **PROPERTY DAMAGE** arising out of discrimination or humiliation;

M.  from or as a result of property:

   (1) owned, leased, rented or occupied by the **ASSURED**; or

   (2) in the care, custody or control of the **ASSURED**;

N.  from or as a result of fines, penalties, punitive damages, exemplary damages, or any additional damages resulting from the multiplication of compensatory damages;

O.  from or as a result of mental injury, anguish or shock where no **BODILY INJURY** has occurred to the claimant;

**Pkg2016.1**

P.  from or as a result of **BODILY INJURY** and/or **PROPERTY DAMAGE** directly or indirectly relating to the actual, alleged or threatened presence of asbestos in any form;

Q.  from or as a result of any claims or circumstances disclosed on the Application for this insurance;

R.  from or as a result of any design, manufacture, assembly, sale trade, distribution or promotion of any product; and

S.  from or as a result of the rendering of or failure to render professional services.

Nothing contained in the above exclusions shall extend this Policy to cover any liability which would not have been covered had these exclusions not been incorporated herein.

### Coverage Section IX Terrorism – Liability Terrorism Definitions

1.  **ACT OF TERRORISM** means an act, including the use of force or violence, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

2.  **ACT OF SABOTAGE** means an act or series of acts of deliberate damage or destruction of property by secret means committed for subversive, political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

3.  **CLAIM EXPENSES** means investigation, adjustment, appraisal, defense and appeal costs and expenses and pre and post judgment interest, paid or incurred by or on behalf of the **ASSURED**. The salaries, expenses or administrative costs of the **ASSURED** or its employees or any insurer shall not be included within the meaning of **CLAIM EXPENSES**.

4.  **OCCURRENCE** means any one loss and/or series of losses arising out of and directly occasioned by one **ACT** or series of related **ACTS OF TERRORISM** and/or **ACTS OF SABOTAGE** for the same purpose or cause. The duration and extent of any one **OCCURRENCE** shall be limited to all losses directly occasioned by one **ACT** or series of **ACTS OF TERRORISM** and/or **ACTS OF SABOTAGE** arising out of the same purpose or cause during any period of seventy-two (72) consecutive hours commencing at the time of the first such act and within a radius of ten (10) miles of the location of the first such **ACT OF TERRORISM** and/or **ACT OF SABOTAGE**.

    However for the purposes of this Policy no period of seventy-two (72) consecutive hours shall commence prior to the attachment of this Policy.

### Coverage Section IX Terrorism – Employers' Liability Terrorism

This is a claims made and reported Coverage Subsection. This means that, subject to the terms and conditions of this Coverage Subsection, the coverage provided by this Coverage Subsection only covers claims first made against the **ASSURED** or a circumstance which could reasonably be expected to give rise to a claim during the **PERIOD OF INSURANCE** and reported to Underwriters in writing as soon as reasonably possible and in no event longer than 90 consecutive days after the expiry of this Policy. **CLAIMS EXPENSES** that are incurred in defending any claim against the **ASSURED** will reduce, and may completely exhaust, the Limit of Liability available to pay **DAMAGES**.

**Pkg2016.1**

**Coverage:** Underwriters agree, subject to the Policy limitations, terms and conditions to indemnify the **ASSURED** for any **DAMAGES** which the **ASSURED** shall become legally liable to pay as compensation for **BODILY INJURY** to an **EMPLOYEE** of the **ASSURED** (other than the perpetrator(s) of the **ACT OF TERRORISM**) during the course of their employment in the business of the **ASSURED**, provided such **BODILY INJURY** is caused solely and directly by an **ACT OF TERRORISM** occurring during the **PERIOD OF INSURANCE** at the location named in the schedule.  Underwriters will also pay **CLAIMS EXPENSES**.

Multiple **ACTS OF TERRORISM** which occur within a period of 72 consecutive hours and which have or appear to have a related purpose or common leadership will be deemed to be one **ACT OF TERRORISM**.

All claims arising out of the same or a continuing **ACT OF TERRORISM**, including **ACTS OF TERRORISM** which have or appear to have a related purpose or common leadership, within a period of 72 hours shall be considered a single claim and deemed to have been made at the time the first of such claims is reported to Underwriters and shall be subject to a single **Specific Excess Limit of Insurance**.

### Coverage Section IX Terrorism – Employers' Liability Terrorism Conditions

1.  **Proof of Loss:** The **ASSURED** shall render a signed and sworn proof of loss within sixty (60) consecutive days after the occurrence of a loss (unless such period be extended by the written agreement of Underwriters) stating the time, place and cause of loss, the interest of the **ASSURED** and all others in the property, the sound value thereof and the amount of loss or damage thereto.

    If Underwriters have not received such proof of loss within two (2) years of the expiry date of this Policy, they shall be discharged from all liability hereunder unless an extension has been specifically filed with Underwriters.

### Coverage Section IX Terrorism – Employers' Liability Terrorism Exclusions

This insurance does not cover **DAMAGES** or **CLAIMS EXPENSES** with respect to any claim directly or indirectly arising from, caused by or due to:

A.  Any **ACT OF TERRORISM** involving the emission, discharge, dispersal, release or escape of any chemical or biological agent;

B.  Any threat or hoax of an **ACT OF TERRORISM**;

C.  Any **ACT OF TERRORISM** by electronic means including computer hacking or the introduction into any computer of any form of corrupting, harmful or otherwise unauthorized instructions or code. This exclusion shall not apply to the detonation of any explosive bomb or missile which is controlled by any remote device or reliant upon electronic means in its launch, guidance or firing systems;

D.  Any **POLLUTANT OR CONTAMINANT**, however such **POLLUTANT OR CONTAMINANT** may have been introduced or arisen;

E.  Vandalism and malicious mischief, strikes, labor unrest, riots or civil commotion;

F.  War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power;

G.  Confiscation, nationalization, requisition or destruction of or damage to property by or under the order of any government or public or local authority;

**Pkg2016.1**

H.    Nuclear reaction, nuclear radiation or radioactive contamination, however such nuclear reaction, nuclear radiation or radioactive contamination may have been caused;

I.    Injury caused by or resulting from the **ASSURED**'s recklessness or deliberate misconduct;

J.    Injury arising out of any breach of an obligation owed by the **ASSURED** as an employer including but not limited to **EMPLOYEE** claims of wrongful termination of employment, discrimination, harassment, false arrest, slander, invasion of privacy, assault or battery, or mental anguish or humiliation when asserted in connection with an employment related claim;

K.    Mental injury, anguish or shock where no actual physical injury has occurred to the claimant;

L.    Criminal, dishonest, fraudulent or malicious conduct by the **ASSURED**.

This insurance does not cover fines, penalties, punitive or exemplary **DAMAGES**, sanctions or any additional **DAMAGES** resulting from the multiplication of compensatory **DAMAGES**. Nothing contained in the above exclusions shall extend this Policy to cover any liability which would not have been covered had these exclusions not been incorporated herein.

## Coverage Section IX Terrorism – Employers' Liability Terrorism Definitions

1.    **ACT OF TERRORISM** means an act, including the use of force or violence, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s), committed for political, religious or ideological purposes including the intention to influence any government and/or to put the public in fear for such purposes.

2.    **BODILY INJURY** means, for this coverage only, all physical injury to a third party human being, other than the perpetrator(s) of the **ACT OF TERRORISM**, including death, sickness, disease or disability and all consequent mental injury, anguish or shock to such human suffering such physical injury.

3.    **CLAIMS EXPENSES** means all fees, costs and expenses incurred with the written consent of Underwriters resulting from the investigation, adjustment, appraisal, defense or appeal of a claim, **SUIT** or proceeding relating to a claim. **CLAIMS EXPENSES** do not include the salaries, expenses, overhead or other charges by the **ASSURED** for any time spent in cooperating in the defense, settlement and investigation of any claim.

4.    **DAMAGES** means a monetary judgment, monetary award or monetary settlement made with Underwriters written approval.

5.    **POLLUTANT OR CONTAMINANT** includes but is not limited to any solid, liquid, gaseous or thermal irritant, contaminant or toxic or hazardous substance or any substance the presence, existence, or release of which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

6.    **EMPLOYEE** means the following persons working for the **ASSURED** for the purpose of the **ASSURED**'s business:

(a)    Any person employed by the **ASSURED** under a contract of service or apprenticeship;

(b)    Any person supplied to, hired by or borrowed by the **ASSURED**;

(c)    Labor masters and persons supplied by them;

(d)    Persons employed by labor only sub-contractors;

**Pkg2016.1**

(e)   Self-employed persons and voluntary helpers;

(f)   Any person attending under a work experience scheme; or

(g)   A prospective **EMPLOYEE** who is undergoing practical work experience while being assessed by the insured as to his or her suitability for employment.

**Pkg2016.1**

This policy is written by a surplus lines insurer and is not subject to the filing or approval requirements of the New Jersey Department of Banking and Insurance. Such a policy may contain conditions, limitations, exclusions and different terms than a policy issued by an insurer granted a Certificate of Authority by the New Jersey Department of Banking and Insurance. The insurer has been approved by the Department as an eligible surplus lines insurer, but the policy is not covered by the New Jersey Insurance Guaranty Fund, and only a policy of medical malpractice liability insurance as defined in N.J.S.A. 17:30D-3d or a policy of property insurance covering owner-occupied dwellings of less than four dwelling units are covered by the New Jersey Surplus Lines Guaranty Fund.

**SANJ0115**

**ENDORSEMENT attaching to and forming part of Policy No.** PK1021618

**NAMED ASSURED:** City of Trenton, NJ

**Effective date of this endorsement:** 01 March 2018

**Authority Ref. No:** B0356JA281N18

Endorsement No. 1

## COVERAGE AMENDATORY - LOSS FUND EXCLUSION

It is understood and agreed that this policy does not provide coverage under **Excess LOSS FUND Protection** of the policy wording.

It is further understood and agreed that any reference made to **Excess LOSS FUND Protection** and to the **ASSURED'S** Loss Fund within the policy wording shall be deemed to be deleted.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**ENDORSEMENT attaching to and forming part of Policy No.**  PK1021618

**NAMED ASSURED:**  City of Trenton, NJ

**Effective date of this endorsement:**  01 March 2018

**Authority Ref. No:**  B0356JA281N18

Endorsement No. 2

## COVERAGE SECTION II GENERAL LIABILITY – FAILURE TO SUPPLY EXCLUSION

It is understood and agreed that **Coverage Section II General Liability** does not apply to **BODILY INJURY** or **PROPERTY DAMAGE** arising out of the failure of any **ASSURED** to adequately supply gas, oil, electricity or steam.

This exclusion does not apply if the failure to supply results from a covered cause of loss under **Coverage Section I Property** caused by Direct Physical Loss or Damage to tangible property owned or used by any **ASSURED** to procure, produce, process or transmit the gas, oil, electricity or steam.

Furthermore, this exclusion shall not apply to **BODILY INJURY** or **PROPERTY DAMAGE** arising out of the failure of any **ASSURED** to adequately supply water.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**ENDORSEMENT attaching to and forming part of Policy No.** PK1021618

**NAMED ASSURED:** City of Trenton, NJ

**Effective date of this endorsement:** 01 March 2018

**Authority Ref. No:** B0356JA281N18

Endorsement No. 3

### U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED NOT PURCHASED CLAUSE

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5219

12 January 2015

**ENDORSEMENT attaching to and forming part of Policy No.** PK1021618

**NAMED ASSURED:** City of Trenton, NJ

**Effective date of this endorsement:** 01 March 2018

**Authority Ref. No:** B0356JA281N18

Endorsement No. 4

## NON – WAIVER OF GOVERNMENTAL IMMUNITY

It is understood and agreed that the **ASSURED** shall not waive, either in the adjustment of claims or in the defense of **SUITS(S)** against the **ASSURED**, any governmental immunity, of the **ASSURED**, unless Underwriters and the **ASSURED** mutually agree, in writing, to do so.

**ENDORSEMENT attaching to and forming part of Policy No.** PK1021618

**NAMED ASSURED:** City of Trenton, NJ

**Effective date of this endorsement:** 01 March 2018

**Authority Ref. No:** B0356JA281N18

Endorsement No. 5

### COVERAGE SECTION II – GENERAL LIABILITY – NURSING HOME PROFESSIONAL HEALTH CARE SERVICES EXCLUSION ENDORSEMENT

Notwithstanding anything contained in **Coverage Section II General Liability** to the contrary, it is understood and agreed that coverage as afforded hereunder excludes **BODILY INJURY**, **PERSONAL INJURY** or **PERSONAL INJURY** arising from Nursing Home Limited Professional Health Care Services at any Nursing Home owned, operated, leased or maintained by an **ASSURED**.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**ENDORSEMENT attaching to and forming part of Policy No.** PK1021618

**NAMED ASSURED:** City of Trenton, NJ

**Effective date of this endorsement:** 01 March 2018

**Authority Ref. No:** B0356JA281N18

Endorsement No. 6

### CORRIDOR RETENTION ENDORSEMENT

It is understood and agreed that in the event of a loss involving **Coverage Section II General Liability, Section III AUTOMOBILE Liability, Section IV Public Officials' Miscellaneous Liability, Section V Excess Workers' Compensation & Employers Liability For A Qualified Self-Insurer, Section VI Employee Benefits Liability and Section VIII Law Enforcement Liability,** the **ASSURED** shall pay the first $500,000, $500,000 in the aggregate annually, for each **OCCURRENCE** or **CLAIM** excess of the **SELF INSURED RETENTION** and any applicable Co-Insurance pay and **MAINTENANCE DEDUCTIBLE**.

It is further understood and agreed that the Underwriter's **Specific Excess Limit of Insurance** per **OCCURRENCE** or **CLAIM** is only for the difference between the Excess Limits as stated in the **Schedule of Specific Excess Limits of Insurance** and the aforesaid Corridor Retention amount which is in turn excess of the **SELF INSURED RETENTION** and any applicable Co-Insurance Pay and **MAINTENANCE DEDUCTIBLE**.

**Specific Excess Limit of Insurance** per **OCCURRENCE** is only for the difference between the **Specific Excess Limit of Insurance** for all Sections of Coverage combined as stated in the **Clash Coverage** and the aforesaid Corridor Retention amount which is in turn excess of the smallest **SELF INSURED RETENTION** applicable to any Section of Coverage involved in the loss.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**ENDORSEMENT attaching to and forming part of Policy No.** PK1021618

**NAMED ASSURED:** City of Trenton, NJ

**Effective date of this endorsement:** 01 March 2018

**Authority Ref. No:** B0356JA281N18

Endorsement No. 7

### GENERAL POLICY CONDITIONS NOTIFICATION OF CLAIMS, OCCURRENCES OR SUITS

It is hereby understood and agreed that **General Policy Condition 7. CLAIMS**, **OCCURRENCES or SUITS** is amended to read as follows:

**7.** **CLAIMS**, **OCCURRENCES or SUITS:** Underwriters reserves the right to deny coverage under this Policy if there has not been full compliance with the following duties:

The **ASSURED** shall as soon as practical notify Underwriters through the **THIRD PARTY CLAIMS ADMINISTRATOR** of any **CLAIM, OCCURRENCE,** or **SUIT** meeting the following criteria:

(a) The cost of which is likely to result in payment by Underwriters under this Policy;

(b) All claims reserved at 50% or more of the **SELF INSURED RETENTION**;

(c) All claims where there has been a settlement demand above the **SELF INSURED RETENTION** and there is a trial, binding arbitration or binding mediation date within ninety (90) days;

(d) Catastrophic losses (including Paraplegia, Quadriplegia, Severe Burns, Fatalities, Significant Brain Injury, Amputation of Major Extremity);

(e) **SEXUAL ABUSE** claims;

(f) Discrimination or Violation of Civil Rights where the claim is reserved at 50% or more of the **SELF INSURED RETENTION** or within ninety (90) days of a trial date, whichever is sooner;

(g) Third-party claims involving **LAW ENFORCEMENT ACTIVITIES**;

(h) Act or series of **ACTS OF TERRORISM**;

(i) Any claims where there is a question as to whether there will be coverage under this Policy.

Underwriters shall have the right, but not the obligation, to be associated with the **ASSURED** in, and/or assume charge of, the investigation, handling, defense or settlement of any claims, **SUIT** or proceedings relative to an **OCCURRENCE** or **CLAIM** where in the opinion of the Underwriters, their liability under this Policy is likely to be involved or when the **SELF INSURED RETENTION** has been exhausted; in which case the **ASSURED** and Underwriters shall co-operate to the mutual advantage of both. In all other circumstances, Underwriters will have the right, but not the obligation, to assume charge of the defense of any claim or suit relative to an **OCCURRENCE** or **CLAIM** at its own expense.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

**ENDORSEMENT attaching to and forming part of Policy No.** PK1021618

**NAMED ASSURED:** City of Trenton, NJ

**Effective date of this endorsement:** 01 March 2018

**Authority Ref. No:** B0356JA281N18

The **ASSURED** shall make no commitment to pay or settle any **CLAIMS, OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is involved without the prior written agreement of Underwriters. Underwriters shall not withhold agreement without just cause. Neither shall the **ASSURED** refuse any reasonable opportunity to pay or settle a claim when such refusal will result in Underwriters having liability under this Policy without the prior agreement of Underwriters. Underwriters shall not withhold agreement without just cause. If the **ASSURED** refuses to consent to settlement of any **CLAIMS, OCCURRENCES** or **SUITS** where Underwriters liability under this Policy is potentially involved, and settlement or compromise is recommended by Underwriters and acceptable to the claimant, then calculation of, and Underwriters obligation under **ULTIMATE NET LOSS** with respect to the **CLAIMS, OCCURRENCES** or **SUITS** shall be limited to the amount of damages or payments for which the **CLAIMS, OCCURRENCES** or **SUITS** could have been settled for, plus any expenses payable under **ULTIMATE NET LOSS** incurred until the date of the **ASSURED'S** refusal to settle or compromise the **CLAIMS, OCCURRENCES** or **SUITS** as recommended by Underwriters.

It is also understood and agreed that **General Policy Condition 21. THIRD PARTY CLAIMS ADMINISTRATOR** is amended to read as follows:

21.   **THIRD PARTY CLAIMS ADMINISTRATOR:** It is a condition precedent that this Policy is issued by Underwriters on the express condition that:

(a)   The **NAMED ASSURED** must contract with, and utilize the services of, a duly qualified and competent **THIRD PARTY CLAIMS ADMINISTRATOR**, as agreed upon by Underwriters prior to the **PERIOD OF INSURANCE**; and

(b)   All **CLAIMS**, **SUITS** or **OCCURRENCES** for which coverage is sought under this Policy must be adjusted and handled by the contracted **THIRD PARTY CLAIMS ADMINISTRATOR**; and

(c)   The duties involved in adjusting and handling **CLAIMS**, **SUITS** or **OCCURRENCES** by the **THIRD PARTY CLAIMS ADMINISTRATOR** include but are not limited to, timely investigations, setting ground-up case reserves, documenting case reserve rationale, pursuing settlement and recording financials; and

(d)   All **CLAIMS**, **SUITS** or **OCCURRENCES** for which coverage is sought under this Policy are adjusted and handled by the **THIRD PARTY CLAIMS ADMINISTRATOR** in accordance with all statutory and regulatory standards, all accepted industry standards and practices and the Brit Global Specialty USA Third Party Claims Administrator Claims Handling Guidelines.

Underwriters or their representative shall have the right but not the duty to conduct audits and inspections of the **CLAIMS, SUITS or OCCURRENCES** reported to the **THIRD PARTY CLAIMS ADMINISTRATOR** to better inform Underwriters of the potential liability under this Policy. The **THIRD PARTY CLAIMS ADMINISTRATOR** will cooperate should the audit or inspection be requested.

The **NAMED ASSURED**, through the **THIRD PARTY CLAIMS ADMINISTRATOR**, may utilize the services of an attorney or lawyer or other specialized party to assist the **THIRD PARTY CLAIMS ADMINISTRATOR** in the disposition of its duties, and defend an **ASSURED**; but only provided that:

**ENDORSEMENT attaching to and forming part of Policy No.** PK1021618

**NAMED ASSURED:** City of Trenton, NJ

**Effective date of this endorsement:** 01 March 2018

**Authority Ref. No:** B0356JA281N18

(a) The **THIRD PARTY CLAIMS ADMINISTRATOR** retains control of the adjusting process, reserving, settlement activity and documentation of the claims financials including erosion of the **SELF INSURED RETENTION** and;

(b) The **THIRD PARTY CLAIMS ADMINISTRATOR** continues to monitor the actions of these other parties; and

(c) Any control of the adjusting process designated to parties other than the **THIRD PARTY CLAIMS ADMINISTRATOR** or an attorney or lawyer hired or employed by the **NAMED ASSURED** must be approved by Underwriters in writing in advance; and

(d) Any control of the adjusting process retained by the **NAMED ASSURED** (i.e. "self-administering **CLAIMS**") must be approved by Underwriters in writing in advance; and

(e) Payment to these other parties shall be subject to all other terms and conditions of the Policy; specifically, but not limited to, **General Policy Condition 11. Duties** and **General Policy Definition 30. ULTIMATE NET LOSS**.

(f) Further, this Policy of insurance is issued by Underwriters on the express condition that all **CLAIMS, SUITS** or **OCCURRENCES,** for which coverage is sought under this Policy and which are being defended by the **THIRD PARTY CLAIMS ADMINISTRATOR** or an attorney or lawyer hired or employed by the **NAMED ASSURED,** are defended by the attorney or lawyer in accordance with all statutory and regulatory standards; and in accordance with all accepted professional standards and practices.

In the event of cancellation, expiration or revision of the agreement between the **NAMED ASSURED** and the designated **THIRD PARTY CLAIM ADMINISTRATOR,** the **NAMED ASSURED** must notify Underwriters in writing sixty (60) days prior to the effective date of such cancellation, expiration or revision, and the **NAMED ASSURED** and Underwriters must agree upon the specifications for the new **THIRD PARTY CLAIMS ADMINISTRATOR** or the revision of the incumbent **THIRD PARTY CLAIMS ADMINISTRATOR'S** agreement with the **NAMED ASSURED**.

If the agreement between **NAMED ASSURED** and the **THIRD PARTY CLAIM ADMINISTRATOR** is terminated for any reason without Underwriters prior written approval, Underwriters reserve the right to deny coverage under this policy for any **CLAIMS** or **OCCURRENCES** reported to Underwriters after the termination date of the **ASSURED'S** agreement with the **THIRD PARTY CLAIMS ADMINISTRATOR.**

These conditions shall survive the termination of this policy without regard to whether said termination is due to cancellation or natural expiration of this policy.

ENDORSEMENT attaching to and forming part of Policy No.   PK1021618

**NAMED ASSURED:**  City of Trenton, NJ

**Effective date of this endorsement:**  01 March 2018

**Authority Ref. No:** B0356JA281N18

Endorsement No. 8

## PROCEDURES FOR THIRD PARTY CLAIMS ADMINISTRATORS

As per **General Policy Condition 21. THIRD PARTY CLAIMS ADMINISTRATOR**, the **NAMED ASSURED** must contract with, and utilize the services of, a duly qualified and competent **THIRD PARTY CLAIM ADMINISTRATOR**, as agreed upon by the Underwriters prior to the **PERIOD OF INSURANCE.**

In the event of cancellation, expiration or revision of the agreement between the **NAMED ASSURED** and CRC, the **NAMED ASSURED** must notify Underwriters in writing sixty (60) days prior to the effective date of such cancellation, expiration or revision, and the **NAMED ASSURED** and Underwriters must agree upon the specifications for the new **THIRD PARTY CLAIMS ADMINISTRATOR** or the revision of the incumbent **THIRD PARTY CLAIMS ADMINISTRATOR'S** agreement with the **NAMED ASSURED**.

If the agreement between **NAMED ASSURED** and the **THIRD PARTY CLAIMS ADMINISTRATOR** is terminated for any reason without Underwriters prior written approval, Underwriters reserve the right to deny coverage under this policy for any **CLAIM** or **OCCURRENCES** reported to Underwriters after the termination date of the **ASSURED'S** agreement with the **THIRD PARTY CLAIMS ADMINISTRATOR.**

As such, the **NAMED ASSURED'S THIRD PARTY CLAIM ADMINISTRATOR** is:

CRC

## QUARTERLY LOSS REPORTING

The **NAMED ASSURED** shall, by and through its **THIRD PARTY CLAIMS ADMINISTRATOR** provide the Underwriters or their Representatives, no later than the 45th day after the end of each calendar quarter or upon the Underwriters' request, whichever is earlier, a current Loss Run listing all ground up **CLAIMS, SUITS** or **OCCURRENCES**.   The Underwriters may contact the **THIRD PARTY CLAIMS ADMINISTRATOR** to facilitate ground up Loss Run reporting.  The Underwriters may request the **THIRD PARTY CLAIMS ADMINISTRATOR** assist in the transmission of such electronically.  The **THIRD PARTY CLAIMS ADMINISTRATOR** will cooperate provided no significant development costs are incurred in performing electronic reporting or if the Underwriters agree to incur the development costs on behalf of the **THIRD PARTY CLAIMS ADMINISTRATOR.**  This reporting obligation continues until ninety (90) days after all **CLAIMS, SUITS** or **OCCURRENCES** are handled to their conclusion.

Case 3:24-cv-13622-ZNQ-JBD Document 76-1 Filed 02/27/24 Page 240 of 240 PageID: 1459
Case 3:24-cv-13622-ZNQ-JBD Document 76-1 Filed 02/27/24 Page 115 of 137 PageID: 664

**ENDORSEMENT attaching to and forming part of Policy No.**  PK1021618

**NAMED ASSURED:**  City of Trenton, NJ

**Effective date of this endorsement:**  01 March 2018

**Authority Ref. No:** B0356JA281N18

### ADDITIONAL CONDITIONS FOR ASSUREDS WITH EXCESS LOSS FUND PROTECTION

If Excess **LOSS FUND** Protection is provided under this Policy, the **NAMED ASSURED** shall, by and through the **THIRD PARTY CLAIMS ADMINISTRATOR** provide the Underwriters or their Representatives, no later than the 45th day after the end of each calendar quarter or upon the Underwriters' request, whichever is earlier, a current Loss Run listing all ground up **CLAIMS, SUITS** or **OCCURRENCES** and a corresponding **LOSS FUND** Report in a previously agreed format so that Underwriters may assess their potential exposure based on **CLAIMS, SUITS** or **OCCURRENCES** with respect to aggregate **LOSS FUND** erosion.   This reporting obligation continues until ninety (90) days after all **CLAIMS, SUITS** or **OCCURRENCES** are handled to their conclusion.  The quarterly Loss Run and **LOSS FUND** Report are to be sent to: Claims.lossruns@britinsurance.com or as directed by the Underwriters.

Once the **LOSS FUND** erosion reaches 50% of the attachment point on an incurred basis, the Underwriters or their Representatives reserve the right to audit all **CLAIMS, SUITS** or **OCCURRENCES** with respect to aggregate **LOSS FUND** erosion. The **NAMED ASSURED** shall, by and through its **THIRD PARTY CLAIMS ADMINISTRATOR** cooperate and facilitate this process.

These conditions shall survive the termination of this Policy without regard to whether said termination is due to cancellation or natural expiration of this Policy.

Except as amended in this Endorsement, this insurance is subject to all coverage terms, clauses and conditions in the policy to which this Endorsement is attached.

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TYSHON EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:20-CV-13552 |
| | ) | |
| v. | ) | **DECLARATION OF DAVID KOURY** |
| | ) | |
| CITY OF TRENTON, MICHAEL | ) | |
| TILTON, JOHNATHON CINCILLA, | ) | |
| NICHOLAS MAHAN, ERIC AVALOS, | ) | |
| ANTHONY KUBISH, and JOHN DOES 1- | ) | |
| 8, | ) | |
| | ) | |
| Defendants. | ) | |

I David L. Koury, Esq., being duly sworn and deposed, upon personal knowledge, state as follows:

1.     I am a partner of the law firm BatesCarey LLP, and I represent Certain Underwriters at Lloyd's, London that Subscribe to Policy No. PK1021618 ("Underwriters") as coverage counsel.

2.     Policy No. PK1021618 (the "Policy") issued to the City of Trenton, NJ has a limit of liability for the Law Enforcement Liability Coverage Section (Section VIII) of $3,000,000 each **OCCURRENCE**,[1] and $6,000,000 Annual Aggregate of Liability, subject to a $500,000 **SELF INSURED RETENTION**, and a $500,000 Corridor Retention pursuant to Endorsement No. 6 to the Policy. The Policy does not impose a duty to defend on Underwriters, only a duty to indemnify.

3.     On January 13, 2023, Underwriters issued a supplemental coverage position letter to CRC, the City's **THIRD PARTY ADMINISTRATOR**, reserving rights with respect to certain

---

[1]    Terms in bold are defined in the Policy.

terms and conditions of the Policy that might limit or preclude coverage for the City in relation to the Lawsuit, including Exclusion B. of the Law Enforcement Liability Coverage Section, which generally precludes coverage under the Policy for any "knowing and intentional violation" of §1983. However, the January 13, 2023 letter was not a denial of coverage, as Underwriters made clear in the letter that "any duty of Underwriters to indemnify the City for the **ULTIMATE NET LOSS**, if at all, may arise only upon resolution of the litigation," and asked that the City keep Underwriters apprised of all developments in the Lawsuit. A true and correct copy of the January 13, 2023 letter is attached to the Certification of J. Brooks DiDonato (Doc. 70-1) as *Exhibit "C"*.

4.    After Underwriters issued its January 13, 2023 coverage position letter, Mr. DiDonato sent me an email dated February 16, 2023 wherein Mr. DiDonato stated that: "I understand that all discussions of settlement are subject to a reservation of rights. I also understand that there is a 500K SIR and a 500K corridor SIR, meaning there is essentially a $1,000,000 SIR for this case." A true and correct copy of Mr. DiDonato's February 16, 2023, email is attached hereto as **Exhibit 1**.

5.    On July 17, 2023, on the eve of a settlement conference set by this Court for July 18, 2023, Mr. DiDonato asserted for the first time to Underwriters that the Corridor Retention (*i.e.*, the "corridor SIR" as referred to by Mr. DiDonato) did not apply, and that Underwriters had "denied coverage" and acted in "bad faith." A true and correct copy of Mr. DiDonato's July 17, 2023, email is attached hereto as **Exhibit 2**.

6.    I attended the July 18, 2023 settlement conference before this Court on Underwriters' behalf, and Underwriters participated in the settlement conference in good faith in order to attempt to negotiate a resolution of the Lawsuit. I specifically disclosed to the Court and Mr. DiDonato that Underwriters had given me authority to contribute to a settlement if a reasonable

agreement could be reached by the parties during the settlement conference. However, the matter did not resolve at the July 18, 2023 settlement conference.

7.    I continued to participate in discussions regarding potential settlement of the Lawsuit with the City and Mr. DiDonato following the July 18, 2023 settlement conference. Despite Mr. DiDonato's representations, Underwriters never stated that it would not contribute towards a settlement of the Lawsuit. Instead, consistent with Underwriters' previous representations to Mr. DiDonato and the City, Underwriters took the position during those conversations that a $500,000 SIR and a $500,000 Corridor Retention applied to the Policy, and that Underwriters would only contribute to a settlement above any remaining portion of the $500,000 SIR and $500,000 Corridor Retention that had not been exhausted by the City. In response to Underwriters' position, Mr. DiDonato kept taking the incorrect position that the $500,000 Corridor Retention should not apply in relation to the Lawsuit, and refused to discuss any settlement involving Underwriters that would require any further payments by the City to meet its obligation to fund $500,000 under the Corridor Retention. Rather, Mr. DiDonato at one point instructed Underwriters to negotiate directly with Plaintiff instead of communicating with him, despite the fact that it was the City's and the **ASSUREDS**' duty to handle, adjust, settle and defend the Lawsuit – not Underwriters – pursuant to Paragraph 11 of the General Policy Conditions of the Policy.

8.    On July 20, 2023, Mr. DiDonato sent an email to me noting that the $500,000 Corridor Retention for the Policy had "been satisfied" by the "Art All Night shooting cases." A true and correct copy of the July 20, 2023 email is attached to Mr. DiDonato's Certification (Doc. 70-1) as *Exhibit "D"*. I explained during subsequent conversations with Mr. DiDonato after his

July 20, 2023 email that CRC had confirmed that the $500,000 Corridor Retention had not been exhausted, and that the Corridor Retention continued to apply with respect to the Policy.

9.      After Underwriters were informed in a report sent by CRC to Underwriters dated January 4, 2024, that the City intended to enter into a settlement with Plaintiff for an amount above any remaining amount within the Policy's $500,000 SIR, I sent an email to Mr. DiDonato dated January 9, 2024 asking to discuss the Lawsuit, and noted in a subsequent email exchanged with Mr. DiDonato that same day that: "there are coverage issues to be discussed and sorted out in connection with this claim and the indemnity-only nature of the policy.  I believe that you and I speaking first offers the best chance of working something out."  A true and correct copy of my January 9, 2024 email exchange with Mr. DiDonato is attached hereto as **Exhibit 3**.

10.     The report from CRC dated January 4, 2024 confirmed the remaining SIR under the Policy as of that date was $442,597.96.

11.     The City appears to have entered into a settlement agreement, along with a proposed Consent Judgment that would be presented to the Court for entry, on or around January 26, 2024.

12.     Prior to entering into the settlement agreement, the City did not seek Underwriters' written agreement to resolve the Lawsuit, as required under Paragraph 7 of the General Policy Conditions to the Policy, as amended by Endorsement No. 7.  The settlement agreement was entered into by Plaintiff and the City without Underwriters' consent.

13.     Underwriters was also not asked to consent to the City assigning any rights to Plaintiff under the Policy, as required for any assignment to bind Underwriters under Paragraph 3 of the General Policy Conditions to the Policy.

4

I declare under penalty of perjury under the laws of the United States of America and the State of Illinois that the foregoing is true and correct.

Executed this 26th day of February, 2024, in Chicago, Illinois.

By:    _/s/David L. Koury_____

# Exhibit 1

**Rohrer, Adrian T.**

---

**Subject:** Tyshon Edwardsv COT

---

**From:** Brooks DiDonato <bdidonato@parkermccay.com>
**Sent:** Thursday, February 16, 2023 3:10 PM
**To:** Koury, David L. <dkoury@BatesCarey.com>
**Cc:** Wesley Bridges <wbridges@trentonnj.org>; Jose Abo <JAbo@crctpa.com>; Rashaan S. Williams <rswilliams@trentonnj.org>; Charles Simmons <csimmons@simmonslaw-llc.com>; Marc Board <Marc.Board@rsml.co.uk>; Elizabeth Frink <ejames@trentonnj.org>; Loretta Shaw <lshaw@parkermccay.com>
**Subject:** RE: Tyshon Edwardsv COT

David,

I understand that all discussions of settlement are subject to a reservation of rights.
I also understand that there is a 500K SIR and a 500K corridor SIR, meaning there is essentially a $1,000,000 SIR for this case.
I also understand that as pre the policy language and common practice, the company will count all attorney's fees and costs against the SIR, thereby "eroding it".

The highlighted section below is what I need clarification on.
The Magistrate's "number" for settlement purposes is $850,000, which is below what the demand currently is (1.2MM).
I am going to determine what the total fees and costs incurred by the City to date are (Elizabeth, help).
I will let you know what that number is.

What I will then need to know is what the Carrier's position is with respect to "contributing" towards satisfaction of the remaining SIR or towards settlement directly.
Assuming that the cold that kept me home the last day and a half does not worsen again I will be available all day tomorrow (Friday) to discuss.
We need to get down to the nitty gritty and find out if this case can be settled and to do that I need to know exactly what role, if any, the carrier is willing to play in that.

Elizabeth, please get me a total for all fees and costs paid by the city to counsel.
Charles please let me know what, if anything, you have that is billed, but not yet paid.
Loretta please let me know what we have in terms of billed, unbilled and actually paid.

Thank you,

**Brooks DiDonato, Esquire**
*Shareholder*
**Defense Litigation**

**PARKER McCAY P.A.**

O: 856-985-4047

C: 856-296-1143

bdidonato@parkermccay.com

**From:** Koury, David L. <dkoury@BatesCarey.com>
**Sent:** Wednesday, February 15, 2023 9:20 PM
**To:** Brooks DiDonato <bdidonato@parkermccay.com>
**Cc:** Wesley Bridges <wbridges@trentonnj.org>; Jose Abo <JAbo@crctpa.com>; Rashaan S. Williams
<rswilliams@trentonnj.org>; Charles Simmons <csimmons@simmonslaw-llc.com>; Marc Board
<Marc.Board@rsml.co.uk>
**Subject:** RE: Tyshon Edwardsv COT

==*** External Email – This email has come from outside of Parker McCay. Think before you click on
links, open attachments, or reply! ***==

**Privileged and Confidential Settlement Communication**
**Subject to FRE 408 and any Other Applicable Privileges**

Hi Brooks,

As you note, we sent two letters out on January 13, 2023.  A supplemental coverage position letter and a "settlement"
letter.  With respect to the coverage position letter, Underwriters note that they do not believe they owe a duty to defend or
indemnify based on the current allegations, pursuant to the application of the Policy provisions outlined in the
letter.  Moreover, even if there were a duty to indemnify, the Policy's $500,000 SIR and $500,000 corridor retention (we
note that the corridor retention only applies to a covered claim, and in this case, would not off-set a global settlement)
would both have to be satisfied before Underwriters would agree to contribute anything.

With respect to the separate "settlement" letter, Underwriters note that, despite there not being a covered claim at present,
Underwriters are still willing to work with the City on resolving the matter, so long as the coverage issues are taken into
account.  As noted in the letter, Underwriters are willing to consider defense fees incurred to date counting towards the
erosion of the Policy's $500,000 SIR.  ==Underwriters are also willing to count a certain percentage of a settlement amount
up to $1,000,000, towards the erosion of the remaining SIR.==

Please let us know if you have any further questions or wish to set up a call to discuss.

Regards,
Dave

**David L. Koury** | Partner
BatesCarey LLP | 191 N. Wacker, Suite 2400, Chicago, IL 60606
Direct 312.762.3226 | dkoury@batescarey.com | batescarey.com



**From:** Brooks DiDonato <bdidonato@parkermccay.com>
**Sent:** Wednesday, February 15, 2023 1:16 PM
**To:** Koury, David L. <dkoury@BatesCarey.com>
**Cc:** Wesley Bridges <wbridges@trentonnj.org>; Jose Abo <JAbo@crctpa.com>; Rashaan S. Williams
<rswilliams@trentonnj.org>; Charles Simmons <csimmons@simmonslaw-llc.com>; Marc Board
<Marc.Board@rsml.co.uk>
**Subject:** Tyshon Edwardsv COT

David,

A while back the City's TPA received two letters from your client re coverage in the above matter that were sent nearly simultaneously. Strangely, one copied only me while the other copied a number of people. One of the letters indicated the carrier would not expend any sums until and unless COT expended the entirety of a $1,000,000 SIR, comprised of the base SIR and a Corridor SIR each of which was $500,000. The other letter suggested there was only a single $500,000 that your client was willing to reduce by $250,000 due to some difference in opinion as to whether the SIR (up to 1MM) had been satisfied.

Can you supply some clarification as to the excess carrier's position here?
Settlement is being pushed by both the court and counsel and until we resolve this issue we cannot move forward.

I will look forward to hearing from you.

Thanks,

**Brooks DiDonato, Esquire**
*Shareholder*
**Defense Litigation**



O: 856-985-4047
C: 856-296-1143
bdidonato@parkermccay.com
**PARKER McCAY P.A.**
9000 Midlantic Drive, Suite 300
Mount Laurel, NJ 08054
P: 856-596-8900  F: 856-596-9631
www.parkermccay.com



This e-mail message from the law firm of Parker McCay P.A. is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

This email and any files transmitted with it may contain confidential and/or privileged information which is intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender, and delete this email from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.

This e-mail message from the law firm of Parker McCay P.A. is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If

you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# Exhibit 2

## Rohrer, Adrian T.

---

**From:** J. Brooks DiDonato <bdidonato@parkermccay.com>
**Sent:** Monday, July 17, 2023 10:40 AM
**To:** Koury, David L. <dkoury@BatesCarey.com>
**Cc:** Wesley Bridges <wbridges@trentonnj.org>
**Subject:** Tyshon Edwards

David,

You had also requested some time ago that I provide you with our position on coverage.

I would say that there are several issues that might well apply to create a need for the excess carrier to contribute to a settlement in a significant fashion if it to satisfy its duty to act in Good Faith towards its insured (Trenton and its employees).

First, I have real questions as to whether the "corridor SIR" referenced in the policy is identified and defined in such a way as to put the insured on notice of its existence and explain exactly how it functions.

Second, the excess carrier's position on coverage has been inconsistent and confusing in this matter.
For instance, a letter was at one point sent which essentially denied any coverage under the policy despite the fact that there is clearly coverage.
It cited the alleged intentional actions of the officers, despite the fact that such allegations are a part of virtually every 1983 case and the exact reason the coverage was taken out in the first place.
That same day it sent another letter that partly refuted that exact stance and was inherently inconsistent in saying the corridor SIR did not apply as it only applied to covered claims, but then said that the underlying SIR did apply and laid out a proposed method of applying it here.
A construction that was convoluted, confusing and wholly inconsistent with both the earlier letter sent that day and itself.

So, our position is that the carrier has acted in bad faith from the inception of the claim and taken every opportunity to come up with multiple inconsistent reasons why it should not pay the claim or some portion thereof.
IF we have to bring a coverage claim we will aggressively pursue discovery on these issues, not just with respect to this claim, but all of its claims and claims handling practices.
I am sure these same issues have come up in the past and it is the carrier's duty to make sure the policy is clear and unambiguous and that it acts consistent with same.

So our position it is that pursuant to your client's own admission, the corridor SIR does not apply, and also because the language re same is both buried in the policy and extremely confusing.
Further, while the base level SIR does apply, it is reduced dollar for dollar by both the funds that were spent in defending the case and then applies once the remainder is exhausted, which would mean it works as I had previously pointed out to you (in the settling at 850 number) previously laid out to you.

Thank you,


**J. Brooks DiDonato, Esquire (He/Him/His)**

1

*Shareholder*
**Defense Litigation**



O: 856-985-4047
C: 856-296-1143
bdidonato@parkermccay.com

**PARKER McCAY P.A.**
9000 Midlantic Drive, Suite 300
Mount Laurel, NJ 08054
P: 856-596-8900  F: 856-596-9631
www.parkermccay.com



---

This e-mail message from the law firm of Parker McCay P.A. is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

# EXHIBIT E

Case 3:24-cv-05522-DEA Document 7-5 Filed 02/06/24 Page 42 of Page ID 680
PageID: 680

https://www.communitynews.org/towns/hamilton-post/hamilton-township-settles-wrongful-arrest-arrest-lawsuit-for-almost-1-million/article_e5809e42-59ff-5e8b-b0e4-8c5d0c53256d.html

## Hamilton Township settles wrongful arrest arrest lawsuit for almost $1 million

By Bill Sanservino
Apr 7, 2020



The township agreed Feb. 3 to a $950,000 settlement with 22-year-old Michael Lionelli, according to his attorney, Thomas J. Mallon of Freehold.

Lionelli had been charged in association with the 2016 armed robbery of a CVS Pharmacy—charges that were later dropped by the Mercer County Prosecutor's Office due to a lack of evidence.

"We can confirm, after years of litigation, this case was settled on the advice of our attorneys," said Bianca Jerez, chief of staff for Hamilton Mayor Jeff Martin. The lawsuit was filed in March 2018, during the administration of former Mayor Kelly Yaede.

The township and Hamilton Police Department offered no further comment on the settlement. The department admitted no wrongdoing in settling the suit.

Lionelli's ordeal started when he and two juveniles were stopped by Lawrence Township Police. The car he was driving matched the description of a vehicle that Hamilton was seeking in association with a robbery that took place earlier that evening.

In that incident, an employee of the CVS located at the intersection of Route 33 and Whitehorse Avenue said that the store had been robbed by a mask-wearing white male brandishing a handgun.

During the stop, Lawrence Police had found a CVS Pharmacy shirt in a duffel bag inside Lionelli's vehicle. He was also charged with possession on marijuana as a result of the stop.

Hamilton Police considered Lionelli and the juveniles—a 17-year-old Hamilton male and a 16-year-old Lawrence female—to be suspects in the CVS robbery. They transported the robbery victim to the location where Lionelli had been stopped in Lawrence.

"The victim was unable to identify Lionelli as the person who committed the robbery; however, an officer wrote a report which stated that a positive identification had occurred," Mallon said.

He said that Hamilton Police also relied on shoe prints left in the snow at the scene by the alleged robber. A N.J. State Police Analyst later confirmed the shoes were not a match to the shoes Lionelli wore at the time of his arrest.

Case 3:22-cv-06522-MAS Document 7-5 Filed 02/08/24 Page 4 of 6 PageID: 682

According to Mallon, Lionelli was implicated in the robbery by the two juveniles after interrogation, but "the Mercer County Prosecutor's Office declined to prosecute Lionelli because of coercive techniques that were used during the recorded interviews."

"These kids initially told police detectives that they knew nothing about a robbery," Mallon said. "The officers then spoon-fed them the narrative they wanted to hear and threatened the juveniles with immediate juvenile detention. They were also told they would be prosecuted as adults if they did not tell the officers the story that the officers wanted to hear."

The two juveniles later recanted. Both were charged as accomplices, but the charges were dismissed 6 months later.

Lionelli was charged by Hamilton with robbery, possession of a weapon for an unlawful purpose, unlawful possession of a weapon, and use of a juvenile to commit a crime.

"Lionelli's charges lingered for 25 months," Mallon said. "He was facing a 20 year prison sentence if he had been convicted and would not have been eligible for parole for 85% of that time."

He added that the Hamilton Police Department never turned the footprint analysis, which exonerated Lionelli, over to Mercer County Prosecutor's Office.

He alleged: "They fabricated evidence to support their complaint and made Lionelli's life miserable for 25 months until the charges were finally dismissed, and he now experiences post-traumatic stress disorder."

The attorney outlined a number of ways that the arrest allegedly impacted Lionetti's life.

He said that his client was not permitted to complete his senior year at Hamilton West High School. He spent 11 days in jail, and even though his bail was reduced from $250,000 to $125,000, his parents had to pay a nonrefundable $12,500 fee to a bail bondsman to get him released.

His college career was delayed by 2 years while the charges were pending.

"The Hamilton Police publicized Michael Lionelli's arrest in a local newspaper causing him to suffer incredible public humiliation" Mallon said. "They ignored very obvious evidence that Michael was not the robber. They rushed to judgment twisting facts, fabricating evidence and lying about evidence in their reports.

"They withheld evidence that would clearly have exonerated a young man who was only 18 at the time of his arrest. They have never apologized or admitted to any wrongdoing. Michael and his parents hope they learn a lesson from this so it does not happen again to somebody else."

Lionelli's lawsuit alleged fabrication of evidence by the Hamilton Police, false arrest, violation of the N.J. Civil Rights Act and false imprisonment. He was seeking compensatory and punitive damages and a trial by jury.

The suit also alleged that Hamilton Officer Peter Frascella fabricated evidence by saying that CVS had identified Lionelli as the perpetrator of the robbery.

"We want to set the record straight at this point," Mallon said. "At this point in time Mr. Lionelli is getting on with his life, going to college trying to put all of this behind him."

**Bill Sanservino**

## <u>CERTIFICATE OF SERVICE</u>

I, Brian H. Leinhauser, Esquire, hereby certify that on this 26th day of February, 2024, a copy of the foregoing was served upon the following via ECF notification:

Jeffrey L. Nash, Esquire
Cozen & O'Connor
Libertyview Building – Suite 300
457 Haddonfield Road
P.O. Box 5459
Cherry Hill, NJ 08002-2220
*Attorney for Plaintiff*

John S. Stapleton, Esquire
Levan Stapleton Segal Cochran LLC
Four Greentree Centre
601 Route 73 N, Suite 303
Marlton, NJ 08053
*Attorney for Plaintiff*

Rashaan Sharif Williams, Esquire
City of Trenton
319 East State Street
Trenton, NJ 08611
*Attorney for Defendant, City of Trenton*

Charles R.G. Simmons, Esquire
Simmons Law LLC
28 Washington Street
Suite 104
East Orange, NJ 07717
*Attorney for Defendant, Michael Tilton*

J. Brooks Didonato, Esquire
Parker, Mc Cay
9000 Midlantic Drive
Suite 300
P.O. Box 5054
Mount Laurel, NJ 08054
*Attorney for Defendants Cincilla, Mahan, Avalos and Kubish*

**MacMAIN LEINHAUSER PC**

Date: <u>February 26, 2024</u>          By:     <u>*/s/ Brian H. Leinhauser*</u>
Brian H. Leinhauser
Attorney I.D. No. 038102006
433 W. Market Street, Suite 200
West Chester, PA 19382
*Attorney for Intervenor*